1

```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA      :      13-CR-220 (RJD)

     -against-                       U.S. Courthouse
                              :
                                     Brooklyn, New York

BEBARS BASLAN

              Defendant       :
                                     June 24, 2014
- - - - - - - - - - - - - - - X      10:00 a.m.


BEFORE:
          HONORABLE RAYMOND J. DEARIE
          United States District Judge


APPEARANCES:

For the Government:      LORETTA E. LYNCH
                         United States Attorney
                         271 Cadman Plaza East
                         Brooklyn, New York 11201
                         BY:  TIANA A. DEMAS
                              TYLER JOSEPH SMITH
                              Assistant U.S. Attorneys
                                   and
                              Hannah Kirshner
                              Danielle Munoz
                              Interns




For the Defendant:       EPHRAIM SAVITT
                         260 Madison Avenue
                         22nd Floor
                         New York, New York 10016
                              and
                         Tamara Podgorskaya
                         Paralegal
```

2

Court Reporter:          RONALD E. TOLKIN, RPR, RMR, CRR
                         Official Court Reporter
                         225 Cadman Plaza East
                         Brooklyn, New York 11201
                         718-613-2647

                         ***

THE CLERK:  We are on this morning for a suppression hearing.  This is U.S.A. versus Baslan.  Docket number 13-CR-220.  Mr. Baslan is defendant number one.

          Can I ask the attorneys, please, to note their appearance, beginning with counsel for the government.

          MS. DEMAS:  Good morning, Your Honor.

          For the government Tiana Demas and Tyler Smith. With us are two summer interns, Hannah Kirshner and Danielle Munoz.

          MR. SAVITT:  Good morning, Your Honor.

          Ephraim Savitt for Mr. Baslan.  With me is Tamara Podgorskaya.  She is a paralegal and she is here free of charge to the court, Your Honor.

          THE COURT:  Good morning, Mr. Savitt, and your colleague.

          MR. SAVITT:  Good morning.

          THE COURT:  We are here to conduct a brief evidentiary hearing on one of the defendant's motions. Specifically, a motion to suppress statements he made post arrest to agents of the FBI.

SPIVACK-DIRECT-DEMAS                                    3

1          As I understand it, having read Mr. Baslan's

2    affidavit, there is no issue whether he was given a warning,

3    whether they were adequate, or, for that manner, whether he

4    waived his Miranda warning.

5          As I understand, it the issue is whether the agent

6    induced his comments by threatening him to expose him as a

7    child molester post-arrest, and to leak the accusation to the

8    press.

9          Does that fairly summarize the subject of this

10   morning's hearing?

11          MR. SAVITT:  It does, Your Honor.

12          THE COURT:  I take it we're going to hear from Agent

13   Spivack.

14          MS. DEMAS:  Yes, Your Honor.

15          THE COURT:  All right.  Let's proceed.

16          MS. DEMAS:  The government calls Special Agent Aaron

17   Spivack.

18          A A R O N   E.   S P I V A C K

19          called as a witness, having been first

20          duly sworn, was examined and testified

21          as follows:

22          THE CLERK:  Please have a seat.  State and spell

23   your name for the record.

24          THE WITNESS:  Aaron Spivack.

25          A-A-R-O-N   S-P-I-V-A-C-K.

SPIVACK-DIRECT-DEMAS                                    4

1          THE COURT:  Can I satisfy my curiosity, Mr. Spivack?

2          THE WITNESS:  Sir.

3          THE COURT:  I think I heard your testimony in the

4    hearing in another case, is that correct?

5          THE WITNESS:  That is correct, sir.

6          THE COURT:  Please continue.

7    DIRECT EXAMINATION

8    BY MS. DEMAS:

9    Q    Who do you work for?

10   A    I work for the Federal Bureau of Investigation.

11   Q    What is your title?

12   A    I am a special agent.

13   Q    How long have you been a special agent for the FBI?

14   A    Approximately five and a half years.

15   Q    What did you do before that for work?

16   A    I was an intelligence analyst for the FBI.

17   Q    How long were you an intelligence analyst?

18   A    Approximately two to two and a half years.

19   Q    Prior to becoming an intelligence with the FBI, what did

20   you do?

21   A    I was a U.S. Marine.

22   Q    Did you serve overseas?

23   A    Yes, ma'am.  I did.

24   Q    Where?

25   A    I served a couple of tours in Iraq.  Western Pacific

1   tour.  And a your of Saudi Arabia.

2   Q    Is there a specific group or section of the FBI that you

3   work for?

4   A    Yes, ma'am, there is.

5   Q    What section is that?

6   A    The violent crime division, the violent crimes against

7   children squad.

8   Q    What violation or crimes does the violence against

9   children squad investigate?

10  A    Our squad's charged to investigate any crime pertaining

11  to the sexual exploitation of children.  That includes child

12  pornography.  That includes child enticement of child for sex,

13  child prostitution investigations, and kidnappings.

14  Q    How long have you been on this particular squad?

15  A    The squad's kind of morphed names and structure over the

16  last couple of years.  But in essence, I've been on the squad

17  since May of 2010, approximately; four years.

18  Q    Now, directing your attention to March 19, 2003 [sic],

19  did you arrest anybody that day?

20  A    2013, yes, ma'am.

21  Q    Who did you arrest?

22  A    Arrested Mr. Bebars Baslan and Ms. Kristin Henry.

23  Q    Where did you arrest those two individuals?

24  A    The arrest was affected at the Hyatt Hotel inn Jersey

25  City, New Jersey.

1    Q    What kind of arrest was it?

2    A    It was probable cause arrest.

3    Q    What is that?

4    A    It's an arrest based on probable cause without a charging

5    document such as an Information, Indictment or Complaint.

6    Q    Is there any particular reason you did not have an

7    Information, Complaint or an Indictment to effectuate the

8    arrest?

9    A    Yes, there is.

10   Q    What is that?

11   A    A number of the charges required that Mr. Baslan and

12   Ms. Henry travel to New Jersey, or travel to the particular

13   hotel where we had this sting operation set up to complete the

14   charges of attempted production of child pornography or

15   aggravated attempt abuse of a minor.

16   Q    How many arrests have you participated in over the course

17   of your career?

18   A    A hundred or so, give or take.

19   Q    In advance of Mr. Baslan's and Ms. Henry's arrest, did

20   you obtain any sort of search warrant?

21   A    Yes, ma'am.

22   Q    What did that search warrant authorize you to search and

23   seize?

24   A    I obtained a search warrant for the physical residence

25   belonging to Mr. Baslan and Ms. Henry in Brooklyn, New York.

1   That search warrant allowed us to search and seize any and all

2   items pertaining to child pornography, which includes

3   computers, computer paraphernalia, any kind of computer media.

4   The search warrant also authorized us to search and seize for

5   any drug or drug paraphernalia.

6   Q    Now, going back to the actual arrest of Mr. Baslan, where

7   within the hotel did the arrest take place?

8   A    The actual arrest was affected in one of the three rooms

9   that we rented or purchased for the evening.

10  Q    Can you give the Court a little bit of background as to

11  how this particular operation had been set up in advance?

12  A    Yes, ma'am.  We purchased three rooms.  Two rooms were

13  adjacent to each other and shared a doorway into each other.

14  And that was -- those were the rooms for our cooperator.  We

15  had a third room that was directly across from one of those

16  rooms where the agents and officers staged.  It's also where

17  we had a visual via a peephole of the cooperator's room.

18  Q    Why was the cooperator in the hotel?

19  A    Through discussions between the cooperator, Mr. Baslan,

20  Ms. Henry, a plan was devised to take children, young

21  children, specifically the nieces and children belonging to

22  the cooperator to the hotel that night to engage in sexually

23  explicit conduct with the children, as well as to videotape

24  and photographs these acts.

25  Q    Were the children really at the hotel that night?

1  A    No, ma'am, they were not.

2  Q    Now, would you explain to the Court how the actual arrest

3  of Mr. Baslan and Ms. Henry took place?

4  A    Yes, ma'am.  Earlier in the day, this particular day, the

5  cooperator had met with Mr. Baslan and Ms. Henry, which a

6  narcotic was provided to the cooperator to administer to his

7  children.  As well as a code which was discussed in which,

8  when the cooperator was at the hotel and had given the

9  narcotics to the children, he was to call Mr. Baslan, give him

10 this code and inform him that everything was good to go.

11       At that point, Mr. Baslan and Ms. Henry were en

12 route to the hotel.  We were present for the conversations

13 that took place on.  I had a surveillance team outside

14 Mr. Baslan and Ms. Henry's residence which observed Mr. Baslan

15 an Ms. Henry leaving the residence after this code was given.

16       I did not have the surveillance team follow them to

17 the city.  Rather, I had a surveillance team pick them up when

18 they got into New Jersey, in the vicinity of the hotel.

19       At that point, surveillance team observed

20 Mr. Baslan, Ms. Henry, valet their car, enter the hotel lobby.

21 And then I personally observed them as they got to the

22 threshold of the cooperator's door.  That door was opened and

23 Mr. Baslan, Ms. Henry, and the cooperator made their way into

24 the room, we affected the arrest.

25 Q    Backing up for a second, you mentioned narcotics.  What

1    were you talking about?

2    A    Talking about children's Benadryl.

3              THE COURT:  Is that a narcotic?

4              THE WITNESS:  In this context, we perceive it to be

5    a sleeping drug.

6              THE COURT:  All right.

7    Q    About how many law enforcement agents or officers were

8    present for the physical arrest of Mr. Baslan and Ms. Henry?

9    A    Approximately eight to ten in the room.

10   Q    At what time did the arrest, approximately, of Mr. Baslan

11   take place?

12   A    It was approximately between 9:00 and 9:30 in the

13   evening.

14   Q    Now, going back to where you left off about seeing

15   Mr. Baslan and Ms. Henry at the threshold of the cooperator

16   door, can you explain how they were actually physically

17   restrained, if they were?

18   A    Yes, ma'am.  Once the cooperator opened the door and

19   started to bring them into the room, I opened the door to our

20   staging area.  That's when the arrest team filed out and

21   immediately put hands on all three of the individuals;

22   Mr. Baslan, the cooperator, and Ms. Henry.  The three

23   individual were separated and promptly cuffed.

24             THE COURT:  Separated within the room or separate

25   places?

SPIVACK-DIRECT-DEMAS                                    10

1      THE WITNESS:  Yes, sir.  The cooperator was brought

2  to the bathroom.  Ms. Henry was brought over to the window --

3  a wall or a window, I think, on the opposite side of the room.

4  And then I was with Mr. Baslan.  We threw him on the bed kind

5  of in the middle of the room.

6  Q    When you went into the room behind Mr. Baslan and

7  Ms. Henry, did you have your weapon drawn?

8  A    Not at all.

9  Q    I believe you said there were a number of other agents

10 who went into that room to effectuate the arrest, is that

11 correct?

12 A    Yes.

13 Q    Did any of those other agents or officers have their

14 weapons drawn?

15 A    No.

16 Q    Why not?

17 A    There's several reasons.  First is a safety reason.  The

18 area in which the arrest was affected is a very narrow area.

19 This is, in law enforcement and military terms, known as a

20 fatal funnel.

21      THE COURT:  Fatal funnel?  That's a new one on me.

22 A    Fatal funnel, to describe it for the Court, is, basically

23 it's a narrow area in which, if an agent in the back, or even

24 in the middle of the stack, or even second in the stack, for

25 that matter, has to fire a round, the round is going forward

1   into the back -- presumably the backside of another officer or

2   agent.  It's a very dangerous area to have weapons done.  It

3   can be done.  It's done in high risk situations when there's a

4   reason to believe that the individuals are armed.

5            In this case, that was not the presumption by us.

6   We had no reason to believe that neither Ms. Henry or

7   Mr. Baslan were armed or dangerous.  In addition, there was

8   the cooperator.  We didn't want to endanger the cooperator.

9   We had a controlled setting.  We needed to enure that we

10  maintained control.

11           Lastly, the distance between Mr. Baslan, Ms. Henry,

12  the cooperator, and ourselves, the arrest team, was very

13  small.  And we were able to get to them in a very quick amount

14  of time and put our hands on them.  So there would have been

15  no need for it anyway.

16  Q    Do you recall the approximate size of the room where

17  Mr. Baslan and Ms. Henry were arrested?

18  A    Yes, ma'am.  It was the size of a normal standard hotel

19  room.  I don't recall if there were one or two beds in it, but

20  it was a standard room.

21  Q    Did you personally place Mr. Baslan under arrest?

22  A    Yes, ma'am, I did.

23  Q    How did you do this?

24  A    Mr. Baslan was on the bed.  I remember his hands were

25  underneath him.  Underneath his stomach, I believe, his chest.

1  Myself and another agent or officer pulled his hands out,

2  cuffed him up in the rear.  And then we administered what's

3  called a high risk search, which is basically just a search of

4  anywhere his hands could grab, to ensure that there was a

5  weapon or something of that effect in his waistband, we would

6  have caught it.  At that point, Mr. Baslan was then taken off

7  the bed and given a full search.

8  Q    Did you cuff Mr. Baslan?

9  A    Yes, ma'am.

10 Q    In the front or the rear?

11 A    The rear.

12 Q    So did you also arrest the cooperator or at least make it

13 appear as though you had?

14 A    Yes.

15 Q    Why did you do that?

16 A    Purpose of arresting the cooperator, and he was

17 handcuffed, and it was visual, was to convey that everybody

18 was arrested together.  It was a tactic we were using to

19 attempt to gain leverage during the interviews, making it seem

20 that everybody was there equally and nobody was setting up

21 anybody else.

22 Q    So once you had rear cuffed Mr. Baslan, did he stay in

23 the original hotel room where you arrested him or did you move

24 him somewhere else?

25 A    I moved him to the staging area where myself and the

1   other officers and agents were staging.

2           THE COURT:  That would be the room opposite?

3           THE WITNESS:  Correct, sir.  The room right across

4   the street -- or right across the street.  It was the room

5   right across the hallway from the room where the arrest took

6   place.

7   Q    Where was Ms. Henry taken, if you know?

8   A    I don't remember.  I think she was taken to the room

9   adjacent to the cooperator's room.  It's entirely possible

10  that she was kept there, in the same room.  I don't remember

11  which one.

12  Q    Where was the cooperator taken?

13  A    The cooperator was initially taken -- I believe,

14  initially, to the other room.  But then promptly uncuffed and

15  let go.

16  Q    Was the uncuffing and letting go done in the presence of

17  either Mr. Baslan or Ms. Henry?

18  A    No, it was not.

19  Q    Now, the room across the way that you transferred

20  Mr. Baslan to, who was in that room throughout the interview?

21  A    Throughout the interview, myself, Special Agent Brian

22  Conolly, although there were times when either he or I stepped

23  out for various reasons.  And there were a couple of agents in

24  and out of the room at any given time.

25  Q    Who was the constant presences in the room with

SPIVACK-DIRECT-DEMAS                                    14

1   Mr. Baslan?

2   A    Myself and Agent Conolly.

3   Q    Now, once Mr. Baslan had been transferred to the room

4   across the hallway from the original arrest location, can you

5   explain what, if anything, you said to him?

6   A    Yes, ma'am.  I'm not 100 percent sure what part this came

7   first.  But at some point, Mr. Baslan was -- myself and Agent

8   Conolly identified ourselves to Mr. Baslan, showing him our

9   credentials, explaining who we were.  And then he was given a

10  full search.  I just don't remember which of those came first.

11          At that point, Mr. Baslan was seated on the far wall

12  of the hotel room.  He was then informed that he was under

13  arrest, that we had some things to take care of before we

14  could talk to him, including advising him of his rights,

15  reading him of his Miranda form.

16  Q    Did Mr. Baslan say anything in response to this sort of

17  initial introduction that you just described?

18  A    Not that I recall.

19  Q    Did you then read Mr. Baslan his Miranda rights?

20  A    Yes, ma'am, I did.

21  Q    Did you use any aid to help you in doing this?

22  A    Yes, ma'am.  I used what's called the FD 395, it's the

23  FBI's printed out version of the advice of rights form.

24          MS. DEMAS:  Your Honor, I've conferred with defense

25  counsel in advance of today.  And all exhibits I intend to

1  use, he's stipulated to.  So with the Court's permission, I'd

2  like to publish to the witness and the Court the advice of

3  rights form.

4        MR. SAVITT:  Your Honor, I don't object to their

5  admissibility.  I don't necessarily stipulate to their

6  contents.

7        THE COURT:  Stipulate to their content?

8        MR. SAVITT:  Well, counsel just stipulated.  I don't

9  object to --

10       THE COURT:  That's fair enough.  They're all

11 received, if they're in evidence by agreement.

12       MS. DEMAS:  Yes, Your Honor.

13       THE COURT:  Fair enough.  Proceed.

14 Q    Agent, do you see the document in front of you?  Is it

15 clear?

16 A    Yes, ma'am, it is.

17       MS. DEMAS:  For the record, I've just put up

18 3500-AS-2.

19 Q    Can you explain this form to the Court?

20 A    Yes, ma'am.  This is just simply the printed out version

21 of our advise of rights form.  When effecting an arrest or

22 conducting a custodial type of interview, the form is read to

23 the individual.

24 Q    Agent, is this, in fact, the form you used to read

25 Mr. Baslan his Miranda rights on March 19, 2013?

SPIVACK-DIRECT-DEMAS                                    16

1   A    Yes, ma'am.

2   Q    Does your handwriting appear on this document anywhere?

3   A    Yes, it does.

4   Q    Where is that?

5   A    It's right -- well, it's supposed to be -- there it is.

6   That's my signature.

7   Q    Now, does this form indicate when you began reading

8   Mr. Baslan his Miranda rights?

9   A    Yes, ma'am, it does.

10  Q    Can you point out where that is?

11  A    Just above the arrow, 2125, which is 9:25 p.m..

12  Q    And is there any indication on this document when you

13  finished reading Mr. Baslan his Miranda rights?

14  A    Yes, ma'am.  It's right down here just below our

15  signatures.  It's 2127, which is 9:27 p.m.

16  Q    Now, without reciting every single thing on the form, can

17  you explain to the Court how you went about reading Mr. Baslan

18  his Miranda rights?

19  A    Yes, ma'am.  I don't remember exactly the approach I

20  took.  But I read Miranda one of only two ways.  I either

21  read -- first of all, I read the Miranda formed verbatim,

22  word-for-word.  One approach I have is I either read line by

23  line, and in-between line I ask for acknowledgment before I

24  move on.  Or, I read start to finish and then at the end, ask

25  the individual if he understood what it was we just read, if

1    he has any question.  And then if he wishes to speak with me

2    by waiving his rights.

3    Q    So am I correct that you either read this form to

4    Mr. Baslan line by line and after each line asked him if he

5    understood, or you read it all the way through and then asked

6    him he if he understood, you can't remember which?

7    A    That's correct.

8    Q    Now, once you finished reading Mr. Baslan all of the

9    rights and waivers on this Miranda form, what, if anything,

10   did he say?

11   A    Mr. Baslan agreed to speak with us at the time.

12   Q    Is there anything on the form to indicate that agreement?

13   A    Yes, ma'am.  We -- Mr. Baslan was handcuffed to the rear.

14   So he verbally agreed, which was written in that form at that

15   time.

16            THE COURT:  Did he decline to sign it or did you not

17   ask him to sign?

18            THE WITNESS:  No, he didn't decline, sir.  Having

19   him handcuffed to the rear, I didn't even ask him to sign it.

20   Q    So when you were reading Mr. Baslan his Miranda warnings,

21   how far away from him were you standing or sitting?

22   A    I was sitting.  And I was no more than two arm lengths

23   away, if that.

24   Q    Did you occasionally look up to observe the expression on

25   his face?

SPIVACK-DIRECT-DEMAS                                           18

1    A    Absolutely.

2    Q    Did he appear to be following along and understanding

3    what you were reading to him?

4    A    He did.

5    Q    Did Mr. Baslan appear to have any physical hearing issues

6    when you read him his Miranda rights.

7    A    No?

8    Q    Did he have any difficulty understanding the English

9    language when you read him his Miranda rights?

10   A    Why.

11   Q    Was he crying when you read him his rights?

12   A    Not that I remember.

13   Q    Was he hyperventilating?

14   A    No.

15   Q    Did he seem focused on what you were telling him?

16   A    Yes, he did.

17   Q    Once Mr. Baslan waived his Miranda rights, did you then

18   begin questioning him?

19   A    I did.

20   Q    Was anyone taking notes while you were questioning

21   Mr. Baslan?

22   A    Yes, ma'am.  Agent Conolly.

23   Q    Who did the vast majority of the questioning?

24   A    I did.

25   Q    Now, while you were questioning Mr. Baslan, did you use

1   any sort of changing techniques as the interview progressed?

2   A    Yes.

3   Q    Can you, in a summary fashion, go through those were the

4   Court.  And then I will ask you more questions.

5   A    Yes, ma'am.  I initially approached this as kind of

6   playing dumb, I guess is the best way to put it.  I asked him

7   open-ended questions, sort of indicating that I did not know

8   much about the situation at all.  I kind of quickly shifted

9   into a more direct line of questioning, asking specific

10  questions about specific events that evening.  And then

11  thirdly, I transitioned into insinuating that the FBI had been

12  listening to recording phone calls.  I was trying to insinuate

13  that we had a wire or a Title III up.  Without giving away the

14  cooperator, just that we were listening to recorded

15  conversations.

16  Q    So during this first stage that you described where you

17  were sort of playing dumb, as you say, did Mr. Baslan respond

18  to those questions?

19  A    He did.

20  Q    Did he appear to be forthcoming when you first questioned

21  him?

22  A    No, he did not.

23  Q    Did you ask Mr. Baslan why he had come to the hotel that

24  evening?

25  A    I did.

SPIVACK-DIRECT-DEMAS                                    20

1   Q    Do you remember what his response was?

2   A    Yes ma'am.  I remember, initially, Mr. Baslan stated that

3   he, Ms. Henry, and the cooperator, were there for a swing

4   party and to do drugs.

5   Q    What's a swing party?

6   A    My understanding of a swing party is a sex party.

7   Q    Now, at this point of the interview, had you said

8   anything about there being kids at the hotel?

9   A    I don't recall at this point if I said anything.  There

10  were, 100 -- I'm certain there was a mention of kids.  Part of

11  this also was discussion of kids on the side, reaffirming the

12  fact there were kids in the hotel room.

13  Q    Did you ever ask Mr. Baslan any specific questions about

14  the presence of young children in the hotel that night?

15  A    I did.  Yes, ma'am.

16  Q    Can you explain that to the Court?

17  A    Yes, ma'am.  My recollection's certainly correct, but I

18  know my 302 would certainly help.

19  Q    Would it help you, would it refresh your recollection to

20  look at your 302 as you explain the stages of questioning

21  Mr. Baslan?

22  A    Yes, ma'am, it would.

23       (Handing.)

24  Q    So my question was, Agent Spivack, did you, at any point

25  in time, ask Mr. Baslan about the presence of young children

1   in the hotel that night?

2   A    Yes, ma'am.  Mr. Baslan initially stated that the

3   cooperator had brought the kids to the hotel because the

4   cooperator watched them, was initially what he said.

5   Q    Did Mr. Baslan's explanation of why children were at the

6   hotel change at any point during the interview?

7   A    Yes, ma'am.  As I kind of shifted into a little bit more

8   direct line of questioning, I asked Mr. Baslan specifically

9   about the kids.  And if -- Mr. Baslan stated that Jack's wife

10  was abusive.  Excuse me, Jack, the cooperator's wife was

11  abusive.  That they needed to -- they wanted to have the kids

12  sleep at the hotel.  So they wanted to provide them the drug,

13  Benadryl, sleeping drug Benadryl, so they could help them

14  sleep.

15  Q    So during this initial phase of questioning, did the

16  defendant say anything to implicate the cooperator?

17  A    No.

18  Q    Moving on to the next phase of questioning, can you

19  explain that to the Court?

20  A    Yes, ma'am.  As I quickly moved from kind of open-ended

21  line of questioning, I started to ask specific questions about

22  the Benadryl, about the kids, about what we knew to be going

23  on that night.

24  Q    Did Mr. Baslan responses to your questions change as you

25  moved to that more direct line of questioning?

1   A    Yes, it did.

2   Q    Explain that.

3   A    I asked Mr. Baslan outright if they were going to abuse

4   the kids that night.  Mr. Baslan responded, quote, "we didn't

5   do it.  You should have waited."  And then stated that, "we

6   would have seen that nothing was going to happen."

7         Mr. Baslan kind of kept with that theme during

8   additional questions very similar to that, and stated -- kept

9   referring to hypothetical things.  Hypothetically speaking, if

10  somebody has a plan, you know, couldn't they change their

11  plan, couldn't they get cold feet, things of that sort.

12  Q    Did you ever confront Mr. Baslan with anything about a

13  child by the name of Leah?

14  A    I did.

15  Q    Can you explain that to the Court?

16  A    Later on during the interview when I confronted

17  Mr. Baslan with evidence that we were listening to a recorded

18  conversation, I confronted him with a number of things that he

19  said that was on the recording.  One of those things was

20  conversation about Leah who is the 8-year-old daughter or

21  niece to the cooperator.  And I can't recall right now if it's

22  the daughter or niece.  But she was eight, maybe nine now.

23         But the conversation that was recorded was where Mr.

24  Baslan stated that he was going to go down on Leah.  When I

25  asked Mr. Baslan about this, Mr. Baslan agreed that that's

1    what he said, but then offered up this explanation of having

2    cold feet.

3    Q    Do you know what "go down" means?

4    A    Yes, I do, ma'am.

5    Q    What does it mean?

6    A    It's oral sex.

7    Q    Did the topic of Mr. Baslan's parents ever come up during

8    the interview?

9    A    Yes.

10   Q    Who brought Mr. Baslan's parents?

11   A    Mr. Baslan.

12   Q    At the time that you arrested Mr. Baslan, did you know

13   his parents' names?

14   A    No.

15   Q    Did you know if they were alive or dead?

16   A    No.

17   Q    Did you know where they lived?

18   A    No.

19   Q    Explain how Mr. Baslan brought up his parents during your

20   interview with him?

21   A    There was a point where it was apparent to us that

22   Mr. Baslan, there were several points where it was apparent to

23   us that Mr. Baslan statements were inconsistent with the

24   recordings.  They were inconsistent with what we knew.

25             So when confronting Mr. Baslan about telling the

1  truth and lying and things of that sort, we talked about the

2  importance of telling the truth.  And how, as an investigator,

3  particularly an investigator on a squad such as this,

4  exploitation squad, we're going to do everything we can to

5  find out what's going on.  We were concerned about a

6  babysitting business that was about to be opened.

7       So we were concerned about past kids, previous kids

8  who may have been the victim of exploitation.  In discussing

9  this with Mr. Baslan, it was made very clear that we need to

10  know everything there is.  If that meant talking to friends

11  and neighbors and such, we would do so if need be.  Mr. Baslan

12  brought up the concern for his parents at that point, and he

13  stated -- he asked if we were going to interview his parents.

14  Q    What did you say?

15  A    I said, at that point, I had no intention of interviewing

16  his parents.  So I told him, Not right now.  But I also stated

17  to him that if the investigation took us there, we would.  I

18  didn't make any promises to him nor threats, but informed him

19  that at that point we had no reason to.  And that was pretty

20  much it.

21  Q    Did you ever threaten Mr. Baslan that you were going to

22  expose him as a child molester to his parents?

23  A    Absolutely not.

24  Q    Do you know where Mr. Baslan's parents live?

25  A    I have a suspicion now.

1   Q    Where do you believe them to live?

2   A    Syria.

3   Q    What is that based on?

4   A    Statements from Mr. Baslan in some of our own inquiries

5   into his past.

6   Q    Did you ever ask the defendant any questions about child

7   pornography that he had accessed during your interview of him?

8   A    I did.

9   Q    What did the defendant tell you about child pornography?

10  A    He told me that he actually downloaded child pornography

11  that day.  He told me that he had been working informally with

12  the FBI sometime ago, providing them tips on child

13  pornography.  He also informed me that he had it at home.  We

14  discussed where it was and how to get it.

15  Q    Did the topic of Russia come up at all during your

16  interview of Mr. Baslan?

17  A    Yes, it did.

18  Q    Could you explain how that came up to the Court?

19  A    Mr. Baslan, after discussing with me that he had child

20  pornography at home, I asked Mr. Baslan where it was and how

21  to get it.  Mr. Baslan informed me that he would provide me

22  the child pornography if, in turn, I allowed him to go to

23  Russia and never come back.

24  Q    How did you respond to that offer?

25  A    Honestly, I may have chuckled.  I don't know.  It

SPIVACK-DIRECT-DEMAS                          26

1  certainly was not a discussion that I was expecting.  I

2  informed Mr. Baslan that I was in no position, no authority to

3  make any kind of agreements or anything like that.  That

4  that's not my job, not my role.  Yeah, again, I told him that

5  I didn't have the authority to do so.

6  Q    How did Mr. Baslan respond when you informed him that you

7  had no authority to allow him to go to Russia?

8  A    He kept trying, he kept trying to make a deal.  Then he

9  also, I remember him inquiring of my supervisor who was there,

10 to see if my supervisor may have had the authority to

11 authorize such a move.  But, of course, he did not either.

12 Q    During your post arrest interview of Mr. Baslan, did you

13 inform of the potential charges that he faced?

14 A    I don't recall.

15 Q    Did you ever inform him of the amount of time he faced if

16 conviction?

17 A    I don't recall myself having said that.

18 Q    During your interview of Mr. Baslan, did he ever give you

19 any passwords to electronic devices?

20 A    Yes, he did.

21 Q    Could you explain to the Court, let's go device by device

22 did.  Did Mr. Baslan give you the password for a laptop?

23 A    Yes, he did.

24 Q    And where was that laptop?

25 A    The laptop was a laptop he brought with him.  It was in

1   his backpack initially.

2   Q    How did the topic of the password of Mr. Baslan's laptop

3   come up?

4   A    I asked him for it.

5   Q    Did he give it to you?

6   A    He did.

7   Q    How did he give it to you?

8   A    As I recall, I pulled up my own laptop with a Word or

9   some other document, a blank document up there, to allow

10  Mr. Baslan to type the password in.  He may have given it to

11  me offhand.  This one was, I believe, an easier password.  I

12  don't remember which -- one of the passwords he had to type

13  in.  I don't remember if this was this one or not.  He ended

14  up providing me the password to the laptop.

15  Q    What was the purpose of asking Mr. Baslan for the

16  password to his laptop?

17  A    It's really twofold, I suppose.  The first is, my

18  understanding of Macintosh computers is that they are much

19  more difficult, forensically, for us to gain access to it

20  without the password.

21       But the number one concern was encryption.  We knew,

22  based on the phone conversation, recorded conversations, Mr.

23  Baslan had encryption.  It was fairly sophisticated, from what

24  we could deduce.  So our objective was to ensure -- to see if

25  that laptop had encryption on it.

SPIVACK-DIRECT-DEMAS                28

1  Q    What did you do with the password that Mr. Baslan gave
2  you to the laptop?
3  A    We opened it to make sure the password actually works,
4  the laptop opened.
5  Q    Did anybody do anything further?
6  A    Forensic guy looked to see if there were any opened
7  encrypted containers or folders that were actively open on his
8  computer.
9  Q    What's an encrypted container or folder?
10 A    An encrypted container is -- really, a folder is the best
11 way to phrase it.  It's a folder that requires a particular
12 password.  In many cases, a very sophisticated password to
13 open.  Otherwise, it takes -- very, very, very difficult for
14 even us, the FBI, to crack.
15 Q    What was the purpose of checking for these encrypted
16 containers?
17 A    My understand, based on having done this for awhile, that
18 if a laptop is up and running, and an encrypted container is
19 open, once that laptop is shut down that encrypted container
20 will lock.  And if that encrypted container locks, we may not
21 get access to that without the password.
22        So the initial reason for looking for that is to
23 see, it was to identify if there were, in fact, any encrypted
24 open containers.
25 Q    Did someone check for that?

SPIVACK-DIRECT-DEMAS                                    29

1   A    Yes.

2   Q    What conclusion did he or she reach?

3   A    That there were no open encrypted containers.

4   Q    What did you then do with the laptop?

5   A    Shut it down.

6   Q    Did you then obtain a search warrant for the laptop?

7   A    Yes, ma'am.

8   Q    Was the laptop ever searched for any contents prior to

9   getting that search warrant?

10  A    No, ma'am.

11  Q    Did Mr. Baslan give you the password to his iPhone?

12  A    Yes, he did.

13  Q    Can you explain to the Court how that came about?

14  A    Came about in much the same fashion.  I asked him for the

15  password and he provided it to me.

16  Q    Did Mr. Baslan resist at all when you asked him for the

17  password?

18  A    No, he did not.

19  Q    What, if anything, did you do with the password to the

20  iPhone when he gave it to you?

21  A    Just ensure that it actually opened the iPhone.

22  Q    Did it?

23  A    Yes, ma'am.

24  Q    Did you search the iPhone in any way that evening beyond

25  seeing if the password opened the iPhone?

1    A    No, I did not.

2    Q    Did you eventually obtain a search warrant for the iPhone

3    as well?

4    A    Yes, I did.

5    Q    Was the iPhone searched pursuant to that warrant?

6    A    It was.

7    Q    Now, have we covered all the passwords that Mr. Baslan

8    gave you for any electronics devices that were on his person

9    at the time of the arrest?

10   A    Yes, we have.

11   Q    Did he give you the password to any other computer or

12   electronic device on the evening of his arrest?

13   A    Yes, he did.

14   Q    Which device -- or, generally, describe the device he

15   gave you a password to.

16   A    Mr. Baslan had a Macintosh desktop computer at his home.

17   Discussing that with him, that and other devices with him, he

18   provided that password to me.

19   Q    The desktop was at Mr. Baslan's residence?

20   A    Yes.

21   Q    Is that the same residence you had previously obtained a

22   search warrant for even before you arrested Mr. Baslan?

23   A    Yes, ma'am.

24   Q    Was the computer that he gave you the password for

25   covered by that warrant?

1   A    Yes, it was.

2   Q    Did anybody try the password that Mr. Baslan gave for

3   that computer to see if it worked?

4   A    Yes, ma'am.  I did later in that evening.

5   Q    Did it work?

6   A    No.

7   Q    Did you have any discussion with Mr. Baslan about any

8   other passwords that he would be willing to give you if he got

9   something back in return?

10  A    Yes, ma'am.

11  Q    Could you explain that to the Court, please.

12  A    Yes, ma'am.  This was regarding the child pornography,

13  again.  Mr. Baslan provided that there was an encrypted child

14  pornography file.  I believe he said it was a 256 bit

15  encryption, if my memory serves me right.  He initially told

16  me he would be willing to provide that password if he got a

17  plea deal.  And then he recanted that and stated that he just

18  wasn't willing to give it to me.

19  Q    Did you ever offer to give Mr. Baslan a plea deal if he

20  gave you the password for his encrypted hard drive?

21  A    Absolutely not.

22  Q    By the way, did you see any encrypted hard drives as part

23  of the search warrant that you acted out at Mr. Baslan's

24  apartment?

25  A    Yes.

1        THE COURT:  Excuse me a moment.  Could you tell me

2   where in this -- how long did this discussion take from start

3   to finish, roughly?

4        THE WITNESS:  Roughly an hour, sir.  Maybe a little

5   more.

6        THE COURT:  Where in the conversation did the

7   subject turn to his parents and whether he you would speak to

8   them, roughly?

9        THE WITNESS:  Roughly the middle, maybe the last

10  third, I'd say.

11       THE COURT:  Go ahead.

12  CONTINUED DIRECT EXAMINATION

13  BY MS. DEMAS:

14  Q    How long was your interview of Mr. Baslan from start to

15  finish?

16  A    If I had to guess, it was an hour, maybe a little more.

17  Q    Going back to the iPhone for a second.  Was there any

18  point after the night of Mr. Baslan's arrest where he -- where

19  you were requested to go into that phone and find particular

20  numbers?

21  A    Yes.

22  Q    Can you explain that?

23  A    The following day, Mr. Baslan was undergoing Pretrial

24  Services here, Eastern District of new York.  I was not with

25  him at the time.  I received a phone call from a colleague of

1  mine who was with him.  He needed numbers, two numbers from

2  his iPhone, which, the iPhone was in my possession at the

3  time.  So we obtained a written consent form, handwritten

4  consent.  We did not have a proper form with us at the time,

5  but my colleague wrote out a handwritten consent which was

6  specific to just these two names and numbers on his phone.

7  Q    Agent Spivack, I'm putting on the screen what's been

8  marked as 3500-AS-7.  Can you see this?

9  A    Yes.

10  Q    Is this the handwritten consent form that you're

11  referring to?

12  A    It is.

13  Q    Did Mr. Baslan sign the consent form?

14  A    I believe he did.  Yes, ma'am.

15  Q    What's the date on the form?

16  A    It's the 3/20/2013.

17  Q    Once Mr. Baslan signed the consent form, did you, in

18  fact, look into his iPhone to obtain those two names and

19  numbers that he had requested.

20  A    I did.

21  Q    What did you do with the names and numbers that you were

22  requested to retrieve?

23  A    I provided them to the agent who was with Mr. Baslan.

24  Q    Did you search the iPhone for anything except for these

25  two numbers on March 20, 2013?

1    A    No, ma'am.

2    Q    Did you search the iPhone for anything except these two

3    numbers at anytime before you obtained a search warrant?

4    A    No, ma'am.

5    Q    Did Mr. Baslan ever give you the code to his apartment?

6    A    Yes, he did.

7    Q    How did that come about?

8    A    We informed Mr. Baslan that we had a search warrant for

9    his residence.  That nobody was there, obviously, because he

10   and Ms. Henry were both at the hotel, and we did not have a

11   key.  We asked Mr. Baslan for the password so we did not have

12   to enter via force.

13   Q    Did he give you that password?

14   A    Yes, he did.

15   Q    Did you threaten him in any way to get any of the

16   passwords that we've just discussed?

17   A    No, ma'am.

18   Q    Now, did you ever threaten Mr. Baslan that you would leak

19   the accusation that he was a child molester to the press?

20   A    Absolutely not.

21   Q    Was there ever a complaint filed against Mr. Baslan and

22   Ms. Henry?

23   A    Yes, there was.

24   Q    Was that complain publically filed?

25   A    Yes, it is.

1  Q    Did the case receive press coverage?

2  A    Yes, it did.

3  Q    Did you threaten Mr. Baslan in any way during his post

4  arrest interview?

5  A    Absolutely not.

6  Q    Did you tell him a prison term he was facing?

7  A    I may have.  I don't recall that.

8  Q    Did you say anything to Mr. Baslan about what you were

9  going to do with the information that he gave you?

10 A    None other than write it up in a report and submit it to

11 the prosecutor's office.

12 Q    Did you ever raise your voice when you were talking to

13 Mr. Baslan?

14 A    Yes, I did.

15 Q    Did you ever use cuss words?

16 A    Yes, I did.

17 Q    Did you leave the room at all during the interview with

18 Mr. Baslan?

19 A    Yes, I did.

20 Q    What was the purpose of that?

21 A    More often than not, it was to confer with other agents.

22 Some who were -- my supervisor, for example, or agents who

23 were interviewing Ms. Henry.

24 Q    Did there come a point in which you left the room, came

25 back and made some sort of indication to Mr. Baslan that his

SPIVACK-DIRECT-DEMAS                                    36

1  codefendant, Ms. Henry, had implicated herself?

2  A    Yes, ma'am.

3  Q    Could you explain that?

4  A    Yes, ma'am.  I -- just that.  I come back in the room

5  and -- I guess it was another tactic, really, to try to elicit

6  truthful responses, indicated that Ms. Henry was talking

7  about -- was telling the truth.

8  Q    Did you ever threaten Mr. Baslan that he and his

9  codefendant Kristin Henry would be locked up for 30 years

10 unless he confessed?

11 A    Absolutely not.

12 Q    Did you ever come back into the room and tell Mr. Baslan

13 that Kristin Henry had broken down and incriminated herself

14 and Mr. Baslan?

15 A    I just insinuated that.  I don't think I ever said that

16 exactly.

17 Q    Did you ever tell Mr. Baslan that if he did not agree

18 with that, meaning, with whatever Kristin Henry just said, to

19 incriminate himself, that Mr. Baslan would be locked up for 30

20 years?

21 A    No, I did not.

22 Q    Did you ever tell Mr. Baslan that he had to decide right

23 away whether he wanted to cooperate because if he waited to

24 seek advice, it would be too late for him to help himself?

25 A    No, ma'am.

SPIVACK-DIRECT-DEMAS                                    37

1  Q    Did you ever say anything to present it as an either/or

2  choice to Mr. Baslan, meaning, either talk now or forever be

3  barred from cooperating?

4  A    No, I did not.

5  Q    At anytime during your interview of Mr. Baslan, did he

6  ask for a lawyer?

7  A    No.

8  Q    Did he ever ask to speak to an attorney?

9  A    No.

10 Q    What would you have done if Mr. Baslan had asked to speak

11 to an attorney or a lawyer, I guess they're the same thing, at

12 anytime during the interview?

13 A    I would have stopped the interview.

14 Q    Did Mr. Baslan sign any sort of written statement during

15 the post arrest interview?

16 A    Yes, he did.

17 Q    Can you give the Court some background as to how that

18 came about?

19 A    Yes, ma'am.  At the end of the interview, I asked

20 Mr. Baslan if would it be okay for us to write up a statement

21 memorializing sum and substance of what we talked about that

22 evening.  He had no issue with that.  I informed him that I

23 would provide the statement to him to read, to correct, to

24 change, to modify, make additions to, et cetera, which is what

25 he did.

SPIVACK-DIRECT-DEMAS                                    38

1          MS. DEMAS:  For the record, I am showing the witness

2   an original version of what's been marked as 3500-AS-6.

3   Q    Can you see this in front of you?

4   A    Yes, ma'am.

5   Q    Do you recognize what I put on the screen?

6   A    Yes.

7   Q    What is it?

8   A    It is a statement that I handwrote for Mr. Baslan, which

9   he initialed, signed and made additions to summarizing the

10  statement he made to us that night.

11         THE COURT:  This happened, presumably, at the end of

12  the interview?

13         THE WITNESS:  Yes, that is correct.

14  Q    Did you write that statement in Mr. Baslan's presence?

15  A    Yes, I did.

16  Q    What did you do with the statement after you wrote it?

17  A    I had Agent Conolly review it to make sure that it was

18  accurate based on his recollection.  At that point, I then

19  provided it to Mr. Baslan and again explained to him that I

20  wanted him to read it aloud, and I advised him he was free to

21  make any changes, any additions, any corrections that he saw

22  fit.

23  Q    Did Mr. Baslan read the statement aloud?

24  A    Yes, he did.

25  Q    Did he make any changes or corrections to the written

1  statement?

2  A    Yes, he did.

3  Q    Going through, starting at the top, can you explain to

4  the Court where -- what changes were made, and which ones

5  Mr. Baslan made?

6  A    At the very top, above that, Mr. Baslan corrected the

7  spelling of his name, and then he initialed the correction.

8  Down here, this is actually my correction.  I apologize.  The

9  sentence with the line crossed out, that's my correction.  And

10  I initialed it off to the side.

11         THE COURT:  Your correction prompted by your own

12  consideration or something Mr. Baslan said?

13         THE WITNESS:  My own, sir.

14         THE COURT:  Did you make that correction before you

15  presented the statement to him or after?

16         THE WITNESS:  Before, sir.

17         THE COURT:  Okay.

18  A    The next one is this here (indicating).  It's not

19  initialed, but it is Mr. Baslan.  I wrote the word "many."

20  Mr. Baslan crossed it out and wrote "few."

21         The next one is here (indicating).  It's a little

22  bit hard to read, I suppose.  But it's this (indicating).  I

23  don't know if I'm -- I'll circle it.  That series of words

24  there, that sentence there, it originally read, "I will

25  provide the FBI my child porn in/on an encrypted hard drive at

1  home.  I also use a 250 bit encryption but" -- and I think the

2  original is a little unclear here.  I apologize, -- "but don't

3  want to provide the password unless I get a plea," was the

4  original.  Mr. Baslan crossed that out and stated, "I also use

5  a 250 bit encryption but can't provide the password" -- I

6  think it says "at this time."

7  CONTINUED DIRECT EXAMINATION

8  BY MS. DEMAS:

9  Q    Did Mr. Baslan initial that statement?

10 A    He did.  I believe he did.  I think that -- I have to see

11 the original.  I think it's -- it might be up there.  He may

12 not.  I have to look at the actual original.

13 Q    Well, I can show it to you right now.

14 A    It's a little hard to see on that.  I apologize.

15      (Handing.)

16 A    His initials -- it's hard to tell if -- if that there

17 underneath the "c" of can't are his initials.  But...

18 Q    Just so it's clear for the Court, when you said

19 underneath the "c" of can't, is this what you're talking

20 about, where I put my pen?

21 A    Yes, ma'am.  It's hard to tell.

22 Q    Now, Agent Spivack, any other change or initials that

23 Mr. Baslan made to the first page of the handwritten

24 statement?

25 A    There's an arrow, ma'am, on the side.  I can't recall

SPIVACK-DIRECT-DEMAS                                    41

1  exactly who drew the arrow.  I remember why it was drawn.  I

2  just don't recall if Mr. Baslan drew it or I drew it myself.

3  Q    Can you explain why it was drawn?

4  A    Yes, ma'am.  This is not a front and back sheet.  It's

5  actually preceded by a completely separate piece of paper.

6  Mr. Baslan made an additional statement on the second piece of

7  paper, which is the piece of paper that he ended up signing.

8  I vividly remember Mr. Baslan being concerned that those piece

9  of paper on the screen now was not going to be made a part of

10  that first page.  So the decision was made to write an arrow.

11  Again, I don't know at this point whether Mr. Baslan drew it

12  or I drew it.  But that's why it was drawn.

13  Q    Moving on to the second page, can you explain who wrote

14  this page of the handwritten statement?

15  A    Yes, ma'am.  Mr. Baslan.

16  Q    Did he write this himself?

17  A    He did.

18  Q    Did he initial this change?

19  A    He did.

20  Q    Can you show where that appears?

21  A    Above the arrow.

22  Q    Did Mr. Baslan sign the handwritten statement?

23  A    Yes.

24  Q    Did you sign it?

25  A    Yes, ma'am, I did.

SPIVACK-DIRECT-DEMAS                                    42

1    Q    Did Agent Conolly also sign it?

2    A    Yes, ma'am.

3    Q    Agent Spivack, if you had understood this second page to

4    be a completely different statement from the one that

5    Mr. Baslan had just gone through and initialed, what, if

6    anything, would you have done differently?

7    A    I'm sorry.  If I perceived it to be a completely separate

8    statement?

9    Q    From the one that we just went through, the first page,

10   what would you have done?

11   A    I would have done a number of things.  In the first --

12   with the first -- with respect to the first page, I would have

13   made room somewhere either on that page or the back of it for

14   us all to sign.  I also, on this page, would have had a

15   preamble up at the top indicating that this was additional

16   statement.  Something to the effect of what I had in the first

17   statement, but I would have made it very clear.  If it was a

18   completely separate statement, I would have made that clear in

19   the preamble.

20   Q    Did Mr. Baslan ever tell you that this separate page was

21   the only statement that he agreed to sign, and that was the

22   extent of the written statements he agreed with?

23   A    Quite the contrary, ma'am.  He wanted this to be

24   included.  He wanted to ensure that this was included with the

25   first page.

1          THE COURT:  What is the marking just before the word

2    "I want"?  Those words, what is that?

3          THE WITNESS:  Those are his initials, sir?

4          THE COURT:  Those are whose initials?

5          THE WITNESS:  Mr. Baslan.

6          THE COURT:  Where?  Point to it, if you would?

7          (Witness complies.)

8          THE COURT:  Right up here (indicating).

9          THE WITNESS:  Right next to the I, sir.

10         THE COURT:  So he initialled that and then signed.

11         THE WITNESS:  I asked any addition -- and it doesn't

12   always happen, but, obviously, as they're reading the

13   statement sometimes they don't initial changes they made.  But

14   any additions we always have them initial.  Just kind of our

15   procedure.  Even though he's signing it, it's still just

16   something we do.

17         THE COURT:  All right.

18   CONTINUED DIRECT EXAMINATION

19   BY MS. DEMAS:

20   Q    Agent Spivack, can you read what the last part of

21   Mr. Baslan statement says?

22   A    Yes, ma'am.  It says, "I want to talk to someone about my

23   options.  I am fully willing to cooperate."

24   Q    Now, when did the discussion about wanting to talk to

25   someone about Mr. Baslan's options first come up during the

1    interview?

2    A    Of the child pornography discussion?

3    Q    Can you explain that to the Court?

4    A    We were discussing the child pornography on the computer.

5    He initially discussed with me the idea of providing the child

6    pornography in exchange for him going to Russia.

7    Q    What does that have to do with wanting to discuss his

8    options with someone?

9    A    That was just the initial part of the discussion.  And

10   that sort of became the theme when I asked him for something,

11   or asked to get into something specific.  He would get into

12   this whole, I can tell you, but I want some kind of deal, I

13   want some kind of promise.  It often referred to going back to

14   Russia.

15   Q    Who did you understand -- strike that.

16        Did Mr. Baslan ever ask to speak to a lawyer even

17   after he had completed either the handwritten -- the first or

18   the second part of the handwritten statement?

19   A    No, he did not.

20   Q    Did he ever ask to talk to an attorney after completing

21   any part of the handwritten statement?

22   A    No, ma'am.

23        MS. DEMAS:  Your Honor, may I have a moment?

24        THE COURT:  Yes.

25        MS. DEMAS:  I have no further questions.

1          THE COURT:  Mr. Savitt.

2          MR. SAVITT:  May I have a moment, Your Honor?

3          THE COURT:  Yes.

4          MR. SAVITT:  Thank you, Your Honor.

5    CROSS EXAMINATION

6    BY MR. SAVITT:

7    Q    Good morning, Mr. Spivack.  We've met before, is that

8    right?

9    A    Yes, sir.  Good morning.

10   Q    You told us on direct examination that you and a number

11   of other agents, as well as some police officers, were in the

12   Jersey City Hyatt on the evening of March 19th of 2013,

13   correct?

14   A    That's correct.

15   Q    You were there specifically to effect the arrest of

16   Mr. Baslan and Ms. Henry?

17   A    Correct.

18   Q    You also told us -- by the way, March 19th of 2013, do

19   you remember the day of the week that was?

20   A    If my memory serves me correctly, it was a Wednesday, I

21   think.

22   Q    You're not sure?

23   A    Not a hundred percent.  I believe it was a Wednesday.  It

24   could be a Tuesday.

25   Q    Before testifying at this hearing, you did review your

1   report, your handwritten notes, am I correct?

2   A    Yes, sir.

3   Q    Because the events about which you are testifying

4   occurred, what, now I guess it's about a year and a half or a

5   year and a quarter?

6   A    Roughly.  Yes, sir.

7   Q    You told us that this was a probable cause arrest,

8   meaning, that there was no charging document or instrument, am

9   I right?

10  A    That's correct.

11  Q    Was that a decision that was made by the FBI because you

12  were unsure whether or not Mr. Baslan and Ms. Henry would be

13  crossing over to New Jersey?

14  A    No, sir.

15  Q    What was the reason for that decision?

16  A    I was sure they were going to cross over to New Jersey.

17  But they needed to cross over to new Jersey and show up at the

18  hotel for that to actually happen.

19  Q    And because you felt that you didn't want to project in

20  advance that they were going to cross over to New Jersey, you

21  didn't get an arrest warrant from a magistrate, right?

22  A    I'm sorry, sir?

23  Q    You didn't want to project that they were going to do

24  something before it happened, am I correct?

25  A    As far as I know, sir, I can't.  As far as I know, the

1   act needs to happen before the arrest can be effected.

2   Q    The reason that you focused on that particular act is

3   because that would be the charge that is the heaviest in terms

4   of potential punishment, a 30-year minimum?

5   A    No, not necessarily.

6   Q    Well, by that time, certainly the FBI knew there were

7   discussions about videotaping children, am I right?

8   A    Absolutely.

9   Q    And discussions about child pornography in Mr. Baslan's

10  possession, am I right?

11  A    Absolutely.

12  Q    In fact, your informant, Mr. Massre, told you that

13  Mr. Baslan showed him some child pornography before the trip

14  on the evening of March 19th of last year, am I right?

15  A    Absolutely.

16  Q    And those are all charges for which an arrest warrant

17  could have been sought, am I correct?

18       MS. DEMAS:  Your Honor, the government objects to

19  this line of questioning as beyond the scope of direct.  It's

20  veering into the realm of discovery.

21       THE COURT:  Well, I'll give him some latitude.

22  After all, he testified on direct he made what he

23  characterized as a probable cause arrest.

24       Go ahead, Mr. Savitt.

25  Q    That would have been the basis for charges for which an

1   arrest warrant could have been sought, am I right?

2   A    I would respectfully disagree with part of that

3   statement, sir.

4   Q    What part of the statement would you disagree with?

5   A    Sure, the child pornography.  But the discussions of

6   making videos and such, I would disagree, that, at that point,

7   were chargeable.

8   Q    The reason you disagree they were chargeable is because

9   there was insufficient proof based on the recording?

10  A    No --

11            MS. DEMAS:  Objection, Your Honor.

12            THE COURT:  Overruled.  Go ahead.

13  A    No, sir.  It was my opinion, my discussion with the

14  prosecutor's office, that we were in control of this.  Having

15  the overt act clearly helps to demonstrate the intent, which

16  is why it didn't have to be Jersey, but why traveling to the

17  hotel we were willing to allow to happen.

18            THE COURT:  Well, it's really not germane.  So let's

19  move along.

20  Q    We're in Jersey now, is that right?

21  A    That's correct.

22  Q    Mr. Baslan and Ms. Henry, they go up to the 7th floor, I

23  guess, of the Hyatt?

24  A    I believe it was the 7th.

25  Q    You're not sure, but they go up somewhere, right, in the

SPIVACK-CROSS-SAVITT                                    49

1    hotel?

2    A    Correct.

3    Q    The FBI rented three rooms for that occasion?

4    A    Correct.

5    Q    Two adjacent to each other.  And the third one was

6    nearby, I would imagine, the same level?

7    A    Right across from one of them.

8    Q    There were FBI agents waiting for the couple, am I

9    correct?

10   A    Correct.

11   Q    You saw them come into the hotel.  Did you follow them?

12   A    I did not see them come into the hotel.  I had a

13   surveillance team, though, that observed them at various

14   stages downstairs.

15   Q    Could you describe for the Court what happened when the

16   two of them -- and, actually, were they accompanied by

17   Mr. Massre or was Mr. Massre already waiting for them?

18   A    The cooperator was in the room waiting.

19   Q    Were there agents with the cooperator at that time?

20   A    No.

21   Q    Did anybody see Mr. Baslan and Ms. Henry approaching

22   Mr. Massre's room?

23   A    Yes, sir.  I did.

24   Q    Where were you?  What was your vantage point?

25   A    If the door to Room A, cooperator's room, is here

1   (indicating), I'm standing right behind the room directly

2   across from it.  And I'm able to see that door through the

3   peephole.

4   Q    So you're looking through the peephole of the room right

5   across from the cooperators room?

6   A    Correct.

7   Q    What time did the agents intercept Mr. Baslan and

8   Ms. Henry?

9   A    I don't remember the time.

10  Q    I didn't mean it in that fashion.  At what point in the

11  action?

12  A    As soon as the cooperator opened the door, and it

13  appeared that all three were moving forward into the threshold

14  is when I opened the door effecting the arrest.

15  Q    How did you do that?

16  A    I opened it as quietly as I could to then allow everybody

17  to leave the room and immediately place hands on three of them

18  entering the room.

19  Q    Were there other agents with you at that time?

20  A    There were.

21  Q    How many?

22  A    Between eight and ten law enforcement personnel.

23  Q    Did you have your badge displayed in any fashion?

24  A    Some may have.  We had letters visible.  We have

25  something identifying ourselves.

SPIVACK-CROSS-SAVITT                                    51

1    Q    Like an FBI raid jacket?

2    A    Yes, sir.

3    Q    Did you have that on that evening?

4    A    I don't recall if I had the raid jacket or a vest with

5    the letters.  Something on.

6    Q    The decision, you told us, was made not to draw any

7    weapons because of -- I'm sorry, I can't remember the term.

8    A    Fatal funnel.

9    Q    Fatal funnel.  But you were also not concerned that any

10   violence would occur given the nature of what you knew about

11   the suspects, am I correct?

12   A    There's always a concern.  But I did not believe them to

13   be armed or dangerous.  No, sir.

14   Q    Everybody then is handcuffed?

15   A    That's correct.

16   Q    Including the informant, Mr. Massre?

17   A    Correct.

18   Q    Was Mr. Massre let out of the room at that time?

19   A    He is.  I can't tell you at what stage.  My focus was now

20   on Mr. Baslan.  But he was led out of the room at some point.

21   Q    Now, you told us that Mr. Baslan, was he thrown onto a

22   bed?

23   A    Yes, sir.  I mean not like thrown hard, hard.  But yes,

24   he was put down on the bed aggressively.

25   Q    When you say put down on the bed aggressively, does that

1  mean, you know, there was some force used to knock him down?

2  A    Absolutely.

3  Q    Did he resist at all?

4  A    No.

5  Q    Was there a reason to use force?

6  A    Absolutely.

7  Q    Can you tell us what that reason was?

8  A    Certainly.  We have -- we're in a very small space.

9  There are a lot of factors at play.  We don't have the luxury

10 of "Excuse me, sir, do you mind sitting down on the bed?"  It

11 has to be much more dynamic than that.  And again, it wasn't

12 an excessive use of force.  But we absolutely put him on the

13 bed.

14 Q    When you say "we put him on the bed," how many agents put

15 him on the bed?

16 A    I think there were two.

17 Q    Were you one of them?

18 A    I was.

19 Q    Who was the other agent?

20 A    I think it was a police officer out of New Jersey.

21 Q    Physically, what did you do to put him down on the bed?

22 Did you push him, shove him, drag him down?

23 A    I don't recall, sir.  It was grabbing his arms and

24 putting him on the bed.

25            THE COURT:  Face down?

SPIVACK-CROSS-SAVITT                                53

1          THE WITNESS:  Yes, sir.

2    Q    You said his arms were underneath him as he was lying

3    face down on the bed?

4    A    Correct.

5    Q    One agent, I guess you, grabbed one of his arms.  And the

6    police officer, or whoever it was, grabbed the other arm?

7    A    I believe so.  I can't remember exactly how it happened.

8    That sounds right.

9          THE COURT:  The first order of business once you had

10   him on the bed was to cuff him behind his back.

11         THE WITNESS:  Correct.  Yes, sir.

12   Q    That's what you did?

13   A    Yes, sir.

14   Q    How did you get him to stand up or sit up?

15   A    I don't remember.  Probably rolled him over, had him sit

16   up, as far as I remember.

17   Q    He was the only one pushed onto a bed, am I correct?

18   A    Correct.

19   Q    Now, at that point in time, did you read him his Miranda

20   rights?

21   A    Not at that moment, no.

22   Q    Did you tell him why he was under arrest?

23   A    At that moment, no.

24   Q    What did you tell him?

25   A    In this particular moment, not much.  It was very chaotic

1    in that room.  We stood him up.  I don't remember if I gave

2    him a search there or if I took him to the other room first.

3    But that was a pretty quick series of events.

4    Q    When you say a search, you're talking about a pat down

5    search for weapons or contraband or anything else?

6    A    Yes correct.

7    Q    At some point you performed a pat down search?

8    A    Correct.  Yes, sir.

9    Q    You don't remember if it was in the initial room where he

10   was arrested or across the hallway?

11   A    Sir, I know my -- we call it a high risk search.  That

12   was conducted immediately.  That is just basically a waistband

13   search to see if there's anything that his hands could have

14   access to.  The full search was -- the full pat down, I don't

15   remember if it happened that room or the room across the hall.

16   Q    Now, he had a backpack with him?

17   A    He did.

18   Q    Did he have it on his back when he was pushed down to the

19   bed?

20   A    I don't remember, sir.  I don't know if he dropped it

21   or -- I don't know how he had it.

22   Q    Do you remember who retrieved it?

23   A    I don't.

24   Q    But obviously, at some point you looked inside?

25   A    Yes.

1  Q    You, yourself?

2  A    I did.

3  Q    You found what, some camera equipment?

4  A    I don't know that I did the actual inventory list, but I

5  did see what was taken out of it.

6  Q    What was that?

7  A    Some camera.  Computer.  There was some peripheral

8  devices such as some SD cards, I believe -- thumb drives.  And

9  a bunch of other miscellaneous items.

10 Q    Do you remember what kind of camera it was?

11 A    I don't remember the name.  I remember it was the exact

12 same camera that he identified on recordings that he was going

13 to bring.

14 Q    The laptop was in the backpack as well, correct?

15 A    Correct.

16 Q    Now, did he ask anyone up to that point what's going on?

17 Why am I being arrested?

18 A    I don't recall him asking many questions at all at that

19 point.

20 Q    Did he appear to be surprised?

21 A    No more than some.  I mean, he was calm.  Appeared calm.

22 Q    So he was calm and he was stoic, is that right?

23 A    I don't know if I would use the word "stoic."  He had his

24 moments of -- of -- I guess not calm.  It wasn't panic.  He

25 certainly wasn't stoic, I'd say.

1   Q    Well, I mean, if he wasn't stoic, do you recall if he

2   said anything?

3   A    Yeah, he certainly conversed with me.  But I don't recall

4   him asking me questions.

5        THE COURT:  Did he, at any point, make any

6   statements intended for Ms. Henry?

7        THE WITNESS:  Yes, he did.  I don't remember -- it

8   was more just making sure she was okay.  I assured him that

9   she was.

10  Q    You told us a moment ago, and I know this was asked and

11  answered, but he didn't ask why am I being arrested?

12  A    He may have, sir.  I don't know.  I don't know.

13  Q    At some point you took him to a different room.  Was that

14  the adjacent or across?

15  A    Right across the hall.

16  Q    Where you were initially before the rest?

17  A    Correct.

18  Q    Looking through the peep hole, right?

19  A    Yes.

20  Q    In that room, you were there, Mr. Baslan was there, and

21  who else?

22  A    At any given time, it was myself, Agent Conolly.  And

23  then there were a couple of others that were kind of in and

24  out sporadically.

25  Q    The couple of others going in and out sporadically, I

SPIVACK-CROSS-SAVITT                    57

1   mean, did they have a function?  Why'd they do that?

2   A    One was our computer guy to look at the laptop.  The

3   other was my supervisor.  Now, typically, if he came in, it

4   was to grab me to ask me a question.  He was also coordinating

5   the search warrant.  So he came in to ask Mr. Baslan questions

6   about, you know, the password to his house and so forth.  But

7   I don't recall there being any agents or officers.

8   Q    Were with those questions asked before or after the

9   Miranda warnings were given?

10  A    All after.

11  Q    You're the one who gave him the Miranda warning using the

12  FBI standard Miranda form?

13  A    Yes.

14  Q    Mr. Baslan was standing or sitting at that time?

15  A    He was sitting.

16  Q    Was he sitting on the bed, a chair, do you recall?

17  A    It was a chair.

18  Q    His hands were cuffed behind him?

19  A    That's correct.

20  Q    That's the reason he actually didn't sign the Miranda

21  form, as you told us on direct examination.

22  A    That's correct.

23  Q    You asked him orally whether he understood his Miranda

24  rights and whether he was willing to talk, am I right?

25  A    Yes, sir.

1   Q    You don't remember if you read him each right

2   individually and then punctuated that with a question, do you

3   understand that, or whether you read all of them at once, am I

4   correct?

5   A    That's correct.

6   Q    Now, Mr. Baslan, as you told us on direct examination,

7   didn't have any -- didn't appear to have any difficulty

8   understanding, am I correct?

9   A    That's correct.

10  Q    You didn't have any difficulty understanding him because

11  his English is fluent.

12  A    Yes.

13  Q    What was the first thing Mr. Baslan said after you read

14  him his rights and he agreed to talk?

15  A    The first thing, sir, I don't know.  I asked him an

16  open-ended question and he gave me an explanation.  If my

17  memory serves me well, it was me asking a question of why

18  we're here and him giving me the swing party answer, I

19  believe.

20  Q    At some point, did you advise Mr. Baslan that it was a

21  federal crime to lie to federal agents?

22  A    Yes, sir.  I believe I did.

23  Q    After that point, did Mr. Baslan tell you that he

24  understood that it was a crime to lie, that he acknowledged

25  that?

1  A    Yes, sir.  I mean, I believe he did.

2  Q    Did he, at that time, tell you it was his intent was to

3  party and use the kid as props and not to touch them?  Do you

4  remember that?

5  A    I remember -- I believe that conversation was before I

6  admonished him about lying to federal agents.

7  Q    Well, do you recall that in your FBI report, which is

8  3500-AS-5.  I don't know if you have that in front of you.

9  A    I have in front of me.

10 Q    Look at the last paragraph of the first page.

11 A    Sir.

12 Q    If you read that to yourself --

13       MR. SAVITT:  Well, it's in evidence, if I may read

14 it for the record.

15       THE COURT:  By all means.

16 Q    "The interviewing agents then advised Baslan that it was

17 a federal crime to lie to federal agents.  Baslan then advised

18 that he was not going to do anything to the kids that night.

19 And if something was going to happen, then he would have

20 stopped it.  Baslan advised that the intent that evening was

21 to party and use the kids as, quote, "props," unquote, but not

22 to touch them.  However, Baslan got cold feet and did not want

23 to do anything."

24       That's in your report, right?

25 A    What paragraph, sir?  I'm sorry.

1    Q    It's the first page of AS-5.

2    A    The first page.

3    Q    The first page, and it's the third or the last paragraph.

4    A    I got that.  Okay.  Yes, sir.

5    Q    Doesn't that suggest that Mr. Baslan made the statement

6    about what his intent was, to use the kids as props but not to

7    touch them after you advised him that it was a federal crime

8    to lie?

9    A    He may have, sir.  I'm just telling you I don't remember

10   at what point those admonishments were given.

11   Q    Are you suggesting that the reports that I see here and

12   that we have in front of us in evidence as 3500-AS-5, it was

13   not written in order to reflect a chronological sequence of

14   questions and answers or events, and that certain of the

15   statements that you see later on may have off come earlier?

16   A    I'm not suggesting that at all, sir.

17   Q    Well, when you wrote the report, it was important to you

18   to make sure that that report accurately reflected the

19   conversation that you and fellow agents had with Mr. Baslan on

20   the night of his arrest, am I correct?

21   A    Absolutely.

22   Q    It was not your intent to set forth -- not a transcript

23   of questions and answers.  But basically, generally, or as

24   much as you could, a chronological rendition of what was said,

25   what came first and what came second, what came third?

1    A    We do our best, obviously, to what came first, what

2    came -- chronological order.  We, obviously, we do our best.

3    I'm just telling you I can't remember what came first.  I

4    mean, I -- it's certainly chronological.  So I -- but I don't

5    remember what point we admonished him about lying and its

6    relation to what Mr. Baslan was telling us.

7    Q    In reading this particular paragraph of the first page of

8    your report, the third paragraph, it does not refresh your

9    recollection of what came first and what came second?

10   A    No, sir.  I'll tell you the reason.  We gave him -- I

11   know we gave him an official admonishment about telling us the

12   truth.  There were many times during that interview where I

13   would remind Mr. Baslan about lying to me.  So there were many

14   times during that where it was kind of a reminder that I knew

15   he was lying.  So I don't know, sir.

16   Q    So you wouldn't have reflected each and every question

17   that you asked and everything that Mr. Baslan told you on this

18   report?

19   A    No, sir.

20   Q    Other than what you read in this report and your notes,

21   all of the 3500 material, you wouldn't have a recollection of

22   anything else was said by either you or Mr. Baslan, or anyone

23   else, in relation to this conversation?

24   A    I'm sorry, I'm --

25   Q    I don't blame you.  It's a very awkward questioned.  I'll

SPIVACK-CROSS-SAVITT                                    62

1   withdraw it.  It's a terrible question.

2           Apart from what we read in the 3500 materials,

3   there's nothing else that you recall concerning your

4   conversation with Mr. Baslan, am I correct?

5   A    Make sure I understand your question before I answer it.

6   You're asking if there's -- it's my recollection that there's

7   nothing in my 3500 that's different?

8   Q    Let me try to make it --

9   A    I apologize.  I'm not --

10  Q    Let me cut to the chase.  Apart from what you read here,

11  you wouldn't have any independent recollection of anything

12  else that was said?

13  A    Oh, I mean, I may have.  As details -- as reading through

14  this, talking through it, certainly there are some details

15  that I may recall.  But I don't think anything pert- -- I

16  think all the pertinent stuff should be memorized in the 302s.

17  Q    But there are some other details that you recall that are

18  not memorialized?

19  A    Sure.  Absolutely.

20  Q    And you don't consider those particularly pertinent?

21  A    Sir, there's a lot of detail to every interview.

22  Obviously, you can't memorialize everything start to finish.

23  You do what you can.

24  Q    I take it that since this interview took place well over

25  a year before the Attorney General's recent suggestion that

1  maybe agents should actually record these types of

2  conversation, the conversation back on March 20th, 2013, was

3  not recorded by federal agents, is that correct?

4  A    That is correct.

5  Q    Now, were you inside the room where Ms -- well, you told

6  us that you were inside the room when Ms. Henry was being

7  questioned, am I correct, from time-to-time?

8  A    I was never in the room during her questioning.  At least

9  I don't think I was.  If I was, it was just to ask an agent to

10 come out.  I don't remember ever being in there during

11 questioning.

12 Q    Do you know who questioned her, was it Agent Robertson?

13 A    Agent Robertson and Agent Lihn Phung, P-H-U-N-G.

14 Q    The time when you came back into the room, correct me if

15 I'm wrong, you said that Kristin just admitted everything

16 about what the two of you were going to do, was that

17 subterfuge?

18 A    I'm sorry, was that a what?

19 Q    Subterfuge.  Was that sort of a ruse?

20 A    The tactic would have been, but I didn't say it like

21 that.  I didn't come out and say that she's capitulating or

22 folding on him.  I definitely insinuated that she was, but I

23 didn't outright say it.

24 Q    So you insinuated that she capitulated, so to speak, and

25 admitted everything, even though you had no basis to say that,

SPIVACK-CROSS-SAVITT                                    64

1    am I correct?

2    A    Absolutely.  Yes, sir.

3    Q    That's a tactic the FBI can lawfully use, am I right?

4    A    Yes, sir.

5    Q    You told us that Mr. Baslan was the one who brought up

6    the concern for -- worried about his arrest or his being a

7    pedophile coming to the attention of his parents, am I right?

8    A    That is correct.

9    Q    That's not something that either you or any fellow

10   agents, as far as you know, brought up initially?

11   A    I know none of us in that room brought it up.

12   Q    In response to that you told Mr. Baslan that you had no

13   intention of speaking to his parents, am I correct?

14   A    Correct.

15   Q    In order to conduct a full investigation, if that's where

16   the investigation took you, you would have to do that, am I

17   right?

18   A    Yes.

19   Q    Do you recall what Mr. Baslan responded at that time?

20   A    Yes, sir.  I do.  Well, I don't know if it was in

21   response to my statement or it was just in general how he was

22   describing it.  He stated that he was fearful that his parents

23   would find out because I think there were some health issues

24   discussed.  I think his father was held in high regard in

25   Syria as doctor, maybe.

SPIVACK-CROSS-SAVITT                           65

1    Q    He was concerned for his father's health?

2    A    Yes, sir.  In terms of both of the parents' health or one

3    or the other, I don't remember.  But generally speaking,

4    that's correct.

5    Q    Did he appear to be concerned?

6    A    He did.

7    Q    Was he concerned that his parents would find out that he

8    was arrested or the nature of the charges against him?

9    A    It was my interpretation that he was more concerned about

10   the nature of the charges.

11   Q    Now, you told us on direct examination that you don't

12   recall -- and correct me if I'm wrong, because I don't

13   recall -- if you told Mr. Baslan specifically what the charges

14   were for his arrest?

15   A    I don't recall ever specifying what charges he was being

16   arrested for.

17   Q    Do you recall telling Mr. Baslan in general without

18   actually using statutory language of the charges, what he was

19   being arrested for?

20   A    If I did, it would have just been sexual exploitation

21   verbiage.

22   Q    Did you say anything about him being a pedophile?

23   A    No.

24   Q    Did you believe Mr. Baslan was a pedophile?

25   A    My personal belief?

SPIVACK-CROSS-SAVITT                                    66

1   Q      Yes.

2   A      Yes, sir.

3   Q      You never confronted him with it?

4   A      No, sir.

5   Q      Mr. Baslan was the one who brought up his concern that

6   there may be a leak to the press by the FBI about his arrest

7   or about him being a pedophile?

8   A      I don't remember a whole lot of discussion about the

9   press, to be honest, sir.  If we did discuss it, it was very

10  brief.  I don't remember a whole lot of discussion.  I don't

11  remember any discussion that concerned that at all.

12  Q      About the press?

13  A      Correct.

14  Q      Did anyone mention the word "pedophile"?

15  A      Not us, sir.

16  Q      Mr. Baslan?

17  A      I don't believe that he did.  But I know that we did not.

18  I don't think that word was spoken that night.  It could have

19  been, but I don't remember it.

20  Q      If it could have been, you don't remember it, it's not in

21  your report, am I correct?

22  A      Correct.

23  Q      You told us earlier that this conversation with

24  Mr. Baslan was approximately an hour?

25  A      My best guess, sir.  I very well could be off on that.

SPIVACK-CROSS-SAVITT                                    67

1   Q    When you say it could be off, could it have been longer

2   than that?

3   A    Sure.

4   Q    But not significantly longer?

5   A    I remember being at Mr. Baslan's residence around 11:00,

6   11:30.

7   Q    He was arrested about, what, two hours earlier?

8   A    Correct.  I had transported Mr. Baslan back to New York.

9   Then I got in a separate car and drove to -- so, I mean, there

10  was a considerable amount of time.  So that's kind of how I'm

11  trying to get back to how long I think the interview lasted.

12  Q    Now, in the room when you were conducting the interview,

13  Mr. Baslan was handcuffed throughout the interview with his

14  hands to his back, am I right?

15  A    The vast majority of the interview, correct.

16  Q    Were there times when the handcuffs were taken off so

17  that he could go to the restroom, for instance?

18  A    He didn't need to.  I did take the handcuffs off and

19  moved them to the front at some point in time during the

20  interview.  I don't recall exactly when.

21  Q    For what purpose was that?

22  A    If I remember correctly, it was for him to sign the form,

23  the written statement.  After everything had kind of settled

24  down, we were comfortable with him in the situation.  I felt

25  comfortable moving his handcuffs to the front.

SPIVACK-CROSS-SAVITT                                68

1   Q     During the course of the interview, Mr. Baslan never

2   refused to answer any questions, right?

3   A     I don't know if that is 100 percent correct, sir.

4   Q     Well, did he refuse to answer any questions?

5   A     I think with regards to like the child pornography, it

6   was -- I don't know if "refused" is the right word.  Maybe

7   it's semantics.  But it was more, I don't want to talk about

8   that unless I guess, you know, some cooperation, or something

9   to that effect.

10  Q     Unless I get some cooperation?

11  A     He wanted this -- this whole Russia thing is what he

12  wanted to engage us in.  It didn't appear he was willing to

13  answer questions regarding child pornography without

14  discussing that.

15  Q     You were the one who brought up child pornography?

16  A     I believe so, myself.

17  Q     He agreed that he downloaded child pornography?

18  A     Yes, sir.

19  Q     The whole thing about Russia was in connection with your

20  request for any passwords for encrypted files on his personal

21  computer at home?

22  A     Probably more general than that.  I knew that there was

23  another hard drive in addition to what may have been on his

24  computer.  The discussion was just in general about child

25  pornography and retrieving child pornography.  He mentioned

SPIVACK-CROSS-SAVITT                                    69

1   that he had it, he could provide it to us, that it was

2   encrypted.  But I don't know, at that point, if it was

3   specific to encrypted on my computer or on an hard drive.

4   Q    In other words, you're not sure?

5   A    I'm sure about the child pornography being at his home,

6   just the type of device I'm not sure of.

7   Q    In fact, you did find a computer and there was child

8   pornography as it turned out, and a lot of it, correct?

9   A    Correct.

10  Q    That was on his personal computer at home?

11  A    A few different places.

12  Q    Also on the external hard drive?

13  A    Yes.

14  Q    Apart from that, any other place?

15  A    At this point, no.

16  Q    Nothing in any of the hard drives that would have been

17  part of a Drobo, D-R-O-B-O?

18            THE COURT:  Let me hear the question.

19            MR. SAVITT:  Withdraw the question.

20            (Requested portion of the record read by the court

21  reporter.)

22            THE COURT:  You're withdrawing the question?

23            MR. SAVITT:  I am, Your Honor.

24  Q    Whose idea was it to write down a statement, was that

25  your idea?

SPIVACK-CROSS-SAVITT                          70

1   A    It's our practice.  Yes, it was my idea.

2   Q    He readily agreed to that, Mr. Baslan did?

3   A    Yes, he did.

4   Q    Did he dictate to you what the statement should be or you

5   handwrote it sort of free style and handed it to him for his

6   review, approval, and changes?

7   A    That's correct, the latter.

8   Q    So you handwrote the statement.  He made certain changes,

9   as you indicated to us on direct examination.  And you,

10  yourself, crossed out one particular line.  Am I right?

11  A    That is correct, sir.

12  Q    Was it your intention to incorporate each and every item

13  of information that you and Mr. Baslan orally discussed in

14  that handwritten statement?

15  A    No.

16  Q    Basically, it was the gist of what you believed was

17  important, am I correct?

18  A    It is the gist of what I believed was important and

19  truthful.

20  Q    And truthful?

21  A    Correct.

22  Q    So you made certain assessments about what Mr. Baslan

23  said as to whether it was truthful or not truthful, correct?

24  A    I did.

25  Q    That was your subjective reasoning, am I right?

1  A    It's more than that.  It was also a conversation with

2  Mr. Baslan.  Again, confronting him with certain particular

3  evidences and then Mr. Baslan conceding to particular facts.

4  Q    So would it be fair to say that you believed Mr. Baslan,

5  or at least in part?

6  A    In part.

7  Q    Based on the things that he told you and that you

8  reflected in the handwritten statement which is 3500-AS-6, is

9  that correct?

10  A    Yes, sir.

11  Q    The arrow on the bottom of that page, and I think you

12  have the exhibit in front of you.

13  A    I don't, but I know what you're talking about.

14  Q    Right.  You don't remember who drew the arrow or what

15  that's supposed to signify?

16  A    I remember vividly what it's supposed to signify.  What I

17  don't remember is which one of us did it.  I know there was a

18  discussion about the second page.  And I don't remember if I

19  said, well, how about this, will this make you happy, or if he

20  actually did it.  But it was to signify the second page being

21  attached to the first.

22  Q    The second page you're talking about is the second page

23  of the form on the screen, which is, I guess, page 2 of

24  3500-AS-6?

25  A    I'll believe you on the number.  But yes, it is that

1  second part of the page.

2  Q    That's the second page?

3  A    Correct.

4  Q    The arrow that I'm talking about is on the bottom of the

5  first page of AS-6.

6  A    That's it -- you almost had it.

7  Q    It's right here.

8  A    That's correct, sir.  Yes, sir.

9         THE COURT:  In the margin?

10         THE WITNESS:  In the margin.  Yes, sir.

11  Q    In the left margin.  Is that supposed to significant that

12  the second page is a continuation of the first page?

13  A    Correct.

14  Q    Do you remember when the arrow was drawn?  Was it

15  after -- I mean, was it drawn initially?

16  A    No.  I mean, I don't know if it was drawn before he wrote

17  this or if it was drawn after he wrote this.  But it was about

18  this.  It wasn't drawn at the beginning of the statement.

19  Q    It couldn't have been drawn at the beginning of the

20  statement.  You don't recall who drew it, correct?

21  A    Correct.

22  Q    Mr. Baslan -- there couldn't be any other suspects who

23  drew that, correct?

24  A    Correct.

25  Q    It's supposed to signify that the next page is part of

SPIVACK-CROSS-SAVITT                                    73

1    the first page?

2    A    I mean, I wouldn't even say it's supposed to signify.

3    That is what it signifies.

4    Q    That second page is the handwriting of Mr. Baslan, am I

5    correct?

6    A    Yes, sir.

7    Q    We're looking at the screen right now.  This is AS-6, I

8    believe, page 2.  As read to us on direct examination, it

9    says, "I want to talk to someone about my options.  I am fully

10   willing to cooperate."  And he signs his name below that, and

11   you sign your name as well as Agent Conolly signing his name,

12   is that right?

13   A    That's correct.

14   Q    To the left margin?

15   A    Yes, sir.

16   Q    Did you understand what Mr. Baslan meant when he said he

17   wanted to talk to someone about my options?

18   A    I had an interpretation of it, my understanding of it.

19   Q    What was your interpretation?

20   A    This goes back to the theme that he adopted when we were

21   discussing child pornography, he wanted to go to Russia and he

22   wanted to talk to somebody about going to Russia.  I made it

23   very apparent to him that I was of no authority to make that

24   happen, which is why he even asked my supervisor.  And so my

25   understanding of this statement is just that same line of

SPIVACK-CROSS-SAVITT                                    74

1    thought.

2    Q    Did you ask him what it meant, did you ask him what he

3    meant to convey, I want to speak to someone about my options?

4    A    No, I did not.

5    Q    When he said I am fully willing to cooperate, the plain

6    meaning of those words is what you understood, am I correct?

7         THE COURT:  Whatever the plain meaning is?

8    Q    Yeah.  Cooperator is a cooperator, am I correct?

9         MS. DEMAS:  Objection.

10        THE COURT:  Sustained.  I've given you latitude.

11   Let stay focused on the very narrow concern of this hearing,

12   which seems to have been forgotten.

13        MR. SAVITT:  I'm sorry, Judge.

14   Q    Mr. Baslan asked you on a number of occasions for a trade

15   so he could go to Russia if he gave you the encrypted password

16   for child pornography?

17   A    That's correct.

18   Q    Of course, it's ludicrous for anyone to even suggest that

19   in a setting like this, hey, you know, I'll give you the

20   password if you let me go to Russia?

21   A    From a rational mind, I think so.  But, I mean, I've

22   never been on the other side --

23   Q    Of rationality?

24        THE COURT:  Let's --

25        MR. SAVITT:  I have more on that.

1          THE COURT:  Let's wrap it up.  Yes, indeed.

2    Q    Did you my think Mr. Baslan was irrational?

3    A    No, I don't think he was irrational.  That statement I

4    thought to be.  But given the context of where he was sitting,

5    it's -- put it this way, sir, I've heard similar questions

6    before in an interview.

7    Q    Well, questions, yes.  But --

8    A    Or similar requests.  Maybe not to Russia, per se.  But

9    people in that chair tend to say things and ask things that

10   sometimes make us --

11   Q    Wonder?

12   A    Yes.

13   Q    Would that indicate that that person is -- he was under a

14   lot of pressure at that point?

15   A    My opinion, sir, no.

16          MS. DEMAS:  Objection, Your Honor.

17          THE COURT:  Go ahead.  Let's go, wrap it up.

18          MR. SAVITT:  We'll wrap it up.

19   Q    At that time, it was clear to you that Mr. Baslan never

20   had any contact with this type of a situation before.  He'd

21   never been arrested by the FBI or any other law enforcement

22   agency.  At least in the United States?

23   A    That is my understanding.  Yes, sir.

24   Q    So that was essentially the maiden voyage in this

25   particular scenario, correct?

SPIVACK-CROSS-SAVITT                              76

1    A    I wouldn't say that.  My understanding is that he had

2    hadn't been arrested for it.  But what he did and having not

3    been arrested for, I couldn't speak to.  That was what -- part

4    of the interview was to figure out if there were any previous

5    offenses.

6    Q    Are you referring to Mr. Baslan's statement regarding

7    contact with other FBI agents?

8    A    No.  I'm referring to conduct of sexual exploitation.

9    Maybe I misunderstood your question.  I understood your

10   question to be if I knew Mr. Baslan to have engaged in any of

11   this stuff before.

12   Q    Yes.

13   A    I knew he hadn't been arrested for anything before in the

14   U.S..  But I didn't know if he had acted in this regard

15   before.  He could have but not just have been caught.

16   Q    As far as you know, there's no other evidence of him ever

17   doing anything?

18            MS. DEMAS:  Objection, Your Honor.

19            THE COURT:  Sustained.

20   Q    Actually, the purpose of my question was to ask you

21   whether or not you understood that Mr. Baslan experienced his

22   first confrontation with law enforcement on March 19, 2013?

23   In an arrest setting where he was arrested and handcuffed?

24            THE COURT:  He's answered that question.

25            As far as you know, this is the first in the United

1   States?

2           THE WITNESS:  Yes, sir.

3           MR. SAVITT:  Thank you.

4           THE COURT:  Anything else?

5           MS. DEMAS:  Just very briefly, Your Honor.

6   REDIRECT EXAMINATION

7   BY MS. DEMAS:

8   Q    Agent Spivack, just to clear up a couple of things that

9   you said on cross examination.  You were asked some questions

10  about Mr. Baslan's handwritten statement and as to whether --

11  I'm sorry, the handwritten statement reflecting Mr. Baslan's

12  statements that he had gave you after his arrest.  Everything

13  that you put in that handwritten statement, did you believe it

14  to be true?

15  A    Everything?

16  Q    Yes.

17  A    Not everything, necessarily.

18  Q    Did you believe it to be true that Mr. Baslan got cold

19  feet?

20  A    No, ma'am.  Not at all.

21  Q    Going back to the arrow that you have been asked about,

22  now, numerous times.  You testified you knew that you did not

23  draw the arrow, obviously, when you began writing this portion

24  of the statement.  Is there any chance that you drew it

25  completely afterwards, after Mr. Baslan had signed the

1  statement?

2  A    That is very possible.

3  Q    Outside his presence?

4  A    Not outside his presence.  I'm saying after he signed the

5  statement it's possible we could have wrote it in to ensure

6  that the signed version was made a part of the original.  It

7  would have been made while he was sitting across from me.

8  Q    You also explained on cross examination that you had

9  discussions with Mr. Baslan about child pornography that he

10 didn't want to discuss unless he got a deal, is that correct?

11 A    That is correct.

12 Q    But it wasn't child pornography that he didn't want to

13 discuss.  It was the particular encryption technique that he

14 had used for child pornography, correct?

15 A    Correct.

16        MS. DEMAS:  I have no further questions.

17        THE COURT:  You may step down, Mr. Spivack.

18        MS. DEMAS:  I'm sorry, Your Honor, the last

19 question.

20 CONTINUED REDIRECT EXAMINATION

21 BY MS. DEMAS:

22 Q    Agent Spivack, what we've gone over today, is this a

23 complete, full summary of everything that Mr. Baslan told you

24 on the day of his arrest?

25 A    No, ma'am.

1    Q    Are there other facts that you can testify about in the

2    future, if you're called upon to do so at a future date, that

3    we have not discussed today?

4    A    Yes.

5    Q    Did you modify Mr. Baslan's handwritten statement in any

6    way after his arrest?

7    A    Absolutely not.

8              MS. DEMAS:  Thank you.

9              THE COURT:  Thank you, sir.

10             Anything else from the government?

11             MS. DEMAS:  No, Your Honor.

12             THE COURT:  Mr. Savitt, for the defense?

13             MR. SAVITT:  May I have a moment, Your Honor?

14             THE COURT:  We will take a short break.

15             MR. SAVITT:  Thank you, Your Honor.  I appreciate

16   that.

17             (Recess taken at 11:40 a.m.)

18             (Matter resumed at 11:55 a.m.)

19             THE COURT:  Please be seated, folks.

20             Go ahead, Mr. Savitt.

21             MR. SAVITT:  Your Honor, the defense will rest at

22   this point.  And we will rely on our submissions to the Court,

23   also Mr. Baslan's affidavit to the Court as a submission.

24   Submissions, not admissions, Your Honor.

25             THE COURT:  All right.  Well, simply stated, as an

1   initial matter, I see no reason to discredit Mr. Spivack's

2   testimony.  I have considered the affidavits any number of

3   times.  Of course, there is a implausibility aspect to begin

4   with.  Mr. Baslan, at some point during the interview, no

5   doubt, understood why he was being arrested and all of this

6   was going to be public.  Maybe not the word pedophile, but

7   certainly the very nature of the charges.

8           More critically and more specifically, based upon

9   the testimony here, it presents, I think, a pretty clear

10  picture of what happened in the environment in the room as the

11  interview progressed.  Certainly nothing I gleaned from the

12  testimony, which I credit, suggests a coercive environment

13  much less lends credence to the specific claim that he was

14  threatened outright being branded or labeled a pedophile, and

15  so forth.

16          His comments were responsive.  He acted in a

17  cooperative posture.  He engaged with the interviewing agent.

18  He negotiated or attempted to negotiate with the interviewing

19  agent.  He appeared composed, correcting the text of the

20  written statement.  Precise, expressing his concern that his

21  own written statement would be considered part of the

22  statement that the agent had written by the knowledge of this

23  arrow in the margin.

24          The whole context of the environment of that meeting

25  does not, in my view, support an inference or suggestion that

1  he was threatened or abused in any way to get him to make

2  statements in response to the agent's questions.  It lasted

3  approximately an hour.  Yes, there was some concern the agent

4  recalled about the defendant's father, a highly regarded

5  physician in Syria.  That's understandable.

6          Having read this affidavit of Mr. Baslan, I find it

7  not credible and, instead, choose to credit the testimony of

8  Agent Spivack.  That being the case, the government has met

9  its burden and the motion to suppress the statements is,

10  therefore, denied.

11          I don't have to remind you of this, but Magistrate

12  Judge Pollak is picking a jury on July 15th.  The trial begins

13  first thing in the morning on July 15th.  You will shortly be

14  hearing from me on other matters.

15          There is some request by the defense to have the

16  jailhouse informant, CI-2, present for trial.  That should

17  certainly be arranged.  Whether he's permitted to call that

18  gentleman, whether that gentleman has any relevant testimony

19  may be subject to further discussions.  Let's make sure the

20  logistics are in place so the man is readily available should

21  Mr. Savitt call him, and assuming the Court permits it as it

22  relates to relevant testimony.

23          Anything else we can do this morning?

24          MR. SMITH:  Your Honor, I'm sure the Court was

25  appraised, we obviously have other outstanding motions that

1    haven't been ruled on yet, the ones that didn't engender a

2    hearing of any sort.  The government just wanted to note that.

3              THE COURT:  That's what I'm referring to when I said

4    you would be hearing from me very shortly.

5              MR. SMITH:  One other issue, Your Honor.  While it

6    seems unlikely that Mr. Baslan would seek to call Kristin

7    henry, the government's done some research into situations

8    where a defendant seeks to call a codefendant who has

9    competency issues.  It may require a competency hearing in

10   advance of Mr. Baslan's trial.

11             We wanted to advise the Court of this rather than be

12   in a situation where, on the eve of trial, Mr. Baslan

13   indicates that she is an intended witness and we have to

14   engage in a competency hearing to prevent some sort of plain

15   error during the trial.

16             THE COURT:  We have two steps to take -- three

17   steps.  Number one, if the defense intends to call or believes

18   he may call or seek to call Ms. Henry, then you're right, we

19   should deal with that issue now, now that I have both reports.

20   But preliminarily, there is the issue of Ms. Henry's

21   willingness to testify and waive her privilege.  That is a

22   matter for her counsel.

23             Should it appear that she is willing to testify, we

24   would have to resolve the question of her competency to

25   testify.  I'm not entirely certain that the competency to

U.S.A. v. BEBARS BASLAN                          83

1   appears as witnesses is the same as the competency to

2   represent themselves at a trial.  Perhaps your research has

3   shown otherwise or confirms that.

4           MR. SMITH:  Judge, the government agrees with that

5   conclusion, that that it is a different test.  Even if she

6   were found not competent to stand trial on her own, she may be

7   competent to serve as a witness and essentially waive her

8   Fifth Amendment rights.

9           THE COURT:  That's very trick question because she's

10  got to be competent enough to make the decision to testify in

11  light of her counsel's advice, whatever that might be.

12          Mr. Savitt, can you shed some light on this

13  potential problem?

14          MR. SAVITT:  Yes, Your Honor.  It's certainly not

15  Mr. Baslan's intention to call Ms. Henry in as a witness.

16          THE COURT:  Under any circumstances?

17          MR. SAVITT:  I can't foresee any circumstances where

18  that would become a necessary component of the trial.

19          THE COURT:  Well, my time is limited, but I think

20  the prudent thing to do is to try to schedule a competency

21  hearing, unless there is some collective judgment that she

22  would be, if called, competent to testify.

23          Does the government have a position on that?

24          MR. SMITH:  I think the prudent think is to schedule

25  a competency hearing, Your Honor.

1     THE COURT:  Ellie, can we do that.  I want both

2  doctors present at the same time.  That's the way I do it.  I

3  will put them both under oath at the same time.  I'll start

4  with whatever witness you want, but I want to make sure we

5  narrow and identify, to the extent we can, those specific

6  areas of differences.

7     I'm uncomfortable having this conversation without

8  Ms. Henry's counsel present.  Perhaps that's the best thing to

9  do, is to get them in here.  Ellie, get them in here as

10  quickly as we can.

11     THE CLERK:  Yes.

12     THE COURT:  We're going to address it immediately.

13     I've now reviewed both reports.  I have a number of

14  questions I'd like to put to both of the doctors.  To be

15  honest with you, I've not had a lot of experience over the

16  years with contested competency matters.  So I'm going to go

17  slowly and cautiously.  I'm ready to proceed if we can get the

18  doctors in here.  More about that after we've contacted

19  counsel.

20     MR. SMITH:  Thank you, Your Honor.

21     THE COURT:  Anything else?

22     MR. SMITH:  Not from the government.

23     THE COURT:  Anything, Mr. Savitt?

24     MR. SAVITT:  Your Honor, I believe we've made a

25  sufficient record with respect to our Messiah issue.  I

1    understand the Messiah issue itself is not something that

2    needs to be the subject of any evidentiary hearing, given the

3    government's concession that there was a Messiah violation.

4              THE COURT:  That's true.

5              MR. SAVITT:  However, the question remains whether

6    or not, at least potentially, or hypothetically, certain

7    remedies are appropriate in this case should the government

8    decide to call CI-2, I guess it is, Mr. Salani, as some sort

9    of rebuttal witness should Mr. Baslan testify, and if I don't

10   call him.

11             I know there are a lot of hypos here.  I understand

12   that.  I'm not asking Your Honor to rule on this because I

13   don't know if it'll ever become an issue at trial.  For

14   instance, if I call Salani, then, of course, there should be

15   no remedy.  I've opened the door to that.  And even though

16   there's a Messiah violation and the government can't use

17   Salani on the direct case, if I open the door, I open the

18   door.  But if I don't, and Mr. Baslan testifies --

19             THE COURT:  I'm not quite sure where you're going

20   with this.

21             MR. SAVITT:  I'm not sure either.

22             THE COURT:  The government has acknowledged that it

23   can't use the statements in its case in chief.  End of

24   discussion.  So presumably they're not going to be calling

25   this chap to elicit those discussions.

1          Is that fair to say?

2          MR. SMITH:  It's fair to say the government won't

3  call him and elicit those discussions in the case in chief.

4  If Mr. Baslan testifies, it's a different situation.

5          THE COURT:  Of course.  That pretty much resolves

6  the issue, the Messiah issue.  There's no need for a hearing.

7  There is a -- there seems to be -- and I will be addressing

8  this, there seems to be a suggestion, however, that the

9  government's conduct is so extreme that a more serious

10 sanction, such as the dismissal of these charges, may be

11 appropriate.

12         First of all, having now listened to those rather

13 peculiar tapes, I very much doubt that such a finding could be

14 supported.  But we needn't decide it now, we have a trial.

15 And if anything evolves out of that trial which suggests,

16 perhaps, something else, we can always address the question of

17 the government's conduct if indeed there is a fair basis to do

18 it.  I don't see that now.

19         Having reviewed the statements in light of the

20 government's concession, there's simply no reason to have a

21 hearing at this point.  Something unusual develops sometimes,

22 in many cases in issues of government conduct, claims of

23 outrageous government conduct that justifies supreme

24 sanctions, there's been a number of instances where that

25 allegation's been made and you have a hearing post trial.  I

1  don't know that this will be such, but that opportunity

2  exists.  But now, for our trial purposes, there's no need for

3  a hearing.

4          All right.  But the witness will be available, the

5  government will make sure of that.  You know what the pitfalls

6  are if you choose to elicit certain testimony on your case,

7  Mr. Savitt.

8          MR. SAVITT:  Yes.

9          THE COURT:  The government's conceded otherwise,

10 that the statements will not be used.  You know, I follow

11 precedence, but I'll say I've always had trouble with that

12 under circumstances such as this, where, in light of an

13 initiative made by a defendant that involves clear

14 indications, there may be an innocent explanation for it.  So

15 this is not a finding.  Clear indication that there has been

16 an obstruction of justice, and continuing efforts to obstruct

17 justice, and the government acts responsibly investigating

18 those ongoing criminal -- potential criminal acts, why the

19 government, under Messiah, can't use those statements has

20 always been a point of trouble for me.  And it was for

21 Justice Ginsberg, if I recall.  But that's it.  And the's

22 government considered it, we needn't argue about it.

23         With that, I'll wish you a good morning.  Thank you,

24 folks.

25         MR. SAVITT:  Your Honor, if I may, the last

1  application is to have a copy of, please, these minutes.

2           THE COURT:  Granted.

3           MR. SAVITT:  We could share it with the government.

4           THE COURT:  Of course.  Share it with the

5  government.  Authorized.

6           Thank you.

7           MR. SAVITT:  Thank you, Your Honor.

8           MS. DEMAS:  Thank you, Your Honor.

9           THE COURT:  Thank you.

10          (Matter concluded at 12:10 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 1

**100** [3] - 14:6, 20:10, 68:3
**10016** [1] - 1:22
**10:00** [1] - 1:8
**11201** [2] - 1:15, 2:2
**11:00** [1] - 67:5
**11:30** [1] - 67:6
**11:40** [1] - 79:17
**11:55** [1] - 79:18
**12:10** [1] - 88:10
**13-CR-220** [2] - 1:3, 2:8
**15th** [2] - 81:12, 81:13
**19** [3] - 5:18, 15:25, 76:22
**19th** [3] - 45:12, 45:18, 47:14

## 2

**2** [2] - 71:23, 73:8
**20** [1] - 33:25
**2003** [1] - 5:18
**2010** [1] - 5:17
**2013** [7] - 5:20, 15:25, 33:25, 45:12, 45:18, 63:2, 76:22
**2014** [1] - 1:7
**20th** [1] - 63:2
**2125** [1] - 16:11
**2127** [1] - 16:15
**225** [1] - 2:2
**22nd** [1] - 1:22
**24** [1] - 1:7
**250** [2] - 40:1, 40:5
**256** [1] - 31:14
**260** [1] - 1:21
**271** [1] - 1:14

## 3

**3/20/2013** [1] - 33:16
**30** [2] - 36:9, 36:19
**30-year** [1] - 47:4
**302** [2] - 20:18, 20:20
**302s** [1] - 62:16
**3500** [3] - 61:21, 62:2, 62:7
**3500-AS-2** [1] - 15:18
**3500-AS-5** [1] - 59:8, 60:12
**3500-AS-6** [1] - 38:2, 71:8, 71:24
**3500-AS-7** [1] - 33:8
**395** [1] - 14:22

## 7

**718-613-2647** [1] - 2:3
**7th** [2] - 48:22, 48:24

## 8

**8-year-old** [1] - 22:20

## 9

**9:00** [1] - 9:12
**9:25** [1] - 16:11
**9:27** [1] - 16:15
**9:30** [1] - 9:12

## A

**a.m** [3] - 1:8, 79:17, 79:18
**Aaron** [2] - 3:16, 3:24
**AARON** [1] - 3:25
**able** [2] - 11:13, 50:2
**absolutely** [16] - 18:1, 24:23, 31:21, 34:20, 35:5, 36:11, 47:8, 47:11, 47:15, 52:2, 52:6, 52:12, 60:21, 62:19, 64:2, 79:7
**abuse** [2] - 6:15, 22:3
**abused** [1] - 81:1
**abusive** [2] - 21:10, 21:11
**access** [3] - 27:19, 28:21, 54:14
**accessed** [1] - 25:7
**accompanied** [1] - 49:16
**accurate** [1] - 38:18
**accurately** [1] - 60:18
**accusation** [2] - 3:7, 34:19
**acknowledged** [2] - 58:24, 85:22
**acknowledgment** [1] - 16:23
**act** [3] - 47:1, 47:2, 48:15
**acted** [3] - 31:23, 76:14, 80:16
**action** [1] - 50:11
**actively** [1] - 28:7
**acts** [3] - 7:24, 87:17, 87:18
**actual** [5] - 7:6, 7:8, 8:2, 40:12, 55:4
**addition** [3] - 11:7, 43:11, 68:23
**additional** [2] - 22:8, 41:6, 42:15

**additions** [4] - 37:24, 38:9, 38:21, 43:14
**address** [2] - 84:12, 86:16
**addressing** [1] - 86:7
**adequate** [1] - 3:3
**adjacent** [4] - 7:13, 13:9, 49:5, 56:14
**administer** [1] - 8:6
**administered** [1] - 12:2
**admissibility** [1] - 15:5
**admissions** [1] - 79:24
**admitted** [2] - 63:15, 63:25
**admonished** [2] - 59:6, 61:5
**admonishment** [1] - 61:11
**admonishments** [1] - 60:10
**adopted** [1] - 73:20
**advance** [5] - 6:19, 7:11, 14:25, 46:20, 82:10
**advice** [4] - 14:23, 15:2, 36:24, 83:11
**advise** [3] - 15:21, 58:20, 82:11
**advised** [5] - 38:20, 59:16, 59:17, 59:20, 60:7
**advising** [1] - 14:14
**affected** [5] - 5:24, 7:8, 8:24, 10:18
**affidavit** [3] - 3:2, 79:23, 81:6
**affidavits** [1] - 80:2
**afterwards** [1] - 77:25
**agency** [1] - 75:22
**agent** [20] - 3:5, 4:12, 4:13, 10:23, 11:2, 12:1, 15:14, 15:24, 18:22, 33:7, 33:23, 52:19, 53:5, 63:9, 63:13, 78:22, 80:17, 80:19, 80:22, 81:3
**Agent** [17] - 3:12, 3:16, 13:21, 14:2, 14:7, 20:24, 38:17, 40:22, 42:1, 42:3, 43:20, 56:22, 63:12, 63:13, 73:11, 77:8, 81:8
**agent's** [1] - 81:2
**agents** [25] - 2:25, 7:16, 9:7, 10:9, 10:13, 13:1, 13:23,

35:21, 35:22, 45:11, 49:8, 49:19, 50:7, 50:19, 52:14, 57:7, 58:21, 59:6, 59:16, 59:17, 60:19, 63:1, 63:3, 64:10, 76:7
**aggravated** [1] - 6:15
**aggressively** [2] - 51:24, 51:25
**ago** [2] - 25:12, 56:10
**agree** [1] - 36:17
**agreed** [8] - 17:11, 17:14, 22:25, 42:21, 42:22, 58:14, 68:17, 70:2
**agreement** [2] - 15:11, 17:12
**agreements** [1] - 26:3
**agrees** [1] - 83:4
**ahead** [5] - 32:11, 47:24, 48:12, 75:17, 79:20
**aid** [1] - 14:21
**alive** [1] - 23:15
**allegation's** [1] - 86:25
**allow** [4] - 26:7, 27:9, 48:17, 50:16
**allowed** [2] - 7:1, 25:22
**almost** [1] - 72:6
**aloud** [3] - 38:20, 38:23
**Amendment** [1] - 83:8
**AMERICA** [1] - 1:3
**amount** [5] - 11:13, 26:15, 67:10
**analyst** [2] - 4:16, 4:17
**answer** [5] - 58:18, 62:5, 68:2, 68:4, 68:13
**answered** [2] - 56:11, 76:24
**answers** [2] - 60:14, 60:23
**anytime** [3] - 34:3, 37:5, 37:12
**anyway** [1] - 11:15
**apart** [3] - 62:2, 62:10, 69:14
**apartment** [2] - 31:24, 34:5
**apologize** [4] - 39:8, 40:2, 40:14, 62:9
**apparent** [3] - 23:21, 23:22, 73:23
**appear** [10] - 12:13, 16:2, 18:2, 18:5, 19:20, 55:20, 58:7, 65:5, 68:12, 82:23

**appearance** [1] - 2:10
**APPEARANCES** [1] - 1:12
**appeared** [3] - 50:13, 55:21, 80:19
**application** [1] - 88:1
**appraised** [1] - 81:25
**appreciate** [1] - 79:15
**approach** [2] - 16:19, 16:22
**approached** [1] - 19:5
**approaching** [1] - 49:21
**appropriate** [2] - 85:7, 86:11
**approval** [1] - 70:6
**approximate** [1] - 11:16
**Arabia** [1] - 5:1
**area** [6] - 9:20, 10:18, 10:23, 11:2, 12:25
**areas** [1] - 84:6
**argue** [1] - 87:22
**arm** [2] - 17:22, 53:6
**armed** [3] - 11:4, 11:7, 51:13
**arms** [3] - 52:23, 53:2, 53:5
**arranged** [1] - 81:17
**arrest** [51] - 2:25, 3:7, 5:19, 5:21, 5:23, 5:24, 6:1, 6:2, 6:4, 6:8, 6:19, 7:6, 7:7, 7:8, 8:2, 8:24, 9:8, 9:10, 9:20, 10:10, 10:18, 11:12, 11:21, 12:12, 13:5, 14:4, 14:13, 15:21, 26:12, 30:9, 30:12, 32:18, 35:4, 37:15, 45:15, 46:7, 46:21, 47:1, 47:16, 47:23, 48:1, 50:14, 53:22, 60:20, 64:6, 65:14, 66:6, 76:23, 77:12, 78:24, 79:6
**arrested** [19] - 5:22, 11:17, 12:18, 12:23, 23:12, 30:22, 54:10, 55:17, 56:11, 65:8, 65:16, 65:19, 67:7, 75:21, 76:2, 76:3, 76:13, 76:23, 80:5
**arresting** [1] - 12:16
**arrests** [1] - 6:16
**arrow** [12] - 16:11, 40:25, 41:1, 41:10, 41:21, 71:11, 71:14, 72:4, 72:14, 77:21, 77:23, 80:23

**AS-5** [1] - 60:1
**AS-6** [2] - 72:5, 73:7
**aspect** [1] - 80:3
**assessments** [1] - 70:22
**Assistant** [1] - 1:16
**assuming** [1] - 81:21
**assured** [1] - 56:8
**attached** [1] - 71:21
**attempt** [2] - 6:15, 12:19
**attempted** [2] - 6:14, 80:18
**attention** [2] - 5:18, 64:7
**Attorney** [2] - 1:14, 62:25
**attorney** [3] - 37:8, 37:11, 44:20
**Attorneys** [1] - 1:16
**attorneys** [1] - 2:9
**authority** [5] - 26:2, 26:5, 26:7, 26:10, 73:23
**authorize** [2] - 6:22, 26:11
**authorized** [2] - 7:4, 88:5
**available** [2] - 81:20, 87:4
**Avenue** [1] - 1:21
**awhile** [1] - 28:17
**awkward** [1] - 61:25

## B

**babysitting** [1] - 24:6
**background** [2] - 7:10, 37:17
**backing** [1] - 8:25
**backpack** [3] - 27:1, 54:16, 55:14
**backside** [1] - 11:1
**badge** [1] - 50:23
**barred** [1] - 37:3
**based** [8] - 6:4, 25:3, 27:22, 28:17, 38:18, 48:9, 71:7, 80:8
**basis** [3] - 47:25, 63:25, 86:17
**Baslan** [206] - 2:7, 2:8, 2:16, 5:22, 6:11, 6:25, 7:6, 7:19, 8:5, 8:11, 8:14, 8:20, 9:8, 9:10, 9:15, 9:22, 10:4, 10:6, 11:7, 11:11, 11:17, 11:21, 11:24, 12:6, 12:18, 12:22, 13:17, 13:20, 14:1, 14:3, 14:7,

14:8, 14:11, 14:16, 14:19, 15:25, 16:8, 16:13, 16:17, 17:4, 17:8, 17:11, 17:13, 17:20, 18:5, 18:17, 18:21, 18:25, 19:17, 19:23, 20:2, 20:13, 20:21, 20:25, 21:2, 21:8, 21:9, 21:24, 22:3, 22:4, 22:7, 22:12, 22:17, 22:24, 22:25, 23:11, 23:12, 23:22, 23:23, 23:25, 24:9, 24:11, 24:21, 25:4, 25:16, 25:19, 25:20, 25:21, 26:2, 26:6, 26:12, 26:18, 26:22, 27:10, 27:15, 27:23, 29:11, 29:16, 30:7, 30:16, 30:22, 31:2, 31:7, 31:13, 31:19, 32:14, 32:23, 33:13, 33:17, 34:5, 34:8, 34:11, 34:18, 34:21, 35:3, 35:8, 35:13, 35:18, 35:25, 36:8, 36:12, 36:14, 36:17, 36:19, 36:22, 37:2, 37:5, 37:10, 37:14, 37:20, 38:8, 38:19, 38:23, 39:5, 39:6, 39:12, 39:19, 39:20, 40:4, 40:9, 40:23, 41:2, 41:6, 41:8, 41:11, 41:15, 41:22, 42:5, 42:20, 43:5, 43:21, 44:16, 45:16, 46:12, 47:13, 48:22, 49:21, 50:7, 51:20, 51:21, 56:20, 57:5, 57:14, 58:6, 58:13, 58:20, 58:23, 59:16, 59:17, 59:20, 59:22, 60:5, 60:19, 61:6, 61:13, 61:17, 62:4, 64:5, 64:12, 64:19, 65:13, 65:17, 65:24, 66:5, 66:16, 66:24, 67:8, 67:13, 68:1, 70:2, 70:13, 70:22, 71:2, 71:3, 71:4, 72:22, 73:4, 73:16, 74:14, 75:2, 75:19, 76:10, 76:21, 77:18, 77:25, 78:9, 78:23, 80:4, 81:6, 82:6, 82:12, 85:9, 85:18, 86:4
**baslan** [7] - 8:3, 8:9, 8:23, 23:19, 28:1, 33:23, 61:22

**BASLAN** [1] - 1:6
**Baslan's** [21] - 3:1, 6:19, 21:5, 23:7, 23:10, 24:24, 27:2, 30:19, 31:23, 32:18, 38:14, 43:25, 47:9, 67:5, 76:6, 77:10, 77:11, 79:5, 79:23, 82:10, 83:15
**bathroom** [1] - 10:2
**Bebars** [1] - 5:22
**BEBARS** [1] - 1:6
**became** [1] - 44:10
**become** [2] - 83:18, 85:13
**becoming** [1] - 4:19
**bed** [17] - 10:4, 11:24, 12:7, 51:22, 51:24, 51:25, 52:10, 52:13, 52:14, 52:15, 52:21, 52:24, 53:3, 53:10, 53:17, 54:19, 57:16
**beds** [1] - 11:19
**BEFORE** [1] - 1:9
**began** [2] - 16:7, 77:23
**begin** [2] - 18:18, 80:3
**beginning** [3] - 2:10, 72:18, 72:19
**begins** [1] - 81:12
**behind** [4] - 10:6, 50:1, 53:10, 57:18
**belief** [1] - 65:25
**believes** [1] - 82:17
**belonging** [2] - 6:25, 7:21
**below** [2] - 16:14, 73:10
**Benadryl** [4] - 9:2, 21:13, 21:22
**best** [6] - 19:6, 28:10, 61:1, 61:2, 66:25, 84:8
**between** [5] - 7:19, 9:12, 11:11, 16:23, 50:22
**beyond** [2] - 29:24, 47:19
**bit** [6] - 7:10, 21:7, 31:14, 39:22, 40:1, 40:5
**blame** [1] - 61:25
**blank** [1] - 27:9
**bottom** [2] - 71:11, 72:4
**branded** [1] - 80:14
**break** [1] - 79:14
**Brian** [1] - 13:21
**brief** [2] - 2:22, 66:10
**briefly** [1] - 77:5

**bring** [2] - 9:19, 55:13
**broken** [1] - 36:13
**Brooklyn** [4] - 1:5, 1:15, 2:2, 6:25
**brought** [12] - 10:1, 10:2, 21:3, 23:10, 23:19, 24:12, 26:25, 64:5, 64:10, 64:11, 66:5, 68:15
**bunch** [1] - 55:9
**burden** [1] - 81:9
**Bureau** [1] - 4:10
**business** [2] - 24:6, 53:9
**but..** [1] - 40:17
**BY** [8] - 1:15, 4:8, 32:13, 40:8, 43:19, 45:6, 77:7, 78:21

## C

**Cadman** [1] - 1:14, 2:2
**calm** [4] - 55:21, 55:22, 55:24
**camera** [4] - 55:3, 55:7, 55:10, 55:12
**capitulated** [1] - 63:24
**capitulating** [1] - 63:21
**car** [2] - 8:20, 67:9
**cards** [1] - 55:8
**care** [1] - 14:13
**career** [1] - 6:17
**case** [9] - 4:4, 11:5, 35:1, 81:8, 85:7, 85:17, 85:23, 86:3, 87:6
**cases** [2] - 28:12, 86:22
**caught** [2] - 12:6, 76:15
**cautiously** [1] - 84:17
**certain** [8] - 20:10, 60:14, 70:8, 70:22, 71:2, 82:25, 85:6, 87:6
**certainly** [13] - 20:17, 20:18, 26:1, 47:6, 52:8, 55:25, 56:3, 61:4, 62:14, 80:7, 80:11, 81:17, 83:14
**cetera** [1] - 37:24
**chair** [3] - 57:16, 57:17, 75:9
**chance** [1] - 77:24
**change** [6] - 21:6, 21:24, 22:10, 37:24, 40:22, 41:18
**changes** [6] - 38:21, 38:25, 39:4, 43:13,

70:6, 70:8
**changing** [1] - 19:1
**chaotic** [1] - 53:25
**chap** [1] - 85:25
**characterized** [1] - 47:23
**charge** [2] - 2:18, 47:3
**chargeable** [2] - 48:7, 48:8
**charged** [1] - 5:10
**charges** [12] - 6:11, 6:14, 26:13, 47:16, 47:25, 65:8, 65:10, 65:13, 65:15, 65:18, 80:7, 86:10
**charging** [2] - 6:4, 46:8
**chase** [1] - 62:10
**check** [1] - 28:25
**checking** [1] - 28:15
**chest** [1] - 11:25
**chief** [2] - 85:23, 86:3
**child** [38] - 3:7, 5:11, 5:12, 5:13, 6:14, 7:2, 22:13, 24:22, 25:6, 25:9, 25:10, 25:12, 25:19, 25:22, 31:12, 31:13, 34:19, 39:25, 44:2, 44:4, 44:5, 47:9, 47:13, 48:5, 68:5, 68:13, 68:15, 68:17, 68:24, 68:25, 69:5, 69:7, 73:21, 74:16, 78:9, 78:12, 78:14
**children** [14] - 5:7, 5:9, 5:11, 7:20, 7:21, 7:23, 7:25, 8:7, 8:9, 20:14, 20:25, 21:5, 47:7
**children's** [1] - 9:2
**choice** [1] - 37:2
**choose** [2] - 81:7, 87:6
**chronological** [4] - 60:13, 60:24, 61:2, 61:4
**chuckled** [1] - 25:25
**CI-2** [2] - 81:16, 85:8
**circle** [1] - 39:23
**circumstances** [3] - 83:16, 83:17, 87:12
**city** [1] - 8:17
**City** [2] - 5:25, 45:12
**claim** [1] - 80:13
**claims** [1] - 86:22
**clear** [10] - 15:15, 24:9, 40:18, 42:17, 42:18, 75:19, 77:8, 80:9, 87:13, 87:15

clearly [1] - 48:15
CLERK [3] - 2:6, 3:22, 84:11
code [4] - 8:7, 8:10, 8:15, 34:5
codefendant [3] - 36:1, 36:9, 82:8
coercive [1] - 80:12
cold [4] - 22:11, 23:2, 59:22, 77:18
colleague [3] - 2:20, 32:25, 33:5
collective [1] - 83:21
comfortable [2] - 67:24, 67:25
coming [1] - 64:7
comments [2] - 3:6, 80:16
competency [9] - 82:9, 82:14, 82:24, 82:25, 83:1, 83:20, 83:25, 84:16
competent [4] - 83:6, 83:7, 83:10, 83:22
complain [1] - 34:24
Complaint [2] - 6:5, 6:7
complaint [1] - 34:21
complete [2] - 6:13, 78:23
completed [1] - 44:17
completely [5] - 41:5, 42:4, 42:7, 42:18, 77:25
completing [1] - 44:20
complies [1] - 43:7
component [1] - 83:18
composed [1] - 80:19
computer [15] - 7:3, 28:8, 30:11, 30:16, 30:24, 31:3, 44:4, 55:7, 57:2, 68:21, 68:24, 69:3, 69:7, 69:10
computers [2] - 7:3, 27:18
conceded [1] - 87:9
conceding [1] - 71:3
concern [8] - 24:12, 27:21, 51:12, 64:6, 66:5, 74:11, 80:20, 81:3
concerned [9] - 24:5, 24:7, 41:8, 51:9, 65:1, 65:5, 65:7, 65:9, 66:11
concerning [1] - 62:3
concession [2] - 85:3, 86:20
concluded [1] - 88:10

conclusion [2] - 29:2, 83:5
conduct [8] - 2:22, 7:23, 64:15, 76:8, 86:9, 86:17, 86:22, 86:23
conducted [1] - 54:12
conducting [2] - 15:22, 67:12
confer [1] - 35:21
conferred [1] - 14:24
confessed [1] - 36:10
confirms [1] - 83:3
confront [1] - 22:12
confrontation [1] - 76:22
confronted [3] - 22:16, 22:18, 66:3
confronting [2] - 23:25, 71:2
connection [1] - 68:19
Conolly [8] - 13:22, 14:2, 14:8, 18:22, 38:17, 42:1, 56:22, 73:11
consent [6] - 33:3, 33:4, 33:5, 33:10, 33:13, 33:17
consider [1] - 62:20
considerable [1] - 67:10
consideration [1] - 39:12
considered [3] - 80:2, 80:21, 87:22
constant [1] - 13:25
contact [2] - 75:20, 76:7
contacted [1] - 84:18
container [5] - 28:9, 28:10, 28:18, 28:19, 28:20
containers [4] - 28:7, 28:16, 28:24, 29:3
content [1] - 15:7
contents [2] - 15:6, 29:8
contested [1] - 84:16
context [3] - 9:4, 75:4, 80:24
continuation [1] - 72:12
continue [1] - 4:6
CONTINUED [4] - 32:12, 40:7, 43:18, 78:20
continuing [1] - 87:16
contraband [1] - 54:5
contrary [1] - 42:23
control [2] - 11:10,

48:14
controlled [1] - 11:9
conversation [14] - 22:18, 22:20, 22:23, 27:22, 32:6, 59:5, 60:19, 61:23, 62:4, 63:2, 66:23, 71:1, 84:7
conversations [2] - 8:12, 19:15, 27:22
conversed [1] - 56:3
convey [2] - 12:17, 74:3
conviction [1] - 26:16
cooperate [4] - 36:23, 43:23, 73:10, 74:5
cooperating [1] - 37:3
cooperation [2] - 68:8, 68:10
cooperative [1] - 80:17
cooperator [30] - 7:14, 7:18, 7:19, 7:22, 8:5, 8:6, 8:8, 8:23, 9:15, 9:18, 9:22, 10:1, 11:8, 11:12, 12:12, 12:16, 13:12, 13:13, 19:14, 20:3, 21:3, 21:4, 21:16, 22:21, 49:18, 49:19, 50:12, 74:8
cooperator's [5] - 7:17, 8:22, 13:9, 21:10, 49:25
cooperators [1] - 50:5
coordinating [1] - 57:4
copy [1] - 88:1
correct [83] - 4:4, 4:5, 10:11, 13:3, 17:3, 17:7, 20:17, 37:23, 38:13, 45:13, 45:14, 45:17, 46:1, 46:10, 46:24, 47:17, 48:21, 49:2, 49:4, 49:9, 49:10, 50:6, 51:11, 51:15, 51:17, 53:4, 53:11, 53:17, 53:18, 54:6, 54:8, 55:14, 55:15, 56:17, 57:19, 57:22, 58:4, 58:5, 58:8, 58:9, 60:20, 62:4, 63:3, 63:4, 63:7, 63:14, 64:1, 64:8, 64:13, 64:14, 65:4, 65:12, 66:13, 66:21, 66:22, 67:8, 67:15, 68:3, 69:8, 69:9, 70:7, 70:11, 70:17, 70:21, 70:23,

71:9, 72:3, 72:8, 72:13, 72:20, 72:21, 72:23, 72:24, 73:5, 73:13, 74:6, 74:8, 74:17, 75:25, 78:10, 78:11, 78:14, 78:15
corrected [1] - 39:6
correcting [1] - 80:19
correction [5] - 39:7, 39:8, 39:9, 39:11, 39:14
corrections [2] - 38:21, 38:25
correctly [2] - 45:20, 67:22
counsel [6] - 2:10, 14:25, 15:8, 82:22, 84:8, 84:19
counsel's [1] - 83:11
couple [7] - 4:25, 5:16, 13:23, 49:8, 56:23, 56:25, 77:8
course [8] - 6:16, 26:11, 68:1, 74:18, 80:3, 85:14, 86:5, 88:4
COURT [74] - 1:1, 2:19, 2:22, 3:12, 3:15, 4:1, 4:3, 4:6, 9:3, 9:6, 9:24, 10:21, 13:2, 15:7, 15:10, 15:13, 17:16, 32:1, 32:6, 32:11, 38:11, 39:11, 39:14, 39:17, 43:1, 43:4, 43:6, 43:8, 43:10, 43:17, 44:24, 45:1, 45:3, 47:21, 48:12, 48:18, 52:25, 53:9, 56:5, 59:15, 69:18, 69:22, 72:9, 74:7, 74:10, 74:24, 75:1, 75:17, 76:19, 76:24, 77:4, 78:17, 79:9, 79:12, 79:14, 79:19, 79:25, 82:3, 82:16, 83:9, 83:16, 83:19, 84:1, 84:12, 84:21, 84:23, 85:4, 85:19, 85:22, 86:5, 87:9, 88:2, 88:4, 88:9
Court [26] - 2:1, 2:1, 7:10, 8:2, 10:22, 15:2, 15:19, 16:17, 19:4, 20:16, 21:19, 22:15, 25:18, 26:21, 29:13, 31:11, 37:17, 39:4, 40:18, 44:3, 49:15, 79:22, 79:23, 81:21, 81:24, 82:11

court [2] - 2:18, 69:20
Court's [1] - 15:1
Courthouse [1] - 1:4
coverage [1] - 35:1
covered [2] - 30:7, 30:25
crack [1] - 28:14
credence [1] - 80:13
credentials [1] - 14:9
credible [1] - 81:7
credit [2] - 80:12, 81:7
crime [6] - 5:6, 5:10, 58:21, 58:24, 59:17, 60:7
crimes [2] - 5:6, 5:8
criminal [2] - 87:18
critically [1] - 80:8
CROSS - 45:5
cross [5] - 46:16, 46:17, 46:20, 77:9, 78:8
crossed [4] - 39:9, 39:20, 40:4, 70:10
crossing [1] - 46:13
CRR [1] - 2:1
crying [1] - 18:11
cuff [2] - 12:8, 53:10
cuffed [4] - 9:23, 12:2, 12:22, 57:18
curiosity [1] - 4:1
cuss [1] - 35:15
custodial [1] - 15:22
cut [1] - 62:10

**D**

dangerous [3] - 11:2, 11:7, 51:13
Danielle [2] - 1:18, 2:13
date [2] - 33:15, 79:2
daughter [2] - 22:20, 22:22
dead [1] - 23:15
deal [6] - 26:8, 31:17, 31:19, 44:12, 78:10, 82:19
DEARIE [1] - 1:10
decide [3] - 36:22, 85:8, 86:14
decision [5] - 41:10, 46:11, 46:15, 51:6, 83:10
decline [2] - 17:16, 17:18
deduce [1] - 27:24
defendant [6] - 2:8, 21:16, 25:6, 25:9, 82:8, 87:13
Defendant [2] - 1:7,

U.S.A. v. BEBARS BASLAN                                    4

1:21
**defendant's** [2] - 2:23, 81:4
**defense** [5] - 14:24, 79:12, 79:21, 81:15, 82:17
**definitely** [1] - 63:22
**Demas** [1] - 2:12
**DEMAS** [27] - 1:15, 2:11, 3:14, 3:16, 4:8, 14:24, 15:12, 15:17, 32:13, 38:1, 40:8, 43:19, 44:23, 44:25, 47:18, 48:11, 74:9, 75:16, 76:18, 77:5, 77:7, 78:16, 78:18, 78:21, 79:8, 79:11, 88:8
**demonstrate** [1] - 48:15
**denied** [1] - 81:10
**describe** [3] - 10:22, 30:14, 49:15
**described** [2] - 14:17, 19:16
**describing** [1] - 64:22
**desktop** [2] - 30:16, 30:19
**detail** [1] - 62:21
**details** [3] - 62:13, 62:14, 62:17
**develops** [1] - 86:21
**device** [6] - 26:21, 30:12, 30:14, 69:6
**devices** [4] - 26:19, 30:8, 30:17, 55:8
**devised** [1] - 7:20
**dictate** [1] - 70:4
**differences** [1] - 84:6
**different** [6] - 42:4, 56:13, 62:7, 69:11, 83:5, 86:4
**differently** [1] - 42:6
**difficult** [2] - 27:19, 28:13
**difficulty** [3] - 18:8, 58:7, 58:10
**direct** [12] - 19:9, 21:8, 21:25, 45:10, 47:19, 47:22, 57:21, 58:6, 65:11, 70:9, 73:8, 85:17
**DIRECT** [4] - 4:7, 32:12, 40:7, 43:18
**directing** [1] - 5:18
**directly** [2] - 7:15, 50:1
**disagree** [4] - 48:2, 48:4, 48:6, 48:8
**discovery** [1] - 47:20

**discredit** [1] - 80:1
**discuss** [4] - 44:7, 66:9, 78:10, 78:13
**discussed** [7] - 8:7, 25:14, 34:16, 44:5, 64:24, 70:13, 79:3
**discussing** [6] - 24:8, 25:19, 30:17, 44:4, 68:14, 73:21
**discussion** [14] - 20:11, 26:1, 31:7, 32:2, 43:24, 44:2, 44:9, 48:13, 66:8, 66:10, 66:11, 68:24, 71:18, 85:24
**discussions** [8] - 7:19, 47:7, 47:9, 48:5, 78:9, 81:19, 85:25, 86:3
**dismissal** [1] - 86:10
**displayed** [1] - 50:23
**distance** [1] - 11:11
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 1:10, 32:24
**division** [1] - 5:6
**docket** [1] - 2:7
**doctor** [1] - 64:25
**doctors** [3] - 84:2, 84:14, 84:18
**document** [7] - 6:5, 15:14, 16:2, 16:12, 27:9, 46:8
**done** [10] - 11:2, 11:3, 13:16, 28:17, 37:10, 42:6, 42:10, 42:11, 82:7
**door** [12] - 8:22, 9:16, 9:18, 9:19, 49:25, 50:2, 50:12, 50:14, 85:15, 85:17, 85:18
**doorway** [1] - 7:13
**doubt** [2] - 80:5, 86:13
**down** [22] - 16:14, 22:24, 23:3, 28:19, 29:5, 36:13, 39:8, 51:24, 51:25, 52:1, 52:10, 52:21, 52:22, 52:25, 53:3, 54:4, 54:7, 54:14, 54:18, 67:24, 69:24, 78:17
**downloaded** [2] - 25:10, 68:17
**downstairs** [1] - 49:14
**drag** [1] - 52:22
**draw** [2] - 51:6, 77:23
**drawn** [11] - 10:7, 10:14, 41:1, 41:3, 41:12, 72:14, 72:15, 72:16, 72:17, 72:18,

72:19
**drew** [9] - 41:1, 41:2, 41:11, 41:12, 71:14, 72:20, 72:23, 77:24
**drive** [5] - 31:20, 39:25, 68:23, 69:3, 69:12
**drives** [3] - 31:22, 55:8, 69:16
**Drobo** [1] - 69:17
**DROBO** [1] - 69:17
**dropped** [1] - 54:20
**drove** [1] - 67:9
**drug** [5] - 7:5, 9:5, 21:12, 21:13
**drugs** [1] - 20:4
**duly** [1] - 3:20
**dumb** [2] - 19:6, 19:17
**during** [26] - 12:19, 19:16, 21:6, 21:15, 22:7, 22:16, 23:7, 23:19, 25:7, 25:15, 26:12, 26:18, 35:3, 35:17, 37:5, 37:12, 37:14, 43:25, 61:12, 61:14, 63:8, 63:10, 67:19, 68:1, 80:4, 82:15
**dynamic** [1] - 52:11

**E**

**easier** [1] - 27:11
**East** [2] - 1:14, 2:2
**Eastern** [1] - 32:24
**EASTERN** [1] - 1:1
**effect** [4] - 12:5, 42:16, 45:15, 68:9
**effected** [1] - 47:1
**effecting** [2] - 15:21, 50:14
**effectuate** [2] - 6:7, 10:10
**efforts** [1] - 87:16
**eight** [3] - 9:9, 22:22, 50:22
**either** [12] - 13:17, 13:22, 16:20, 16:22, 17:3, 26:11, 37:2, 42:13, 44:17, 61:22, 64:9, 85:21
**either/or** [1] - 37:1
**electronic** [2] - 26:19, 30:12
**electronics** [1] - 30:8
**elicit** [4] - 36:5, 85:25, 86:3, 87:6
**Ellie** [2] - 84:1, 84:9
**en** [1] - 8:11
**encrypted** [17] - 28:7,

28:9, 28:10, 28:15, 28:18, 28:19, 28:20, 28:23, 29:3, 31:13, 31:20, 31:22, 39:25, 68:20, 69:2, 69:3, 74:15
**encryption** [7] - 27:21, 27:23, 27:25, 31:15, 40:1, 40:5, 78:13
**end** [4] - 16:24, 37:19, 38:11, 85:23
**endanger** [1] - 11:8
**ended** [5] - 19:7, 21:20, 27:13, 41:7, 58:16
**enforcement** [5] - 9:7, 10:19, 50:22, 75:21, 76:22
**engage** [3] - 7:22, 68:12, 82:14
**engaged** [2] - 76:10, 80:17
**engender** [1] - 82:1
**English** [2] - 18:8, 58:11
**ensure** [5] - 12:4, 27:24, 29:21, 42:24, 78:5
**enter** [2] - 8:20, 34:12
**entering** [1] - 50:18
**enticement** [1] - 5:12
**entirely** [2] - 13:9, 82:25
**enure** [1] - 11:9
**environment** [3] - 80:10, 80:12, 80:24
**ePHRAIM** [1] - 1:21
**Ephraim** [1] - 2:16
**equally** [1] - 12:20
**equipment** [1] - 55:3
**error** [1] - 82:15
**essence** [1] - 5:16
**essentially** [2] - 75:24, 83:7
**et** [1] - 37:24
**eve** [1] - 82:12
**evening** [12] - 7:9, 9:13, 19:10, 19:24, 29:24, 30:12, 31:4, 37:22, 45:12, 47:14, 51:3, 59:20
**events** [4] - 19:10, 46:3, 54:3, 60:14
**eventually** [1] - 30:2
**evidence** [5] - 15:11, 22:17, 59:13, 60:12, 76:16
**evidences** [1] - 71:3
**evidentiary** [2] - 2:23, 85:2

**evolves** [1] - 86:15
**exact** [1] - 55:11
**exactly** [5] - 16:19, 36:16, 41:1, 53:7, 67:20
**EXAMINATION** [7] - 4:7, 32:12, 40:7, 43:18, 45:5, 77:6, 78:20
**examination** [8] - 45:10, 57:21, 58:6, 65:11, 70:9, 73:8, 77:9, 78:8
**examined** [1] - 3:20
**example** [1] - 35:22
**except** [2] - 33:24, 34:2
**excessive** [1] - 52:12
**exchange** [1] - 44:6
**excuse** [2] - 21:10, 32:1
**Excuse** [1] - 52:10
**exhibit** [1] - 71:12
**exhibits** [1] - 14:25
**exists** [1] - 87:2
**expecting** [1] - 26:1
**experience** [1] - 84:15
**experienced** [1] - 76:21
**explain** [21] - 8:2, 9:16, 14:5, 15:19, 16:17, 20:16, 20:20, 21:19, 22:2, 22:15, 23:19, 25:18, 26:21, 29:13, 31:11, 32:22, 36:3, 39:3, 41:3, 41:13, 44:3
**explained** [2] - 38:19, 78:8
**explaining** [1] - 14:9
**explanation** [4] - 21:5, 23:1, 58:16, 87:14
**explicit** [1] - 7:23
**exploitation** [5] - 5:11, 24:4, 24:8, 65:20, 76:8
**expose** [2] - 3:6, 24:22
**expressing** [1] - 80:20
**expression** [1] - 17:24
**extent** [2] - 42:22, 84:5
**external** [1] - 69:12
**extreme** [1] - 86:9

**F**

**face** [3] - 17:25, 52:25, 53:3
**faced** [2] - 26:13, 26:15

U.S.A. v. BEBARS BASLAN                                                          5

facing [1] - 35:6
fact [6] - 15:24, 20:12, 28:23, 33:18, 47:12, 69:7
factors [1] - 52:9
facts [2] - 71:3, 79:1
fair [6] - 15:10, 15:13, 71:4, 86:1, 86:2, 86:17
fairly [2] - 3:9, 27:23
far [8] - 14:11, 17:21, 46:25, 53:16, 64:10, 76:16, 76:25
fashion [4] - 19:3, 29:14, 50:10, 50:23
fatal [5] - 10:20, 10:21, 10:22, 51:8, 51:9
father [2] - 64:24, 81:4
father's [1] - 65:1
FBI [20] - 2:25, 4:13, 4:16, 4:19, 5:2, 19:11, 25:12, 28:14, 39:25, 46:11, 47:6, 49:3, 49:8, 51:1, 57:12, 59:7, 64:3, 66:6, 75:21, 76:7
FBI's [1] - 14:23
FD [1] - 14:22
fearful [1] - 64:22
federal [7] - 58:21, 59:6, 59:17, 60:7, 63:3
Federal [1] - 4:10
feet [4] - 22:11, 23:2, 59:22, 77:19
fellow [2] - 60:19, 64:9
felt [2] - 46:19, 67:24
few [2] - 39:20, 69:11
Fifth [1] - 83:8
figure [1] - 76:4
file [1] - 31:14
filed [3] - 9:20, 34:21, 34:24
files [1] - 68:20
finish [4] - 16:24, 32:3, 32:15, 62:22
finished [2] - 16:13, 17:8
fire [1] - 10:25
first [39] - 3:19, 10:17, 14:7, 14:10, 16:21, 19:16, 19:20, 27:17, 40:23, 41:10, 42:9, 42:11, 42:12, 42:16, 42:25, 43:25, 44:17, 53:9, 54:2, 58:13, 58:15, 59:10, 60:1, 60:2, 60:3, 60:25, 61:1, 61:3, 61:7, 61:9, 71:21, 72:5,

72:12, 73:1, 76:22, 76:25, 81:13, 86:12
fit [1] - 38:22
five [1] - 4:14
floor [1] - 48:22
Floor [1] - 1:22
fluent [1] - 58:11
focus [1] - 51:19
focused [3] - 18:15, 47:2, 74:11
folder [3] - 28:9, 28:10, 28:11
folders [1] - 28:7
folding [1] - 63:22
folks [2] - 79:19, 87:24
follow [3] - 8:16, 49:11, 87:10
following [2] - 18:2, 32:23
follows [1] - 3:21
force [4] - 34:12, 52:1, 52:5, 52:12
forensic [1] - 28:6
forensically [1] - 27:19
foresee [1] - 83:17
forever [1] - 37:2
forgotten [1] - 74:12
form [23] - 14:15, 14:23, 15:3, 15:19, 15:21, 15:22, 15:24, 16:7, 16:16, 17:3, 17:9, 17:12, 17:14, 33:3, 33:4, 33:10, 33:13, 33:15, 33:17, 57:12, 57:21, 67:22, 71:23
formed [1] - 16:21
forth [3] - 57:6, 60:22, 80:15
forthcoming [1] - 19:20
forward [2] - 10:25, 50:13
four [1] - 5:17
free [3] - 2:17, 38:20, 70:5
friends [1] - 24:10
front [10] - 12:10, 15:14, 38:3, 41:4, 59:8, 59:9, 60:12, 67:19, 67:25, 71:12
full [6] - 12:7, 14:10, 54:14, 64:15, 78:23
fully [3] - 43:23, 73:9, 74:5
function [1] - 57:1
funnel [5] - 10:20, 10:21, 10:22, 51:8, 51:9

future [2] - 79:2

## G

gain [2] - 12:19, 27:19
general [4] - 64:21, 65:17, 68:22, 68:24
General's [1] - 62:25
generally [3] - 30:14, 60:23, 65:3
gentleman [2] - 81:18
germane [1] - 48:18
Ginsberg [1] - 87:21
gist [2] - 70:16, 70:18
given [14] - 3:2, 8:8, 8:15, 12:7, 13:24, 14:9, 27:10, 51:10, 56:22, 57:9, 60:10, 74:10, 75:4, 85:2
gleaned [1] - 80:11
government [2] - 2:10, 2:12, 3:16, 47:18, 79:10, 81:8, 82:2, 83:4, 83:23, 84:22, 85:7, 85:16, 85:22, 86:2, 86:22, 86:23, 87:5, 87:17, 87:19, 87:22, 88:3, 88:5
Government [1] - 1:13
government's [6] - 82:7, 85:3, 86:9, 86:17, 86:20, 87:9
grab [2] - 12:4, 57:4
grabbed [2] - 53:5, 53:6
grabbing [1] - 52:23
granted [1] - 88:2
group [1] - 5:2
guess [12] - 19:6, 32:16, 36:5, 37:11, 46:4, 48:23, 53:5, 55:24, 66:25, 68:8, 71:23, 85:8
guy [2] - 28:6, 57:2

## H

half [3] - 4:14, 4:18, 46:4
hall [2] - 54:15, 56:15
hallway [3] - 13:5, 14:4, 54:10
handcuffed [6] - 12:17, 17:13, 17:19, 51:14, 67:13, 76:23
handcuffs [3] - 67:16, 67:18, 67:25
handed [1] - 70:5
Handing [2] - 20:23,

40:15
hands [9] - 9:21, 11:14, 11:24, 12:1, 12:4, 50:17, 54:13, 57:18, 67:14
handwriting [2] - 16:2, 73:4
handwritten [16] - 33:3, 33:5, 33:10, 40:23, 41:14, 41:22, 44:17, 44:18, 44:21, 46:1, 70:14, 71:8, 77:10, 77:11, 77:13, 79:5
handwrote [3] - 38:8, 70:5, 70:8
Hannah [2] - 1:17, 2:13
happy [1] - 71:19
hard [13] - 31:20, 31:22, 39:22, 39:25, 40:14, 40:16, 40:21, 51:23, 68:23, 69:3, 69:12, 69:16
health [3] - 64:23, 65:1, 65:2
hear [3] - 3:12, 69:18
heard [2] - 4:3, 75:5
hearing [19] - 2:7, 2:23, 3:10, 4:4, 18:5, 45:25, 74:11, 81:14, 82:2, 82:4, 82:9, 82:14, 83:21, 83:25, 85:2, 86:6, 86:21, 86:25, 87:3
heaviest [1] - 47:3
held [1] - 64:24
help [5] - 14:21, 20:18, 20:19, 21:13, 36:24
helps [1] - 48:15
henry [10] - 8:5, 8:15, 8:20, 10:2, 13:17, 20:3, 36:1, 63:6, 82:7, 83:15
Henry [29] - 5:22, 6:12, 6:25, 7:20, 8:3, 8:11, 8:23, 9:8, 9:15, 9:22, 10:7, 11:6, 11:11, 11:17, 13:7, 34:10, 34:22, 35:23, 36:6, 36:9, 36:13, 36:18, 45:16, 46:12, 48:22, 49:21, 50:8, 56:6, 82:18
henry's [1] - 82:20
Henry's [3] - 6:19, 8:14, 84:8
herself [2] - 36:1, 36:13
high [4] - 11:3, 12:3,

54:11, 64:24
highly [1] - 81:4
himself [3] - 36:19, 36:24, 41:16
hole [1] - 56:18
home [7] - 25:13, 25:20, 30:16, 40:1, 68:21, 69:5, 69:10
honest [2] - 66:9, 84:15
honestly [1] - 25:25
Honor [33] - 2:11, 2:15, 2:18, 3:11, 3:14, 14:24, 15:4, 15:12, 44:23, 45:2, 45:4, 47:18, 48:11, 69:23, 75:16, 76:18, 77:5, 78:18, 79:11, 79:13, 79:15, 79:21, 79:24, 81:24, 82:5, 83:14, 83:25, 84:20, 84:24, 85:12, 87:25, 88:7, 88:8
HONORABLE [1] - 1:10
Hotel [1] - 5:24
hotel [26] - 6:13, 7:7, 7:18, 7:22, 7:25, 8:8, 8:12, 8:18, 8:20, 11:18, 12:23, 14:12, 19:23, 20:8, 20:12, 20:14, 21:1, 21:3, 21:6, 21:12, 34:10, 46:18, 48:17, 49:1, 49:11, 49:12
hour [4] - 32:4, 32:16, 66:24, 81:3
hours [1] - 67:7
house [1] - 57:6
hundred [2] - 6:18, 45:23
Hyatt [3] - 5:24, 45:12, 48:23
hyperventilating [1] - 18:13
hypos [1] - 85:11
hypothetical [1] - 22:9
hypothetically [2] - 22:9, 85:6

## I

idea [4] - 44:5, 69:24, 69:25, 70:1
identified [2] - 14:8, 55:12
identify [2] - 28:23, 84:5
identifying [1] - 50:25
III [1] - 19:13

U.S.A. v. BEBARS BASLAN                                                          6

**imagine** [1] - 49:6
**immediately** [4] - 9:21, 50:17, 54:12, 84:12
**implausibility** [1] - 80:3
**implicate** [1] - 21:16
**implicated** [1] - 36:1
**importance** [1] - 24:2
**important** [3] - 60:17, 70:17, 70:18
**in-between** [1] - 16:23
**in/on** [1] - 39:25
**included** [2] - 42:24
**includes** [3] - 5:11, 5:12, 7:2
**including** [2] - 14:14, 51:16
**inconsistent** [2] - 23:23, 23:24
**incorporate** [1] - 70:12
**incriminate** [1] - 36:19
**incriminated** [1] - 36:13
**indeed** [2] - 75:1, 86:17
**independent** [1] - 62:11
**indicate** [3] - 16:7, 17:12, 75:13
**indicated** [2] - 36:6, 70:9
**indicates** [1] - 82:13
**indicating** [3] - 19:7, 42:15, 50:1
**indicating)** [4] - 39:18, 39:21, 39:22, 43:8
**indication** [3] - 16:12, 35:25, 87:15
**indications** [1] - 87:14
**Indictment** [2] - 6:5, 6:7
**individual** [3] - 9:23, 15:23, 16:25
**individually** [1] - 58:2
**individuals** [3] - 5:23, 9:21, 11:4
**induced** [1] - 3:6
**inference** [1] - 80:25
**inform** [3] - 8:10, 26:13, 26:15
**informally** [1] - 25:11
**informant** [3] - 47:12, 51:16, 81:16
**information** [2] - 35:9, 70:13
**Information** [2] - 6:5, 6:7
**informed** [8] - 14:12,

24:18, 25:13, 25:21, 26:2, 26:6, 34:8, 37:22
**initial** [10] - 14:17, 21:15, 28:22, 40:9, 41:18, 43:13, 43:14, 44:9, 54:9, 80:1
**initialed** [3] - 38:9, 39:7, 39:10, 39:19, 42:5
**initialled** [1] - 43:10
**initials** [5] - 40:16, 40:17, 40:22, 43:3, 43:4
**initiative** [1] - 87:13
**inn** [1] - 5:24
**innocent** [1] - 87:14
**inquiries** [1] - 25:4
**inquiring** [1] - 26:9
**inside** [3] - 54:24, 63:5, 63:6
**insinuate** [1] - 19:12
**insinuated** [3] - 36:15, 63:22, 63:24
**insinuating** [1] - 19:11
**instance** [2] - 67:17, 85:14
**instances** [1] - 86:24
**instead** [1] - 81:7
**instrument** [1] - 46:8
**insufficient** [1] - 48:9
**intelligence** [3] - 4:16, 4:17, 4:19
**intend** [1] - 14:25
**intended** [2] - 56:6, 82:13
**intends** [1] - 82:17
**intent** [5] - 48:15, 59:2, 59:20, 60:6, 60:22
**intention** [4] - 24:15, 64:13, 70:12, 83:15
**intercept** [1] - 50:7
**Interns** [1] - 1:18
**interns** [1] - 2:13
**interpretation** [3] - 65:9, 73:18, 73:19
**interview** [31] - 13:20, 13:21, 15:22, 19:1, 20:7, 21:6, 22:16, 23:8, 23:20, 24:13, 25:7, 25:16, 26:12, 26:18, 32:14, 35:4, 35:17, 37:5, 37:12, 37:13, 37:15, 37:19, 38:12, 44:1, 61:12, 62:21, 62:24, 67:11, 67:12, 67:13, 67:15, 67:20, 68:1, 75:6, 76:4, 80:4, 80:11

**interviewing** [5] - 24:15, 35:23, 59:16, 80:17, 80:18
**interviews** [1] - 12:19
**introduction** [1] - 14:17
**inventory** [1] - 55:4
**investigate** [2] - 5:9, 5:10
**investigating** [1] - 87:17
**investigation** [3] - 24:17, 64:15, 64:16
**Investigation** [1] - 4:10
**investigations** [1] - 5:13
**investigator** [2] - 24:2, 24:3
**involves** [1] - 87:13
**iPhone** [13] - 29:17, 29:20, 29:21, 29:24, 29:25, 30:2, 30:5, 32:17, 33:2, 33:18, 33:24, 34:2
**Iraq** [1] - 4:25
**irrational** [2] - 75:2, 75:3
**issue** [11] - 3:2, 3:5, 37:22, 82:5, 82:19, 82:20, 84:25, 85:1, 85:13, 86:6
**issues** [4] - 18:5, 64:23, 82:9, 86:22
**it'll** [1] - 85:13
**item** [1] - 70:12
**items** [2] - 7:2, 55:9
**itself** [1] - 85:1

## J

**Jack** [1] - 21:10
**Jack's** [1] - 21:9
**jacket** [2] - 51:1, 51:4
**jailhouse** [1] - 81:16
**Jersey** [5] - 5:24, 5:25, 6:12, 8:18, 45:12, 46:13, 46:16, 46:17, 46:20, 48:16, 48:20, 52:20
**job** [1] - 26:4
**JOSEPH** [1] - 1:16
**judge** [1] - 83:4
**Judge** [3] - 1:10, 74:13, 81:12
**judgment** [1] - 83:21
**July** [2] - 81:12, 81:13
**June** [1] - 1:7
**jury** [1] - 81:12
**justice** [2] - 87:16,

87:17
**Justice** [1] - 87:21
**justifies** [1] - 86:23

## K

**kept** [5] - 13:10, 22:7, 22:8, 26:8
**key** [1] - 34:11
**kid** [1] - 59:3
**kidnappings** [1] - 5:13
**kids** [14] - 20:8, 20:10, 20:11, 20:12, 21:3, 21:9, 21:11, 21:22, 22:4, 24:7, 59:18, 59:21, 60:6
**kind** [18] - 5:15, 6:1, 7:3, 10:4, 19:5, 19:8, 21:7, 21:20, 22:7, 26:3, 43:14, 44:12, 44:13, 55:10, 56:23, 61:14, 67:10, 67:23
**Kirshner** [2] - 1:17, 2:13
**knock** [1] - 52:1
**knowledge** [1] - 80:22
**known** [1] - 10:19
**Kristin** [6] - 5:22, 36:9, 36:13, 36:18, 63:15, 82:6

## L

**labeled** [1] - 80:14
**language** [2] - 18:9, 65:18
**laptop** [18] - 26:22, 26:24, 26:25, 27:2, 27:8, 27:14, 27:16, 27:25, 28:2, 28:4, 28:18, 28:19, 29:4, 29:6, 29:8, 55:14, 57:2
**last** [8] - 5:16, 32:9, 43:20, 47:14, 59:10, 60:3, 78:18, 87:25
**lasted** [2] - 67:11, 81:2
**lastly** [1] - 11:11
**late** [1] - 36:24
**latitude** [2] - 47:21, 74:10
**latter** [1] - 70:7
**law** [5] - 9:7, 10:19, 50:22, 75:21, 76:22
**lawfully** [1] - 64:3
**lawyer** [3] - 37:6, 37:11, 44:16
**Leah** [2] - 22:13, 22:20, 22:24
**leak** [3] - 3:7, 34:18,

66:6
**least** [5] - 12:12, 63:8, 71:5, 75:22, 85:6
**leave** [2] - 35:17, 50:17
**leaving** [1] - 8:15
**led** [1] - 51:20
**left** [4] - 9:14, 35:24, 72:11, 73:14
**lends** [1] - 80:13
**lengths** [1] - 17:22
**less** [1] - 80:13
**letters** [2] - 50:24, 51:5
**letting** [1] - 13:16
**level** [1] - 49:6
**leverage** [1] - 12:19
**lie** [4] - 58:21, 58:24, 59:17, 60:8
**light** [4] - 83:11, 83:12, 86:19, 87:12
**Lihn** [1] - 63:13
**limited** [1] - 83:19
**line** [14] - 16:22, 16:23, 17:4, 19:9, 21:8, 21:21, 21:25, 39:9, 47:19, 70:10, 73:25
**list** [1] - 55:4
**listened** [1] - 86:12
**listening** [3] - 19:12, 19:14, 22:17
**live** [2] - 24:24, 25:1
**lived** [1] - 23:17
**lobby** [1] - 8:20
**location** [1] - 14:4
**lock** [1] - 28:20
**locked** [2] - 36:9, 36:19
**locks** [1] - 28:20
**logistics** [1] - 81:20
**look** [6] - 17:24, 20:20, 33:18, 40:12, 57:2, 59:10
**looked** [2] - 28:6, 54:24
**looking** [4] - 28:22, 50:4, 56:18, 73:7
**LORETTA** [1] - 1:13
**ludicrous** [1] - 74:18
**luxury** [1] - 52:9
**lying** [6] - 24:1, 53:2, 59:6, 61:5, 61:13, 61:15
**LYNCH** [1] - 1:13

## M

**ma'am** [58] - 4:23, 5:4, 5:20, 6:21, 7:12, 8:1,

8:4, 9:18, 11:18, 11:22, 12:9, 14:6, 14:20, 14:22, 15:16, 15:20, 16:1, 16:9, 16:14, 16:19, 17:13, 18:22, 19:5, 20:2, 20:15, 20:17, 20:22, 21:2, 21:7, 21:20, 23:4, 29:7, 29:10, 29:23, 30:23, 31:4, 31:10, 31:12, 33:14, 34:1, 34:4, 34:17, 36:2, 36:4, 36:25, 37:19, 38:4, 40:21, 40:25, 41:4, 41:15, 41:25, 42:2, 42:23, 43:22, 44:22, 77:20, 78:25

**Macintosh** [1] - 27:18, 30:16

**Madison** [1] - 1:21

**magistrate** [1] - 46:21

**Magistrate** [1] - 81:11

**maiden** [1] - 75:24

**maintained** [1] - 11:10

**majority** [2] - 18:23, 67:15

**man** [1] - 81:20

**manner** [1] - 3:3

**March** [8] - 5:18, 15:25, 33:25, 45:12, 45:18, 47:14, 63:2, 76:22

**margin** [5] - 72:9, 72:10, 72:11, 73:14, 80:23

**Marine** [1] - 4:21

**marked** [2] - 33:8, 38:2

**marking** [1] - 43:1

**Massre** [2] - 49:17, 51:18

**massre** [3] - 47:12, 49:17, 51:16

**Massre's** [1] - 49:22

**material** [1] - 61:21

**materials** [1] - 62:2

**matter** [5] - 10:25, 79:18, 80:1, 82:22, 88:10

**matters** [2] - 81:14, 84:16

**mean** [15] - 23:5, 50:10, 51:23, 52:1, 55:21, 56:1, 57:1, 59:1, 61:4, 62:13, 67:9, 72:15, 72:16, 73:2, 74:21

**meaning** [5] - 36:18, 37:2, 46:8, 74:6,

74:7

**means** [2] - 23:3, 59:15

**meant** [4] - 24:10, 73:16, 74:2, 74:3

**media** [1] - 7:3

**meeting** [1] - 80:24

**memorialize** [1] - 62:22

**memorialized** [1] - 62:18

**memorializing** [1] - 37:21

**memorized** [1] - 62:16

**memory** [3] - 31:15, 45:20, 58:17

**mention** [2] - 20:10, 66:14

**mentioned** [2] - 8:25, 68:25

**Messiah** [6] - 84:25, 85:1, 85:3, 85:16, 86:6, 87:19

**met** [3] - 8:5, 45:7, 81:8

**middle** [3] - 10:5, 10:24, 32:9

**might** [2] - 40:11, 83:11

**military** [1] - 10:19

**mind** [2] - 52:10, 74:21

**mine** [1] - 33:1

**minimum** [1] - 47:4

**minor** [1] - 6:15

**minutes** [1] - 88:1

**Miranda** [20] - 3:4, 14:15, 14:19, 15:25, 16:8, 16:13, 16:18, 16:20, 16:21, 17:9, 17:20, 18:6, 18:9, 18:17, 53:19, 57:9, 57:11, 57:12, 57:20, 57:23

**miscellaneous** [1] - 55:9

**misunderstood** [1] - 76:9

**modify** [2] - 37:24, 79:5

**molester** [3] - 3:7, 24:22, 34:19

**moment** [8] - 32:1, 44:23, 45:2, 53:21, 53:23, 53:25, 56:10, 79:13

**moments** [1] - 55:24

**morning** [10] - 2:6, 2:11, 2:15, 2:19, 2:21, 45:7, 45:9,

81:13, 81:23, 87:23

**morning's** [1] - 3:10

**morphed** [1] - 5:15

**motion** [2] - 2:24, 81:9

**motions** [2] - 2:23, 81:25

**move** [4] - 12:23, 16:24, 26:11, 48:19

**moved** [4] - 12:25, 21:20, 21:25, 67:19

**moving** [4] - 21:18, 41:13, 50:13, 67:25

**MR** [34] - 2:15, 2:21, 3:11, 15:4, 15:8, 45:2, 45:4, 45:6, 59:13, 69:19, 69:23, 74:13, 74:25, 75:18, 77:3, 79:13, 79:15, 79:21, 81:24, 82:5, 83:4, 83:14, 83:17, 83:24, 84:20, 84:22, 84:24, 85:5, 85:21, 86:2, 87:8, 87:25, 88:3, 88:7

**MS** [26] - 2:11, 3:14, 3:16, 4:8, 14:24, 15:12, 15:17, 32:13, 38:1, 40:8, 43:19, 44:23, 44:25, 47:18, 48:11, 74:9, 75:16, 76:18, 77:5, 77:7, 78:16, 78:18, 78:21, 79:8, 79:11, 88:8

**Munoz** [2] - 1:18, 2:14

---

**N**

**name** [7] - 3:23, 22:13, 39:7, 55:11, 73:10, 73:11

**names** [5] - 5:15, 23:13, 33:6, 33:18, 33:21

**narcotic** [2] - 8:6, 9:3

**narcotics** [2] - 8:9, 8:25

**narrow** [4] - 10:18, 10:23, 74:11, 84:5

**nature** [4] - 51:10, 65:8, 65:10, 80:7

**nearby** [1] - 49:6

**necessarily** [3] - 15:5, 47:5, 77:17

**necessary** [1] - 83:18

**need** [6] - 11:15, 24:9, 24:11, 67:18, 86:6, 87:2

**needed** [4] - 11:9, 21:11, 33:1, 46:17

**needn't** [2] - 86:14,

87:22

**needs** [2] - 47:1, 85:2

**negotiate** [1] - 80:18

**negotiated** [1] - 80:18

**neighbors** [1] - 24:11

**never** [7] - 25:23, 63:8, 66:3, 68:1, 74:22, 75:19, 75:21

**NEW** [1] - 1:1

**new** [3] - 10:21, 32:24, 46:17

**New** [14] - 1:5, 1:15, 1:22, 2:2, 5:25, 6:12, 6:25, 8:18, 46:13, 46:16, 46:20, 52:20, 67:8

**next** [5] - 21:18, 39:18, 39:21, 43:9, 72:25

**niece** [2] - 22:21, 22:22

**nieces** [1] - 7:21

**night** [11] - 7:22, 7:25, 20:14, 21:1, 21:23, 22:4, 32:18, 38:10, 59:18, 60:20, 66:18

**nine** [1] - 22:22

**nobody** [2] - 12:20, 34:9

**none** [2] - 35:10, 64:11

**normal** [1] - 11:18

**note** [2] - 2:9, 82:2

**notes** [3] - 18:20, 46:1, 61:20

**nothing** [5] - 22:6, 62:3, 62:7, 69:16, 80:11

**number** [14] - 2:7, 2:8, 6:11, 10:9, 22:18, 27:21, 42:11, 45:10, 71:25, 74:14, 80:2, 82:17, 84:13, 86:24

**numbers** [8] - 32:20, 33:1, 33:6, 33:19, 33:21, 33:25, 34:3

**numerous** [1] - 77:22

---

**O**

**oath** [1] - 84:3

**object** [2] - 15:4, 15:9

**objection** [4] - 48:11, 74:9, 75:16, 76:18

**objective** [1] - 27:24

**objects** [1] - 47:18

**observe** [1] - 17:24

**observed** [4] - 8:14, 8:19, 8:21, 49:13

**obstruct** [1] - 87:16

**obstruction** [1] -

87:16

**obtain** [4] - 6:20, 29:6, 30:2, 33:18

**obtained** [4] - 6:24, 30:21, 33:3, 34:3

**obviously** [8] - 34:9, 43:12, 54:24, 61:1, 61:2, 62:22, 77:23, 81:25

**occasion** [1] - 49:3

**occasionally** [1] - 17:24

**occasions** [1] - 74:14

**occur** [1] - 51:10

**occurred** [1] - 46:4

**OF** [2] - 1:1, 1:3

**offenses** [1] - 76:5

**offer** [2] - 25:24, 31:19

**offered** [1] - 23:1

**offhand** [1] - 27:11

**office** [2] - 35:11, 48:14

**officer** [4] - 11:1, 12:1, 52:20, 53:6

**officers** [6] - 7:16, 9:7, 10:13, 13:1, 45:11, 57:7

**official** [1] - 61:11

**Official** [1] - 2:1

**often** [2] - 35:21, 44:13

**once** [9] - 9:18, 12:22, 14:3, 17:8, 18:17, 28:19, 33:17, 53:9, 58:3

**one** [34] - 2:8, 2:23, 7:8, 7:15, 10:21, 11:19, 11:11, 16:20, 16:22, 22:19, 27:11, 27:12, 27:13, 27:21, 39:18, 39:21, 42:4, 42:9, 49:5, 49:7, 52:17, 53:5, 53:17, 57:2, 57:11, 64:5, 65:2, 66:5, 68:15, 70:10, 71:17, 82:5, 82:17

**ones** [2] - 39:4, 82:1

**ongoing** [1] - 87:18

**open** [10] - 19:7, 21:20, 28:7, 28:13, 28:19, 28:24, 29:3, 58:16, 85:17

**open-ended** [3] - 19:7, 21:20, 58:16

**opened** [13] - 8:22, 9:18, 9:19, 24:6, 28:3, 28:4, 28:6, 29:21, 29:25, 50:12, 50:14, 50:16, 85:15

operation [2] - 6:13, 7:11
opinion [2] - 48:13, 75:15
opportunity [1] - 87:1
opposite [2] - 10:3, 13:2
options [6] - 43:23, 43:25, 44:8, 73:9, 73:17, 74:3
oral [1] - 23:6
orally [2] - 57:23, 70:13
order [4] - 53:9, 60:13, 61:2, 64:15
original [8] - 12:23, 14:4, 38:2, 40:2, 40:4, 40:11, 40:12, 78:6
originally [1] - 39:24
otherwise [3] - 28:13, 83:3, 87:9
ourselves [3] - 11:12, 14:8, 50:25
outrageous [1] - 86:23
outright [3] - 22:3, 63:23, 80:14
outside [3] - 8:13, 78:3, 78:4
outstanding [1] - 81:25
overruled [1] - 48:12
overseas [1] - 4:22
overt [1] - 48:15
own [6] - 25:4, 27:8, 39:11, 39:13, 80:21, 83:6

59:25, 60:3, 61:7, 61:8
Paralegal [1] - 1:24
paralegal [1] - 2:17
paraphernalia [2] - 7:3, 7:5
parents [13] - 23:7, 23:10, 23:19, 24:12, 24:13, 24:16, 24:22, 24:24, 32:7, 64:7, 64:13, 64:22, 65:7
parents' [2] - 23:13, 65:2
part [18] - 14:6, 20:10, 31:22, 41:9, 43:20, 44:9, 44:18, 44:21, 48:2, 48:4, 69:17, 71:5, 71:6, 72:1, 72:25, 76:3, 78:6, 80:21
participated [1] - 6:16
particular [15] - 5:14, 6:6, 6:12, 7:11, 8:4, 28:11, 32:19, 47:2, 53:25, 61:7, 70:10, 71:2, 71:3, 75:25, 78:13
particularly [1] - 24:3, 62:20
party [7] - 20:4, 20:5, 20:6, 58:18, 59:3, 59:21
password [31] - 26:22, 27:2, 27:10, 27:11, 27:14, 27:16, 27:20, 28:1, 28:3, 28:12, 28:21, 29:11, 29:15, 29:17, 29:19, 29:25, 30:11, 30:15, 30:18, 30:24, 31:2, 31:16, 31:20, 34:11, 34:13, 40:3, 40:5, 57:6, 74:15, 74:20
passwords [6] - 26:19, 27:12, 30:7, 31:8, 34:16, 68:20
past [2] - 24:7, 25:5
pat [3] - 54:4, 54:7, 54:14
peculiar [1] - 86:13
pedophile [7] - 64:7, 65:22, 65:24, 66:7, 66:14, 80:6, 80:14
peep [1] - 56:18
peephole [3] - 7:17, 50:3, 50:4
pen [1] - 40:20
people [1] - 75:9
per [1] - 75:8
perceive [1] - 9:4

perceived [1] - 42:7
percent [3] - 14:6, 45:23, 68:3
performed [1] - 54:7
perhaps [3] - 83:2, 84:8, 86:16
peripheral [1] - 55:7
permission [1] - 15:1
permits [1] - 81:21
permitted [1] - 81:17
person [2] - 30:8, 75:13
personal [2] - 65:25, 68:20, 69:10
personally [2] - 8:21, 11:21
personnel [1] - 50:22
pert [1] - 62:15
pertaining [2] - 5:10, 7:2
pertinent [2] - 62:16, 62:20
phase [2] - 21:15, 21:18
phone [5] - 19:12, 27:22, 32:19, 32:25, 33:6
photographs [1] - 7:24
phrase [1] - 28:11
Phung [1] - 63:13
physical [3] - 6:24, 9:8, 18:5
physically [2] - 9:16, 52:21
physician [1] - 81:5
pick [1] - 8:17
picking [1] - 81:12
picture [1] - 80:10
piece [4] - 41:5, 41:6, 41:7, 41:8
pitfalls [1] - 87:5
place [10] - 7:7, 8:3, 8:13, 9:11, 11:21, 13:6, 50:17, 62:24, 69:14, 81:20
places [2] - 9:25, 69:11
plain [3] - 74:5, 74:7, 82:14
plan [3] - 7:20, 22:10, 22:11
play [1] - 52:9
playing [2] - 19:6, 19:17
Plaza [2] - 1:14, 2:2
plea [3] - 31:17, 31:19, 40:3
Podgorskaya [2] - 1:23, 2:17

point [42] - 8:11, 8:19, 12:6, 14:7, 14:11, 16:10, 20:7, 20:9, 20:24, 21:6, 23:21, 24:12, 24:15, 24:19, 32:18, 35:24, 38:18, 41:11, 43:6, 48:6, 49:24, 50:10, 51:20, 53:19, 54:7, 54:24, 55:16, 55:19, 56:5, 56:13, 58:20, 58:23, 60:10, 61:5, 67:19, 69:2, 69:15, 75:14, 79:22, 80:4, 86:21, 87:20
points [1] - 23:22
police [3] - 45:11, 52:20, 53:6
Pollak [1] - 81:12
porn [1] - 39:25
pornography [30] - 5:12, 6:14, 7:2, 25:7, 25:9, 25:10, 25:13, 25:20, 25:22, 31:12, 31:14, 44:2, 44:4, 44:6, 47:9, 47:13, 48:5, 68:5, 68:13, 68:15, 68:17, 68:25, 69:5, 69:8, 73:21, 74:16, 78:9, 78:12, 78:14
portion [2] - 69:20, 77:23
position [2] - 26:2, 83:23
possession [2] - 33:2, 47:10
possible [3] - 13:9, 78:2, 78:5
post [6] - 2:24, 3:7, 26:12, 35:3, 37:15, 86:25
post-arrest [1] - 3:7
posture [1] - 80:17
potential [4] - 26:13, 47:4, 83:13, 87:18
potentially [1] - 85:6
practice [1] - 70:1
preamble [2] - 42:15, 42:19
preceded [1] - 41:5
precedence [1] - 87:11
precise [1] - 80:20
preliminarily [1] - 82:20
presence [6] - 13:16, 20:14, 20:25, 38:14, 78:3, 78:4
presences [1] - 13:25

present [6] - 8:12, 9:8, 37:1, 81:16, 84:2, 84:8
presented [1] - 39:15
presents [1] - 80:9
press [6] - 3:8, 34:19, 35:1, 66:6, 66:9, 66:12
pressure [1] - 75:14
presumably [3] - 11:1, 38:11, 85:24
presumption [1] - 11:5
Pretrial [1] - 32:23
pretty [4] - 24:19, 54:3, 80:9, 86:5
prevent [1] - 82:14
previous [2] - 24:7, 76:4
previously [1] - 30:21
printed [2] - 14:23, 15:20
prison [1] - 35:6
privilege [1] - 82:21
probable [4] - 6:2, 6:4, 46:7, 47:23
problem [1] - 83:13
procedure [1] - 43:15
proceed [3] - 3:15, 15:13, 84:17
production [1] - 6:14
progressed [2] - 19:1, 80:11
project [2] - 46:19, 46:23
promise [1] - 44:13
promises [1] - 24:18
prompted [1] - 39:11
promptly [2] - 9:23, 13:14
proof [1] - 48:9
proper [1] - 33:4
props [3] - 59:3, 59:21, 60:6
prosecutor's [2] - 35:11, 48:14
prostitution [1] - 5:13
provide [8] - 21:12, 25:21, 31:16, 37:23, 39:25, 40:3, 40:5, 69:1
provided [6] - 8:6, 29:15, 30:18, 31:13, 33:23, 38:19
providing [3] - 25:12, 27:14, 44:5
prudent [2] - 83:20, 83:24
public [1] - 80:6
publically [1] - 34:24

**P**

P-H-U-N-G [1] - 63:13
p.m [2] - 16:15, 88:10
p.m. [1] - 16:11
Pacific [1] - 4:25
page [31] - 40:23, 41:10, 41:13, 41:14, 42:3, 42:9, 42:12, 42:13, 42:14, 42:20, 42:25, 59:10, 60:1, 60:2, 60:3, 61:7, 71:11, 71:18, 71:20, 71:22, 71:23, 72:1, 72:2, 72:5, 72:12, 72:25, 73:1, 73:4, 73:8
panic [1] - 55:24
paper [4] - 41:5, 41:7, 41:9
paragraph [5] - 59:10,

**publish** [1] - 15:2
**pulled** [2] - 12:1, 27:8
**punctuated** [1] - 58:2
**punishment** [1] - 47:4
**purchased** [2] - 7:9, 7:12
**purpose** [6] - 12:16, 27:15, 28:15, 35:20, 67:21, 76:20
**purposes** [1] - 87:2
**pursuant** [1] - 30:5
**push** [1] - 52:22
**pushed** [2] - 53:17, 54:18
**put** [16] - 9:21, 11:14, 15:17, 19:6, 38:5, 40:20, 51:24, 51:25, 52:12, 52:14, 52:21, 75:5, 77:13, 84:3, 84:14
**putting** [2] - 33:7, 52:24

## Q

**quarter** [1] - 46:5
**questioned** [4] - 19:20, 61:25, 63:7, 63:12
**questioning** [14] - 18:18, 18:20, 18:23, 18:25, 19:9, 20:20, 21:8, 21:15, 21:18, 21:21, 21:25, 47:19, 63:8, 63:11
**questions** [25] - 19:4, 19:7, 19:10, 19:18, 20:13, 21:21, 21:24, 22:8, 25:6, 44:25, 55:18, 56:4, 57:5, 57:8, 60:14, 60:23, 75:5, 75:7, 77:9, 78:16, 81:2, 84:14
**quick** [2] - 11:13, 54:3
**quickly** [3] - 19:8, 21:20, 84:10
**quietly** [1] - 50:16
**quite** [2] - 42:23, 85:19
**quote** [2] - 22:4, 59:21

## R

**raid** [2] - 51:1, 51:4
**raise** [1] - 35:12
**rather** [3] - 8:17, 82:11, 86:12
**rational** [1] - 74:21
**rationality** [1] - 74:23

**RAYMOND** [1] - 1:10
**reach** [1] - 29:2
**read** [33] - 3:1, 14:19, 15:22, 15:24, 16:20, 16:21, 16:22, 16:24, 16:25, 17:3, 17:5, 18:6, 18:9, 18:11, 37:23, 38:20, 38:23, 39:22, 39:24, 43:20, 53:19, 58:1, 58:3, 58:13, 59:12, 59:13, 61:20, 62:2, 62:10, 69:20, 73:8, 81:6
**readily** [2] - 70:2, 81:20
**reading** [10] - 14:15, 16:7, 16:13, 16:17, 17:8, 17:20, 18:3, 43:12, 61:7, 62:13
**ready** [1] - 84:17
**reaffirming** [1] - 20:11
**really** [5] - 7:25, 27:17, 28:10, 36:5, 48:18
**realm** [1] - 47:20
**rear** [6] - 12:2, 12:10, 12:11, 12:22, 17:13, 17:19
**reason** [15] - 6:6, 10:17, 11:4, 11:6, 24:19, 28:22, 46:15, 47:2, 48:8, 52:5, 52:7, 57:20, 61:10, 80:1, 86:20
**reasoning** [1] - 70:25
**reasons** [2] - 10:17, 13:23
**rebuttal** [1] - 85:9
**recalled** [1] - 81:4
**recanted** [1] - 31:17
**receive** [1] - 35:1
**received** [2] - 15:11, 32:25
**recent** [1] - 62:25
**Recess** [1] - 79:17
**reciting** [1] - 16:16
**recognize** [1] - 38:5
**recollection** [6] - 20:19, 38:18, 61:9, 61:21, 62:6, 62:11
**recollection's** [1] - 20:17
**record** [7] - 3:23, 15:17, 38:1, 59:14, 63:1, 69:20, 84:25
**recorded** [5] - 19:14, 22:17, 22:23, 27:22, 63:3
**recording** [3] - 19:12, 22:19, 48:9
**recordings** [2] -

23:24, 55:12
**REDIRECT** [2] - 77:6, 78:20
**referred** [1] - 44:13
**referring** [5] - 22:9, 33:11, 76:6, 76:8, 82:3
**reflect** [1] - 60:13
**reflected** [3] - 60:18, 61:16, 71:8
**reflecting** [1] - 77:11
**refresh** [2] - 20:19, 61:8
**refuse** [1] - 68:4
**refused** [2] - 68:2, 68:6
**regard** [2] - 64:24, 76:14
**regarded** [1] - 81:4
**regarding** [3] - 31:12, 68:13, 76:6
**regards** [1] - 68:5
**relates** [1] - 81:22
**relation** [2] - 61:6, 61:23
**relevant** [2] - 81:18, 81:22
**rely** [1] - 79:22
**remains** [1] - 85:5
**remedies** [1] - 85:7
**remedy** [1] - 85:15
**remember** [49] - 11:24, 13:8, 13:10, 14:10, 16:19, 17:6, 18:12, 20:1, 20:2, 26:9, 27:12, 27:13, 41:1, 41:8, 45:19, 50:9, 51:7, 53:7, 53:15, 53:16, 54:1, 54:9, 54:15, 54:20, 54:22, 55:10, 55:11, 56:7, 58:1, 59:4, 59:5, 60:9, 61:3, 61:5, 63:10, 65:3, 66:8, 66:10, 66:11, 66:19, 66:20, 67:5, 67:22, 71:14, 71:16, 71:17, 71:18, 72:14
**remind** [1] - 61:13, 81:11
**reminder** [1] - 61:14
**rendition** [1] - 60:24
**rented** [2] - 7:9, 49:3
**report** [10] - 35:10, 46:1, 59:7, 59:24, 60:17, 60:18, 61:8, 61:18, 61:20, 66:21
**Reporter** [2] - 2:1, 2:1
**reporter** [1] - 69:21
**reports** [3] - 60:11,

82:19, 84:13
**represent** [1] - 83:2
**request** [2] - 68:20, 81:15
**requested** [4] - 32:19, 33:19, 33:22, 69:20
**requests** [1] - 75:8
**require** [1] - 82:9
**required** [1] - 6:11
**requires** [1] - 28:11
**research** [2] - 82:7, 83:2
**residence** [7] - 6:24, 8:14, 8:15, 30:19, 30:21, 34:9, 67:5
**resist** [2] - 29:16, 52:3
**resolve** [1] - 82:24
**resolves** [1] - 86:5
**respect** [2] - 42:12, 84:25
**respectfully** [1] - 48:2
**respond** [3] - 19:17, 25:24, 26:6
**responded** [2] - 22:4, 64:19
**response** [5] - 14:16, 20:1, 64:12, 64:21, 81:2
**responses** [2] - 21:24, 36:6
**responsibly** [1] - 87:17
**responsive** [1] - 80:16
**rest** [2] - 56:16, 79:21
**restrained** [1] - 9:17
**restroom** [1] - 67:17
**resumed** [1] - 79:18
**retrieve** [1] - 33:22
**retrieved** [1] - 54:22
**retrieving** [1] - 68:25
**return** [1] - 31:9
**review** [3] - 38:17, 45:25, 70:6
**reviewed** [2] - 84:13, 86:19
**rights** [19] - 14:14, 14:19, 14:23, 15:3, 15:21, 15:25, 16:8, 16:13, 16:18, 17:2, 17:9, 18:6, 18:9, 18:11, 18:17, 53:20, 57:24, 58:14, 83:8
**risk** [3] - 11:3, 12:3, 54:11
**RJD** [1] - 1:3
**RMR** [1] - 2:1
**Robertson** [2] - 63:12, 63:13
**role** [1] - 26:4
**rolled** [1] - 53:15

**RONALD** [1] - 2:1
**room** [58] - 7:15, 7:17, 8:24, 9:9, 9:19, 9:24, 10:3, 10:5, 10:6, 10:10, 11:16, 11:19, 11:20, 12:23, 13:2, 13:3, 13:4, 13:5, 13:8, 13:9, 13:10, 13:14, 13:19, 13:20, 13:24, 13:25, 14:3, 14:12, 20:12, 35:17, 35:24, 36:4, 36:12, 42:13, 49:18, 49:22, 49:25, 50:1, 50:4, 50:5, 50:17, 50:18, 51:18, 51:20, 54:1, 54:2, 54:9, 54:15, 56:13, 56:20, 63:5, 63:6, 63:8, 63:14, 64:11, 67:12, 80:10
**Room** [1] - 49:25
**rooms** [6] - 7:8, 7:12, 7:14, 7:16, 49:3
**roughly** [5] - 32:3, 32:4, 32:8, 32:9, 46:6
**round** [2] - 10:25
**route** [1] - 8:12
**RPR** [1] - 2:1
**rule** [1] - 85:12
**ruled** [1] - 82:1
**running** [1] - 28:18
**ruse** [1] - 63:19
**Russia** [12] - 25:15, 25:23, 26:7, 44:6, 44:14, 68:11, 68:19, 73:21, 73:22, 74:15, 74:20, 75:8

## S

**S-P-I-V-A-C-K** [1] - 3:25
**safety** [1] - 10:17
**Salani** [3] - 85:8, 85:14, 85:17
**sanction** [1] - 86:10
**sanctions** [1] - 86:24
**satisfy** [1] - 4:1
**Saudi** [1] - 5:1
**Savitt** [2] - 2:16, 2:19, 45:1, 47:24, 79:12, 79:20, 81:21, 83:12, 84:23, 87:7
**SAVITT** [28] - 1:21, 2:15, 2:21, 3:11, 15:4, 15:8, 45:2, 45:4, 45:6, 59:13, 69:19, 69:23, 74:13, 74:25, 75:18, 77:3,

79:13, 79:15, 79:21, 83:14, 83:17, 84:24, 85:5, 85:21, 87:8, 87:25, 88:3, 88:7
**saw** [2] - 38:21, 49:11
**scenario** [1] - 75:25
**schedule** [2] - 83:20, 83:24
**scope** [1] - 47:19
**screen** [5] - 33:7, 38:5, 41:9, 71:23, 73:7
**SD** [1] - 55:8
**se** [1] - 75:8
**search** [30] - 6:20, 6:22, 6:24, 7:1, 7:4, 12:3, 12:7, 14:10, 29:6, 29:9, 29:24, 30:2, 30:22, 31:23, 33:24, 34:2, 34:3, 34:8, 54:2, 54:4, 54:5, 54:7, 54:11, 54:13, 54:14, 57:5
**searched** [2] - 29:8, 30:5
**seat** [1] - 3:22
**seated** [2] - 14:11, 79:19
**second** [17] - 8:25, 10:24, 32:17, 41:6, 41:13, 42:3, 44:18, 60:25, 61:9, 71:18, 71:20, 71:22, 72:1, 72:2, 72:12, 73:4
**section** [2] - 5:2, 5:5
**see** [20] - 15:14, 26:10, 27:24, 28:6, 28:23, 31:3, 31:22, 33:8, 38:3, 40:10, 40:14, 49:12, 49:21, 50:2, 54:13, 55:5, 60:11, 60:15, 80:1, 86:18
**seeing** [2] - 9:14, 29:25
**seek** [3] - 36:24, 82:6, 82:18
**seeks** [1] - 82:8
**seem** [2] - 12:19, 18:15
**seize** [3] - 6:23, 7:1, 7:4
**semantics** [1] - 68:7
**sentence** [2] - 39:9, 39:24
**separate** [6] - 9:24, 41:5, 42:7, 42:18, 42:20, 67:9
**separated** [2] - 9:23, 9:24
**sequence** [1] - 60:13

**series** [2] - 39:23, 54:3
**serious** [1] - 86:9
**serve** [2] - 4:22, 83:7
**served** [1] - 4:25
**serves** [3] - 31:15, 45:20, 58:17
**Services** [1] - 32:24
**set** [3] - 6:13, 7:11, 60:22
**setting** [4] - 11:9, 12:20, 74:19, 76:23
**settled** [1] - 67:23
**several** [2] - 10:17, 23:22
**sex** [3] - 5:12, 20:6, 23:6
**sexual** [3] - 5:11, 65:20, 76:8
**sexually** [1] - 7:22
**share** [2] - 88:3, 88:4
**shared** [1] - 7:13
**shed** [1] - 83:12
**sheet** [1] - 41:4
**shifted** [2] - 19:8, 21:7
**short** [1] - 79:14
**shortly** [2] - 81:13, 82:4
**shove** [1] - 52:22
**show** [3] - 40:13, 41:20, 46:17
**showed** [1] - 47:13
**showing** [2] - 14:8, 38:1
**shown** [1] - 83:3
**shut** [2] - 28:19, 29:5
**sic** [1] - 5:18
**side** [5] - 10:3, 20:11, 39:10, 40:25, 74:22
**sign** [13] - 17:16, 17:17, 17:19, 33:13, 37:14, 41:22, 41:24, 42:1, 42:14, 42:21, 57:20, 67:22, 73:11
**signature** [1] - 16:6
**signatures** [1] - 16:15
**signed** [6] - 33:17, 38:9, 43:10, 77:25, 78:4, 78:6
**significant** [1] - 72:11
**significantly** [1] - 67:4
**signifies** [1] - 73:3
**signify** [5] - 71:15, 71:16, 71:20, 72:25, 73:2
**signing** [3] - 41:7, 43:15, 73:11
**signs** [1] - 73:10
**similar** [3] - 22:8, 75:5, 75:8
**simply** [3] - 15:20,

79:25, 86:20
**single** [1] - 16:16
**sit** [2] - 53:14, 53:15
**sitting** [8] - 17:21, 17:22, 52:10, 57:14, 57:15, 57:16, 75:4, 78:7
**situation** [5] - 19:8, 67:24, 75:20, 82:12, 86:4
**situations** [2] - 11:3, 82:7
**size** [2] - 11:16, 11:18
**sleep** [2] - 21:12, 21:14
**sleeping** [2] - 9:5, 21:13
**slowly** [1] - 84:17
**small** [2] - 11:13, 52:8
**SMITH** [8] - 1:16, 81:24, 82:5, 83:4, 83:24, 84:20, 84:22, 86:2
**Smith** [1] - 2:12
**someone** [7] - 28:25, 43:22, 43:25, 44:8, 73:9, 73:17, 74:3
**sometime** [1] - 25:12
**sometimes** [3] - 43:13, 75:10, 86:21
**somewhere** [3] - 12:24, 42:13, 48:25
**soon** [1] - 50:12
**sophisticated** [2] - 27:23, 28:12
**sorry** [9] - 42:7, 46:22, 51:7, 59:25, 61:24, 63:18, 74:13, 77:11, 78:18
**sort** [15] - 6:20, 14:16, 19:1, 19:7, 19:17, 22:11, 24:1, 35:25, 37:14, 44:10, 63:19, 70:5, 82:2, 82:14, 85:8
**sought** [2] - 47:17, 48:1
**sounds** [1] - 53:8
**space** [1] - 52:8
**speaking** [3] - 22:9, 64:13, 65:3
**Special** [2] - 3:16, 13:21
**special** [2] - 4:12, 4:13
**specific** [10] - 5:2, 19:9, 19:10, 20:13, 21:21, 33:6, 44:11, 69:3, 80:13, 84:5
**specifically** [6] - 2:24, 7:21, 21:8, 45:15,

65:13, 80:8
**specifying** [1] - 65:15
**spell** [1] - 3:22
**spelling** [1] - 39:7
**Spivack** [14] - 3:13, 3:17, 3:24, 4:1, 20:24, 33:7, 40:22, 42:3, 43:20, 45:7, 77:8, 78:17, 78:22, 81:8
**Spivack's** [1] - 80:1
**spoken** [1] - 66:18
**sporadically** [2] - 56:24, 56:25
**squad** [6] - 5:7, 5:9, 5:14, 5:16, 24:3, 24:4
**squad's** [2] - 5:10, 5:15
**stack** [2] - 10:24
**stage** [2] - 19:16, 51:19
**staged** [1] - 7:16
**stages** [2] - 20:20, 49:14
**staging** [3] - 9:20, 12:25, 13:1
**stand** [2] - 53:14, 83:6
**standard** [3] - 11:18, 11:20, 57:12
**standing** [3] - 17:21, 50:1, 57:14
**start** [5] - 16:24, 32:2, 32:14, 62:22, 84:3
**started** [2] - 9:19, 21:21
**starting** [1] - 39:3
**State** [1] - 3:22
**statement** [50] - 37:14, 37:20, 37:23, 38:8, 38:10, 38:14, 38:16, 38:23, 39:1, 39:15, 40:9, 40:24, 41:6, 41:14, 41:22, 42:4, 42:8, 42:16, 42:17, 42:18, 42:21, 43:13, 43:21, 44:18, 44:21, 48:3, 48:4, 60:5, 64:21, 67:23, 69:24, 70:4, 70:8, 70:14, 71:8, 72:18, 72:20, 73:25, 75:3, 76:6, 77:10, 77:11, 77:13, 77:24, 78:1, 78:5, 79:5, 80:20, 80:21, 80:22
**statements** [13] - 2:24, 23:23, 25:4, 42:22, 56:6, 60:15, 77:12, 81:2, 81:9, 85:23,

86:19, 87:10, 87:19
**STATES** [2] - 1:1, 1:3
**States** [4] - 1:10, 1:14, 75:22, 77:1
**statutory** [1] - 65:18
**stay** [2] - 12:22, 74:11
**step** [1] - 78:17
**stepped** [1] - 13:22
**steps** [2] - 82:16, 82:17
**still** [1] - 43:15
**sting** [1] - 6:13
**stipulate** [2] - 15:5, 15:7
**stipulated** [2] - 15:1, 15:8
**stoic** [4] - 55:22, 55:23, 55:25, 56:1
**stomach** [1] - 11:25
**stood** [1] - 54:1
**stopped** [2] - 37:13, 59:20
**street** [2] - 13:4
**strike** [1] - 44:15
**structure** [1] - 5:15
**stuff** [2] - 62:16, 76:11
**style** [1] - 70:5
**subject** [4] - 3:9, 32:7, 81:19, 85:2
**subjective** [1] - 70:25
**submission** [1] - 79:23
**submissions** [2] - 79:22, 79:24
**submit** [1] - 35:10
**substance** [1] - 37:21
**subterfuge** [2] - 63:17, 63:19
**sufficient** [1] - 84:25
**suggest** [2] - 60:5, 74:18
**suggesting** [2] - 60:11, 60:16
**suggestion** [2] - 62:25, 80:25, 86:8
**suggests** [2] - 80:12, 86:15
**sum** [1] - 37:21
**summarize** [1] - 3:9
**summarizing** [1] - 38:9
**summary** [2] - 19:3, 78:23
**summer** [1] - 2:13
**supervisor** [5] - 26:9, 26:10, 35:22, 57:3, 73:24
**support** [1] - 80:25
**supported** [1] - 86:14

U.S.A. v. BEBARS BASLAN                                    11

**suppose** [2] - 27:17, 39:22
**supposed** [6] - 16:5, 71:15, 71:16, 72:11, 72:25, 73:2
**suppress** [2] - 2:24, 81:9
**suppression** [1] - 2:6
**supreme** [1] - 86:23
**surprised** [1] - 55:20
**surveillance** [5] - 8:13, 8:16, 8:17, 8:19, 49:13
**suspects** [2] - 51:11, 72:22
**suspicion** [1] - 24:25
**sustained** [2] - 74:10, 76:19
**swing** [4] - 20:3, 20:5, 20:6, 58:18
**sworn** [1] - 3:20
**Syria** [3] - 25:2, 64:25, 81:5

**T**

**tactic** [4] - 12:18, 36:5, 63:20, 64:3
**Tamara** [2] - 1:23, 2:16
**tapes** [1] - 86:13
**team** [7] - 8:13, 8:16, 8:17, 8:19, 9:20, 11:12, 49:13
**technique** [1] - 78:13
**techniques** [1] - 19:1
**ten** [2] - 9:9, 50:22
**tend** [1] - 75:9
**term** [2] - 35:6, 51:7
**terms** [3] - 10:19, 47:3, 65:2
**terrible** [1] - 62:1
**test** [1] - 83:5
**testified** [3] - 3:20, 47:22, 77:22
**testifies** [2] - 85:18, 86:4
**testify** [7] - 79:1, 82:21, 82:23, 82:25, 83:10, 83:22, 85:9
**testifying** [2] - 45:25, 46:3
**testimony** [8] - 4:3, 80:2, 80:9, 80:12, 81:7, 81:18, 81:22, 87:6
**text** [1] - 80:19
**THE** [93] - 2:6, 2:19, 2:22, 3:12, 3:15, 3:22, 3:24, 4:1, 4:3,

4:5, 4:6, 9:3, 9:4, 9:6, 9:24, 10:1, 10:21, 13:2, 13:3, 15:7, 15:10, 17:16, 17:18, 32:1, 32:4, 32:6, 32:9, 32:11, 38:11, 38:13, 39:11, 39:13, 39:14, 39:16, 39:17, 43:1, 43:3, 43:4, 43:5, 43:6, 43:9, 43:10, 43:11, 43:17, 44:24, 45:1, 45:3, 47:21, 48:12, 48:18, 52:25, 53:1, 53:9, 53:11, 56:5, 56:7, 59:15, 69:18, 69:22, 72:9, 74:7, 74:10, 74:24, 75:1, 75:17, 76:19, 76:24, 77:2, 77:4, 78:17, 79:9, 79:12, 79:14, 79:19, 79:25, 82:3, 82:16, 83:9, 83:16, 83:19, 84:1, 84:11, 84:12, 84:21, 84:23, 85:4, 85:19, 85:22, 86:5, 87:9, 88:2, 88:4, 88:9
**the's** [1] - 87:21
**theme** [3] - 22:7, 44:10, 73:20
**themselves** [1] - 83:2
**therefore** [1] - 81:10
**third** [6] - 7:15, 32:10, 49:5, 60:3, 60:25, 61:8
**thirdly** [1] - 19:11
**threaten** [5] - 24:21, 34:15, 34:18, 35:3, 36:8
**threatened** [2] - 80:14, 81:1
**threatening** [1] - 3:6
**threats** [1] - 24:18
**three** [8] - 7:8, 7:12, 9:21, 9:22, 49:3, 50:13, 50:17, 82:16
**threshold** [3] - 8:22, 9:15, 50:13
**threw** [1] - 10:4
**throughout** [3] - 13:20, 13:21, 67:13
**thrown** [2] - 51:21, 51:23
**thumb** [1] - 55:8
**Tiana** [1] - 2:12
**TIANA** [1] - 1:15
**time-to-time** [1] - 63:7
**tips** [1] - 25:12
**title** [1] - 4:11

**Title** [1] - 19:13
**today** [3] - 14:25, 78:22, 79:3
**together** [1] - 12:18
**TOLKIN** [1] - 2:1
**took** [9] - 8:3, 8:13, 13:5, 16:20, 24:17, 54:2, 56:13, 62:24, 64:16
**top** [3] - 39:3, 39:6, 42:15
**topic** [3] - 23:7, 25:15, 27:2
**touch** [3] - 59:3, 59:22, 60:7
**tour** [1] - 5:1
**tours** [1] - 4:25
**trade** [1] - 74:14
**transcript** [1] - 60:22
**transferred** [2] - 13:19, 14:3
**transitioned** [1] - 19:11
**transported** [1] - 67:8
**travel** [2] - 6:12
**traveling** [1] - 48:16
**trial** [13] - 81:12, 81:16, 82:10, 82:12, 82:15, 83:2, 83:6, 83:18, 85:13, 86:14, 86:15, 86:25, 87:2
**trick** [1] - 83:9
**trip** [1] - 47:13
**trouble** [1] - 87:11, 87:20
**true** [3] - 77:14, 77:18, 85:4
**truth** [4] - 24:1, 24:2, 36:7, 61:12
**truthful** [5] - 36:6, 70:19, 70:20, 70:23
**try** [4] - 31:2, 36:5, 62:8, 83:20
**trying** [4] - 19:12, 26:8, 67:11
**Tuesday** [1] - 45:24
**turn** [2] - 25:22, 32:7
**turned** [1] - 69:8
**two** [19] - 2:13, 4:18, 5:23, 7:12, 11:19, 16:20, 17:22, 33:1, 33:6, 33:18, 33:25, 34:2, 49:5, 49:16, 52:16, 63:16, 67:7, 82:16
**twofold** [1] - 27:17
**TYLER** [1] - 1:16
**Tyler** [1] - 1:16
**type** [5] - 15:22, 27:10, 27:12, 69:6, 75:20

**types** [1] - 63:1
**typically** [1] - 57:3

**U**

**U.S** [3] - 1:4, 1:16, 4:21
**U.S.** [1] - 76:14
**U.S.A** [1] - 2:7
**unclear** [1] - 40:2
**uncomfortable** [1] - 84:7
**uncuffed** [1] - 13:14
**uncuffing** [1] - 13:16
**under** [8] - 11:21, 14:12, 53:22, 75:13, 83:16, 84:3, 87:12, 87:19
**undergoing** [1] - 32:23
**underneath** [5] - 11:25, 40:17, 40:19, 53:2
**understandable** [1] - 81:5
**understood** [10] - 16:25, 17:5, 17:6, 42:3, 57:23, 58:24, 74:6, 76:9, 76:21, 80:5
**UNITED** [2] - 1:1, 1:3
**united** [1] - 1:10
**United** [3] - 1:14, 75:22, 76:25
**unless** [6] - 36:10, 40:3, 68:8, 68:10, 78:10, 83:21
**unlikely** [1] - 82:6
**unquote** [1] - 59:21
**unsure** [1] - 46:12
**unusual** [1] - 86:21
**up** [46] - 6:13, 7:11, 8:17, 8:25, 12:2, 12:20, 15:17, 17:24, 19:13, 23:1, 23:7, 23:19, 24:12, 25:15, 25:18, 27:3, 27:8, 27:9, 27:14, 28:18, 35:10, 36:9, 36:19, 37:20, 40:11, 41:7, 42:15, 43:8, 43:25, 53:14, 53:16, 54:1, 55:16, 64:5, 64:10, 64:11, 66:5, 68:15, 75:1, 75:17, 75:18, 77:8

**V**

**valet** [1] - 8:20
**vantage** [1] - 49:24
**various** [2] - 13:23, 49:13
**vast** [2] - 18:23, 67:15
**veering** [1] - 47:20
**verbally** [1] - 17:14
**verbatim** [1] - 16:21
**verbiage** [1] - 65:21
**version** [4] - 14:23, 15:20, 38:2, 78:6
**versus** [1] - 2:7
**vest** [1] - 51:4
**via** [2] - 7:17, 34:12
**vicinity** [1] - 8:18
**victim** [1] - 24:8
**videos** [1] - 48:6
**videotape** [1] - 7:23
**videotaping** [1] - 47:7
**view** [1] - 80:25
**violation** [3] - 5:8, 85:3, 85:16
**violence** [2] - 5:8, 51:10
**violent** [2] - 5:6
**visible** [1] - 50:24
**visual** [2] - 7:17, 12:17
**vividly** [2] - 41:8, 71:16
**voice** [1] - 35:12
**voyage** [1] - 75:24

**W**

**waistband** [2] - 12:5, 54:12
**waited** [2] - 22:5, 36:23
**waiting** [3] - 49:8, 49:17, 49:18
**waive** [2] - 82:21, 83:7
**waived** [2] - 3:4, 18:17
**waivers** [1] - 17:9
**waiving** [1] - 17:2
**wall** [2] - 10:3, 14:11
**warning** [3] - 3:2, 3:4, 57:11
**warnings** [2] - 17:20, 57:9
**warrant** [18] - 6:20, 6:22, 6:24, 7:1, 7:4, 29:6, 29:9, 30:2, 30:5, 30:22, 30:25, 31:23, 34:3, 34:8, 46:21, 47:16, 48:1, 57:5
**watched** [1] - 21:4
**ways** [1] - 16:20

U.S.A. v. BEBARS BASLAN                              12

**weapon** [2] - 10:7, 12:5
**weapons** [4] - 10:14, 11:2, 51:7, 54:5
**Wednesday** [2] - 45:20, 45:23
**week** [1] - 45:19
**Western** [1] - 4:25
**whole** [6] - 44:12, 66:8, 66:10, 68:11, 68:19, 80:24
**why'd** [1] - 57:1
**wife** [2] - 21:9, 21:10
**willing** [10] - 31:8, 31:16, 31:18, 43:23, 48:17, 57:24, 68:12, 73:10, 74:5, 82:23
**willingness** [1] - 82:21
**window** [2] - 10:2, 10:3
**wire** [1] - 19:13
**wish** [1] - 87:23
**wishes** [1] - 17:1
**withdraw** [2] - 62:1, 69:19
**withdrawing** [1] - 69:22
**witness** [10] - 3:19, 15:2, 38:1, 43:7, 82:13, 83:7, 83:15, 84:4, 85:9, 87:4
**WITNESS** [21] - 3:24, 4:2, 4:5, 9:4, 10:1, 13:3, 17:18, 32:4, 32:9, 38:13, 39:13, 39:16, 43:3, 43:5, 43:9, 43:11, 53:1, 53:11, 56:7, 72:10, 77:2
**witnesses** [1] - 83:1
**wonder** [1] - 75:11
**word** [9] - 16:22, 39:19, 43:1, 55:23, 66:14, 66:18, 68:6, 80:6
**Word** [1] - 27:8
**word-for-word** [1] - 16:22
**words** [5] - 35:15, 39:23, 43:2, 69:4, 74:6
**works** [1] - 28:3
**worried** [1] - 64:6
**wrap** [3] - 75:1, 75:17, 75:18
**write** [6] - 35:10, 37:20, 38:14, 41:10, 41:16, 69:24
**writing** [1] - 77:23
**written** [10] - 17:14,

33:3, 37:14, 38:25, 42:22, 60:13, 67:23, 80:20, 80:21, 80:22
**wrote** [9] - 33:5, 38:16, 39:19, 39:20, 41:13, 60:17, 72:16, 72:17, 78:5

## Y

**year** [4] - 46:4, 46:5, 47:14, 62:25
**years** [7] - 4:14, 4:18, 5:16, 5:17, 36:9, 36:20, 84:16
**YORK** [1] - 1:1
**York** [8] - 1:5, 1:15, 1:22, 2:2, 6:25, 32:24, 67:8
**young** [3] - 7:20, 20:14, 20:25
**yourself** [3] - 55:1, 59:12, 70:10