518

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 13-CR-00220(RJD)
                               :
                               :
                               :
       -against-               : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
                               : Wednesday, July 23, 2014
BEBARS BASLAN,                 : 9:15 a.m.
                               :
        Defendant.             :
                               :

- - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE RAYMOND J. DEARIE
UNITED STATES SENIOR DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                       271 Cadman Plaza East
                       Brooklyn, New York 11201
                    BY:  TYLER JOSEPH SMITH, ESQ.
                       TIANA A. DEMAS, ESQ.
                       Assistant United States Attorney

For the Defendant:   EPHRAIM SAVITT
                       260 Madison Avenue
                       22nd Floor
                       New York, New York 10016
                    BY: EPHRAIM SAVITT, ESQ.


Court Reporter:     VICTORIA A. TORRES BUTLER, CRR
                    225 Cadman Plaza East / Brooklyn, NY 11201
                    **VButlerRPR@aol.com**
Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcription.

VB     OCR     CRR

1            (In open court.)

2            (The following occurs outside the presence of the

3    jury.)

4            (Judge RAYMOND J. DEARIE enters the courtroom.)

5            THE COURTROOM DEPUTY:  All rise.

6            THE COURT:  Good morning, everyone.

7            ALL:  Good morning.

8            THE COURT:  I understand the juror is here and we

9    are ready to proceed.

10           MR. SAVITT:  Yes, Your Honor.

11           MS. DEMAS:  Yes, Your Honor.

12           THE COURT:  I also understand Mr. Baslan is about to

13   testify.

14           MR. SAVITT:  Yes, Your Honor.

15           (Defendant enters the courtroom.)

16           THE COURT:  Please be seated, everyone.

17           MR. SAVITT:  Thank you, Your Honor.

18           THE COURT:  I am informed as a result of our

19   discussions that you are going to testify in your own defense,

20   Mr. Baslan, as is your right.

21           THE DEFENDANT:  Yes, sir, Your Honor.

22           THE COURT:  I'll start again.

23           MR. SAVITT:  Thank you, Your Honor.

24           THE COURT:  I am informed through our discussions

25   you have chosen to testify in your own defense, as is your

1   right and your decision, not Counsel's.

2            You have made that decision to testify, Mr. Baslan?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  All right, very well.

5            I have received in the unfortunate break a letter

6   from the Government seeking, I guess what you'd call, a

7   preclusion of certain subjects that they fear Mr. Baslan will

8   get into in his testimony.

9            I made my position and rulings, I hope, clear to all

10  regarding these matters.  I am reluctant to issue any general,

11  any broad-based proscription, but if Mr. Baslan takes

12  liberties that transgress these limitations, they will be

13  addressed by objection or by the Court and he proceeds at his

14  peril.

15           With that, Ellie, please bring the jury in.

16           MS. DEMAS:  Your Honor.

17           THE COURT:  Yes?

18           MS. DEMAS:  Before the defendant takes the stand we

19  were just presented with four Exhibits.

20           MR. SAVITT:  Five.

21           MS. DEMAS:  I'm sorry, five Exhibits that the

22  defendant apparently intends to offer during his testimony.

23           The Government objects to these.  They were never

24  provided to us prior to today despite our repeated requests

25  for reciprocal discovery.

Proceedings                                    521

1          There is one picture in here we do not object to

2    because it came off of Mr. Baslan's iPhone, but everything

3    else we have seen for the first time today and did not come

4    from discovery that the Government had provided to the

5    defendant.

6          THE COURT:  I haven't seen them.  Why am I not

7    surprised.

8          Mr. Savitt.

9          MR. SAVITT:  Yes, Your Honor.

10         THE COURT:  Can you please tender an explanation.

11         MR. SAVITT:  I will tender an explanation,

12   Your Honor.

13         The first Exhibit, it's easier if Your Honor sees

14   it, comes from data in Mr. Baslan's cellular telephone that

15   was seized by the Government and I see that there is some

16   writing on the back.

17         MS. DEMAS:  That's the Government's writing,

18   Your Honor.

19         MR. SAVITT:  I'm sorry.

20         I'm not so sure that it will come in or that I will

21   offer it, but in the excess of caution in case the topic of

22   Buffalo comes in to some extent, I would offer that in my

23   redirect examination to put my cards on the table.

24         THE COURT:  It is off of his cell phone?

25         MR. SAVITT:  It's off of his cell phone.

Proceedings                              522

1          MS. DEMAS:  Your Honor, it's not off of the cell

2     phone.  It appears the report that the Government did of the

3     cell phone did not have this text on it.  It would appear that

4     Mr. Baslan has had somebody else access, I don't know if it's

5     the Cloud or whatever he did to find this, but it was not on

6     the physical cell phone that the Government had and it's not

7     on either of the reports that the Government produced to the

8     defendant.

9          MR. SAVITT:  I just want to see what the deal is

10     here.

11          THE DEFENDANT:  Your Honor.

12          THE COURT:  No, speak to Counsel.

13          THE DEFENDANT:  Oh, there's a Lantern report and the

14     other report, this is out of the Lantern report.  This USA

15     CD-3 and we can provide them with the number of the image so

16     they can get it off of the CD and actually look at it and

17     confirm.  This is the first set of discovery that I received.

18          MS. DEMAS:  That is not the format on the Lantern

19     report.

20          THE COURT:  You can compare them at your leisure.

21          MS. DEMAS:  Sure.

22          THE COURT:  What's the next one?

23          MS. DEMAS:  The next one the Government has no

24     objection to.  This is a photograph of Mr. Baslan standing

25     with a number of young females in Buffalo.  This photograph

Proceedings                                              523

1   does appear on his cell phone, we have no objection to it.

2   That's marked as Defendant's Exhibit B.

3            The second three are signed affidavits that were not

4   on the defendant's computer.  I do not know where he obtained

5   these, but these, two of them are signed by victim, one who

6   the Government did not call to testify whose first name is

7   Andrea.  One is signed by a person I think identified in

8   Government papers as Victim 3, also not called by the

9   Government.

10           We have no way of authenticating these documents, we

11  do not have the notary public who authenticated the signatures

12  and again, none of these were ever produced to the Government

13  despite our repeated requests for reciprocal discovery.

14           THE COURT:  Mr. Savitt.

15           MR. SAVITT:  Yes, Your Honor.

16           The Government introduced in evidence draft

17  affidavits.

18           THE COURT:  I understand.

19           Why were these not produced?  That's the question.

20           MR. SAVITT:  Because at the time that the Government

21  introduced it, I had no intention of introducing them,

22  Your Honor.

23           THE COURT:  You were aware of them?

24           MR. SAVITT:  I was aware of them, yes.

25           THE COURT:  And you had an opportunity to verify

Proceedings                                         524

1   them?

2          MR. SAVITT:  Your Honor, I have not had an

3   opportunity to verify them other than that Mr. Baslan gave the

4   originals of these affidavits to an attorney in Buffalo, I

5   think his name is Mr. Eiss who gave it thereafter to my

6   predecessor Mr. Caceedie, who then sent it in with a number of

7   other materials to me and I was kind of hoping that none of

8   this would become an issue.

9          But the Government did introduce draft affidavits

10  and these are the affidavits that on two occasions were signed

11  by the woman whose first name is Andrea and on one occasion --

12          THE COURT:  Well, as far as you know.

13          MR. SAVITT:  As far as I know.

14          THE COURT:  The problem is there is no way to verify

15  and given the tardy tendering of it, it exacerbates the

16  problem.

17          MR. SAVITT:  I understand that, Your Honor.

18          THE COURT:  See what you can find out about these.

19  In the meantime, I am not going to admit them until I have

20  heard more about this.

21          MR. SAVITT:  Yes, Your Honor.

22          THE COURT:  Okay.

23          MR. SMITH:  Your Honor the Government also asks,

24  pursuant to Rule 615, that one of the witnesses on the Defense

25  witness list Shira Keller, who is in the courtroom, be

Proceedings                                    525

1    excluded.

2              THE COURT:  Yes, all potential witnesses are

3    excluded.

4              MR. SAVITT:  I will definitely not call her.  I am

5    not calling her.

6              THE COURT:  All right, Ellie, let's go.

7              MR. SMITH:  All right.

8              (Defendant and takes the stand.)

9              (In open court.)

10             THE COURTROOM DEPUTY:  All rise.

11             (Jury enters.)

12             THE COURT:  Good morning, folks.  Please, be seated.

13             I apologize for the unexpected delay in the trial.

14   We are ready to resume and we resume with the Defense case.

15             Swear the witness, please.

16             THE COURTROOM DEPUTY:  Please, raise your right

17   hand.

18

19             (Continued on following page.)

20

21

22

23

24

25

Baslan - direct - Savitt                        526

1   **B E B A R S     B A S L A N,**

2             called by The Defense, having been

3             first duly sworn, was examined and testified

4             as follows:

5             THE COURTROOM DEPUTY:  Thank you, please have a

6   seat.

7             THE WITNESS:  Thank you.

8             THE COURTROOM DEPUTY:  State and spell your name for

9   the record.

10            THE WITNESS:  My name is Bebars Baslan --

11  B-E-B-A-R-S, B-A-S-L-A-N.

12            THE COURT:  Mr. Savitt.

13            MR. SAVITT:  Thank you, Your Honor.

14  DIRECT EXAMINATION

15  BY MR. SAVITT:

16  Q    Good morning, Mr. Baslan.

17  A    Good morning Mr. Savitt.

18  Q    Can you tell us where you're from originally?

19  A    My parents are Hungarian Austrian with Russian

20  background.  I was born in North Africa in a UN compound near

21  Tripoli and then my dad was a UNICEF doctor so following his

22  career, we pretty much moved every year to a different

23  country, mainly Africa, Western Africa and Middle East.

24  Q    And tell us a little bit about your educational

25  background.

Baslan - direct - Savitt                      527

1   A    I have a psychology degree, and I went in for a bachelor

2   degree in Russia, and I started doing my masters but I never

3   finished.

4   Q    Okay.  Did you come to the United States -- well.

5            MR. SAVITT:  Let me withdraw that.

6   Q    When did you come to the United States?

7   A    I believe I was around 17 or 18.

8   Q    How old are you today?

9   A    Thirty-seven.

10  Q    When you came to the United States, did you come alone,

11  with your parents, other family members?

12  A    Came alone, but we had some family members here that I

13  stayed with for a while, then I was on my own for the most

14  part.

15  Q    And where did you live?

16  A    Mainly in New York State; Buffalo for a while,

17  New York City for a while.

18  Q    Do you have any background or familiarity with computers?

19  A    Yes.

20  Q    If you can elaborate on that?

21  A    My career started with computers.  I was -- one of the

22  biggest companies I worked was Installs, Inc. and I started as

23  a consultant, and within a couple of years I was the senior VP

24  of information technology, and it's a company that managed

25  installations of all the direct TVs and satellite dishes

Baslan - direct - Savitt                                528

1   around the country.

2           And then I went on to doing consulting for a few

3   years on my own, and then I moved into the IT and media field

4   where we used to produce international events, not-for-profit

5   events, concerts where we brought that from around the world,

6   over satellite, over Internet, and so on.

7   Q    When you say IT, that's information technology?

8   A    Correct.

9   Q    What does that mean, for those of us like me?

10  A    Informing technology is a broad term.  That means

11  anything from programming a computer to dealing with the

12  hardware to dealing with software and programming.

13          My job was mainly analytics and trying to deliver

14  the technology that the business requires.

15  Q    You came to the United States when you were a teenager?

16  A    Yes.

17  Q    Did you go to school in the United States?

18  A    Yes.

19  Q    Can you tell us where and what did you study?

20  A    I went in New Jersey and I started my psychology degree

21  and then, when I went back to Europe -- I went back to Europe

22  a few times in between.  This time I finished there.

23  Q    Where in Europe?

24  A    I was in Hungary and I was in Russia.

25  Q    Are your parents in the United States?

Baslan - direct - Savitt                              529

1    A    No.

2    Q    Where are they?

3    A    Currently, they are in South Russia.  They are retired.

4    Q    And is that where they are originally from?

5    A    They were not born there, but that's where the family

6    originally from.

7    Q    Did you ever learn photography?

8    A    Yes.

9    Q    Can you elaborate on that?

10   A    Absolutely.

11        One of my uncles was a well-known photographer in

12   Europe and I had learned from him when I was young, you know,

13   the old wooden camera with the cover an the magnesium light.

14   And then, when I came here, you know, IT career can be

15   treacherously boring and sometimes just, you need the creative

16   outlet, so I started doing photography.  I was published in a

17   few magazines.  I pretty much do high fashion.  I started with

18   high fashion and after a couple years I stopped and I started

19   doing more Holocaust survivor.

20        I worked with the Holocaust museum in Washington, I

21   traveled around the world.  Whenever I went anywhere in

22   Europe, I would interview holocaust survivors, take their

23   pictures.  Mainly like, really old people, people that with

24   faces that could tell a story in a time.

25   Q    Were any of these works published?

VB        OCR        CRR

1    A    Yeah.  I won a second place in Holocaust museum in Sweden

2    for a lady that had her, from Eastern Germany, a Jewish lady

3    that had her brother killed in front of her and she played the

4    accordion for years and years and years after, you know, just

5    walking around playing the accordion, and I had an interview

6    with her.  I tracked her down and I had an interview with her

7    and take the photo and I won second place at the time and get

8    some really renowned photographers.

9              My fashion work has been published.  I been in

10   Lucire, GQ, Vanity Fair once, and I cover Fashion Week for a

11   few years, so most of my images were sold to wire company that

12   they sold to magazines.

13   Q    Now, did you live in Buffalo proper, in the city?

14   A    Yes.

15   Q    For how long a period of time, from when to when

16   approximately?

17   A    I lived on and off in Buffalo, probably could accumulate

18   about five years, maybe a little bit more.  It was a while

19   back.  I think I left Buffalo when I was 27.

20   Q    When did you start living in Buffalo, when did you leave

21   Buffalo; the years, approximately?

22   A    I would say in early 2000's.  And then I left when I was

23   in 2007.  I returned to Buffalo when I was 30 for, to work for

24   Wilson Greatbatch the guy that invented the pacemaker for the

25   heart.  We did the documentary before he died, captured the

Baslan - direct - Savitt                    531

1   last few month of his life and I was there for a while.  And

2   then I ended upcoming back to Brooklyn and I stayed in

3   Brooklyn ever since.

4   Q    Now, in Buffalo, did you ever get married?

5   A    Yes.

6   Q    Can you tell us about that?

7   A    Well, she was and still is my best friend.  We met --

8   Q    What is her name?

9   A    Maryana Kowal.  And we met, I think she was just getting

10  out of high school.  We dated a few years, we got married and

11  then unfortunately, we ended up getting divorced.  We lived in

12  Buffalo for the most time.

13          During that period there was a time where I was

14  commuting to New York and working through my job in New York

15  and she came and stayed with me and, you know, we stayed in

16  touch and we stayed very close until now.

17  Q    And you're still friends?

18  A    Yeah.

19  Q    Did you ever work in a photography studio in the Buffalo

20  area?

21  A    Yes, I had a time-share in 700 Main Street and Tupper, it

22  was right across from the downtown police precinct in Buffalo

23  and had a time-share.  It was three photographers total I

24  believe.

25  Q    When you say a time-share, can you give us a little more

VB       OCR       CRR

Baslan - direct - Savitt                          532

1    information on that?

2    A    Meaning that I didn't own the studio.  I would pay third

3    of the rent and there's two other photographers that will pay

4    third of the rent.

5                The studio was very busy because it did all the

6    commercial photography for a lot of companies in Buffalo,

7    anywhere that chocolate to spoons.  And so, it was segregated

8    into sports or media photography where the news would come if

9    they need something really quick, one bay was for news or

10   media if you needed somebody to come and just take a photo

11   really quick, then one bay was for fashion photography and one

12   bay was for products, you know, stationary camera products and

13   then we had editing stations where we would sit down and edit.

14               But I pretty much started that whole modeling

15   photography movement in Buffalo where I start holding groups,

16   I started inviting many photographers, many models.  They come

17   in, they shoot with each other, they get to practice,

18   experience.  I've had high-end equipment that I brought from

19   New York and like printers and photo processors that I allowed

20   others to use and then, you know, and elevated.  And since

21   then, it actually had taken off quite substantially in

22   Buffalo.

23   Q    While you were in Buffalo, did you develop a circle of

24   friends in that city?

25   A    Absolutely.

Baslan - direct - Savitt                              533

1   Q    Okay.  And you still keep in touch with some of them?

2   A    Not since my arrest.  We don't get in touch with lot of

3   people, but I was on friendly basis up to my arrest with most

4   of them.

5   Q    Now, you said that you moved to Brooklyn sometime in

6   2007, was it?

7   A    No, '07 I went to Europe for couple, few years.  I was

8   diagnosed with an illness and I went there for treatment and

9   end up getting into remission, so I came back.  I probably

10  came 2010, '09.  But since returning to the U.S., I was

11  commuting between Buffalo and Brooklyn because I figured as

12  soon as the Wilson Greatbatch gig was over, I'm going come to

13  New York and work.

14           After coming to New York I started doing the media

15  events and I worked with a company called Prix Galien.  And

16  then we did like the Oscars for Doctors, scientific awards

17  given by Nobel prize laureates to doctors who invented

18  medicine.  We had a lot of guys like Pfizer, the chairman I

19  think was Elie Wiesel, which is another person I was fortunate

20  to work with and I did a lot of his private interviews the

21  last year or so, and then this case mapped and the work

22  stopped.

23  Q    Now, did you did you meet a young lady named Kristen

24  Henry?

25  A    Absolutely.

                    VB        OCR        CRR

Baslan - direct - Savitt                      534

1    Q    Was this in Buffalo?

2    A    Yes.

3    Q    Did you become friends?

4    A    Yes.

5    Q    Did you ultimately develop a relationship?

6    A    Correct.

7    Q    What kind of a relationship was it?

8    A    We, we ended up moving in together at some point.  We

9    started dating.

10            Kristen at that point had dropped from college or --

11   before meeting me, so and we were -- I was going to come to

12   New York at some point, so what we did is I helped her get

13   back on track, pay off the student loans, finish the one

14   degree and then we went into a country tour of colleges and

15   she ended up getting into The City College For Landscape

16   Architecture and that's what's, primarily why we ended up

17   moving back to New York full-time.

18   Q    Primarily for what reason?

19   A    For Kristen because she wanted, she was going to school

20   in Manhattan for landscape architecture so that was what

21   pinned me down here.  Otherwise, I would probably have gone

22   back to Europe.

23   Q    Where did you live in Brooklyn?  What area?

24   A    Initially, I lived in, when I first moved into Brooklyn I

25   lived in Midwood area.  Then I moved into an apartment in

Baslan - direct - Savitt                    535

1    Borough Park off of New Utrecht, and then I moved back to

2    Midwood off of Ocean Parkway and M.

3    Q    Did you live in those locations or in some of those

4    location was Kristen Henry?

5    A    All of them.

6    Q    Were you ever a neighbor of a man named Steven who

7    testified at this trial?

8    A    Correct.

9    Q    When was that?

10   A    When I first started coming into Brooklyn I lived with

11   Benny Hayon, which is his next-door neighbor and friends of

12   Steven until I got on my feet in the City and found and

13   apartment and so on, which took a couple months.  Actually,

14   took more than couple months, probably took about six months,

15   but I was on and off in that apartment for about a year.

16           We became friends and, you know, social, going to

17   Shabbat dinners, religious services, so on.

18   Q    Did you then meet Steven's brother Jack?

19   A    Yes.

20   Q    Did you become friendly with both Steven and Jack?

21   A    Absolutely.  I was actually more, I was closer to Jack

22   probably and became more friends.  Steven and I always been

23   very friendly and most Shabbats we go over or they'll come

24   over and so on, but Jack and I became more friends.

25   Q    And how did that, in a general sense, how did that

1   friendship develop?

2   A    Well, initially he has gone through a divorce, he is

3   going through some hard time.

4   Q    You're talking about Jack?

5   A    Jack.  Jack.  Seemingly intelligent guy.  He needed help

6   to start his new business and I think it was auto transporting

7   for people who migrate in the winter from New York to Florida

8   and so on.  He needed a website and so forth, so I helped him

9   get the phone line, the website, the marketing media,

10  et cetera, et cetera.  Most of my friends used to always come

11  to me for issues like at that.

12        And then, we slowly ended up seeing each other

13  socially.  He'd go out, I'd go out, we are in the same circle

14  of friends because when I came back to Brooklyn those who are

15  my circle of friends.  And then we got closer and closer and

16  then he start going through a really hard time.  He had couple

17  of suicide attempts, went to hospital a few times.  I actually

18  had more than one occasion, had to drive to his house at 4:00

19  in the morning and pretty much not to gross you out, but stick

20  my finger down his throat to make him throw up because he is

21  swallow lot of pills and take him to the hospital.

22        In fact, towards the end.  I tried twice to have him

23  go committed to the hospital and I delivered him to the

24  hospital and the hospital promise that they keep him in, and

25  then he would escape.  There was a guy called Mike that would

Baslan - direct - Savitt                                    537

1    drive by, you know, they'll talk, he'll drive by and he'll

2    just jump out a window or run to the door and escape and get

3    out.

4    Q    Now, did there come a point in time when you and Jack had

5    some conversations about underage children?

6    A    Yes, yeah.  There was one time he came to our house, we

7    were partying.  He, I think, was on Oxycodones and a cocktail

8    of other drugs and he broke down and start telling us about

9    his fetishes.  Starting saying he likes underwear, especially

10   underwear concerning young children and it developed slowly to

11   telling us that he was abused by his mother.  His first memory

12   is waking up to his mother performing a sexual act on him and

13   then, then he, then he told us that, you know, him and his

14   aunt and his cousins and even Steven used to play with each

15   other a lot.  When he grow older, he started touching kids he

16   used to baby-sit including Steven's children, especially the

17   boy.  That was not mentioned.

18            And then he pulled out his iPad and he had a stash

19   of child pornography on there, including what I remember was a

20   picture of his daughter and picture of his niece and a few

21   other people that I don't know.  I had not met really his

22   children that much and I know he has seven or eight kids all

23   together, and he started talking about it, and then he ended

24   up passing out probably about 2:00, 3:00 o'clock in the

25   morning, and then he woke up and then he left.

Baslan - direct - Savitt                    538

1   Q    When, approximately did this occur, date-wise more or

2   less?

3   A    It would have to be somewhere either between December of

4   2012 and January 2013.

5            One other detail is that when we asked him did you

6   ever do things with children, he said that he used to have a

7   girlfriend called Rachel come to his previous residence, I

8   think it was in 22nd Street, and perform oral sex on his baby

9   while he would have sexual interaction with her.

10  Q    Now, did there come a point in time when -- well.

11           MR. SAVITT:  Let me withdraw that.

12  Q    Did you ever take any drugs?

13  A    Yes.

14  Q    Can you tell us about that?

15  A    I mainly, I had very severe anxiety problem all my life,

16  all my friends know that, so at some point in time got to be

17  so bad with the workload that I have that I would take, I

18  would have to smoke pot to fall asleep sometime, and sometimes

19  I would take coke to, you know, to stay focused.

20           And then what happened, I had quit for a couple of

21  months, up to for two or three months, up to the point that

22  the whole thing started with Jack again.  And then one time we

23  ended up, he suggested that we buy and we ended up buying, so

24  I started using again until the time of the arrest.

25  Q    Now, when you say the thing started up with Jack again,

Baslan - direct - Savitt                    539

1   can you tell us what you mean by that?

2   A    Well, one, on one of the days, I think we heard it on the

3   recordings, he said can we pick up some, I think it was called

4   tickets or products or bags or whatever, and we ended up

5   buying four, which is four little bags.  And he took two, I

6   believe, and we took two and then I started using more until

7   the time of the arrest.

8   Q    Now, were there any times that there were, I want to put

9   this delicately, that you, Kristen and Jack had a ménage à

10  trois?

11  A    Yes, twice.

12  Q    And without going into any real personal details, why did

13  that happen?

14  A    Kristen had done it in the past and she said that she

15  want to actually do it.  I have not done it in that kind of

16  circumstance or whatever and it was okay.  I mean, I

17  understand maybe it's something odd here, but with European

18  kind of, it's, we have more open, I guess, about such things,

19  so.

20  Q    Now, you've heard the tapes of this trial?

21  A    Yes.

22  Q    And you've had access to those tapes before the trial;

23  right?

24  A    Until recently, before the trial, yes.

25  Q    All right.  Prior to those taped discussions, were there

Baslan - direct - Savitt                    540

1  any discussions that you had with Jack regarding the same

2  topics?

3  A    Well, okay.  So, the first discussion about the subject

4  came out when he was high, as I say few minutes ago.  Then we,

5  I got a visit from him a little bit after and he was kind of

6  paranoid and scared.  Nothing was talked about in details.

7  And then I got a phone call from him saying that oh, I had

8  this dream about Kristen and I'm scared that she's going to

9  set me up and she saw me doing what I was doing, as you heard

10  on the tape.

11         And then, after that, he left.  It was ten or twelve

12  days, I think, before he came back again, however, though,

13  between those two recordings he came to our house once or

14  twice, I believe, and start introducing the whole plan of

15  baby-sitting and so on.  And then, when the second call came

16  in, that's one of the reasons he asked about the plan and then

17  we just went right into it.

18  Q    Now, the plan that you're talking about, can you

19  elaborate on that?

20  A    His initial thought was he wanted to bring his children

21  and simulate what his previous girlfriend Rachel used to do.

22  Q    Now, prior to that time, and I'm sorry for going backward

23  a little bit, had he ever given you any videos that he had of

24  having sexual relationships with other people?

25  A    I wouldn't say given.  His computer broke down, he had a

VB          OCR          CRR

Baslan - direct - Savitt                    541

1   fight with his wife and she went and smashed the computer

2   around, so I went and I did the file rescue and I did find

3   these files, and I kept them, and that's how I was able to get

4   him to commit himself to the hospital the first few times.

5   Q    What kind of files were they?  Just give us a very

6   general description.

7   A    Him with a girl that was underage and he was having sex

8   with her and doing acts from shoving ice cubes in her private

9   parts to writing words on her.  They were in a hotel and -- a

10  couple of them were hotels.  I didn't see all of them, but

11  some of them in hotel rooms.  Some of them from, I think, a

12  trip to Florida and so on.

13         I learned after from friends of that girl -- I mean,

14  I was never friends with that girl, I met her only once before

15  Jack started dating her -- that he used to take her with her

16  friends.

17         MS. DEMAS:  Objection, Your Honor.  Hearsay.

18         THE COURT:  Sustained.

19  Q    The videos, how many videos were they, more or less?

20  A    A dozen.  Somewhere between a dozen, two dozen, I don't

21  remember right now.

22  Q    Okay.  All with the same person?

23  A    Yeah.

24         However, I seen videos --

25         THE COURT:  Wait for the next question, please.

VB       OCR       CRR

Baslan - direct - Savitt                          542

1          Go ahead Mr. Savitt.

2   Q    Were there any other videos you saw of Jack having sexual

3   relationships with anybody?

4   A     Yes.  He had plenty.  About six or seven different girls.

5   I believe some of them were his neighbors.  However, though,

6   when his computer smashed, he had two external hard drives.

7   One was a white Seagate, I believe, and one was some kind of a

8   silver -- I think it's a Westerngate drive, and I was able to

9   recover the one but not the other because the other had been

10  damaged.  And the one I recovered was the newer one, which

11  only had Jackie on it, I believe.

12  Q    And the name Jackie refers to?

13  A    The underage girl that he was having sex with her on

14  those videos.

15  Q    Now, did there come a point in time when you and Jack

16  discussed a plan to take some photographs of children?

17  A     I mean, my initial plan, which we -- the initial plan

18  that I devised with Kristen was to go to one of the rabbis in

19  the community and get him committed, but forcibly at this

20  point.  You know, getting his family members and other people

21  to sign because when you commit you get committed by a friend,

22  I guess if you escape the hospital, doesn't -- I mean, I

23  understood it as in the hospital doesn't have any jurisdiction

24  or power to go after you and bring you back again.

25          So, in the Jewish community, as you know, we don't

1  go to the police, we try to resolve issues locally through the

2  rabbinical court and so on.  The rabbi, of course, having a

3  scandal like this would want proof because his main objective

4  would be to, to just not have any scandals, not have to open

5  up the dirty laundry and so on, and this is a big, sticky

6  legal issue.  So, he demanded proof.

7         The initial idea that we had is that we would, I

8  would wire up his iPad or he had also a tablet of some sort.

9  Q    Jack did?

10 A    Jack.

11        Get a video feed off of what he's watching and try

12 to get him even to go in the back room when we downloaded the

13 child porn.  And I offered; if you want, you can go to the

14 back room and go pleasure yourself watching those and I will

15 have a hidden camera wiring him up while his 'Pad, the video

16 feed on his 'Pad would be recorded, meaning I would see what

17 he is watching on the screen and I would sync it up with time

18 code and with some of the audio to prove what he's watching at

19 the time with the video feed showing him sitting in the bed or

20 whatever and doing it, and that would have been more than

21 enough proof, I suppose.  Especially if he had pulled up

22 pictures of his children again and done it.

23        However, though, he, as much as I did offer it to

24 Jack, I think Jack was reluctant and kept pushing the whole

25 baby-sitting experience, et cetera, et cetera and it started

Baslan - direct - Savitt                    544

1   evolving from there.

2          I mean, pretty much every time we talked about doing

3   one thing, he would introduce another issue and another issue.

4   We thought, even at some point we jumped on the idea he said

5   he was scared of Kristen so Kristen and I devised this thing

6   where he would drop off his kid, she pretends to take him to

7   the back room and I sit and talk to him about it, look how

8   cool, this is going to happen, whatever, whatever and we have

9   a video of him coming into the house and a video of him

10  dropping off the kids and, et cetera.  But he said no and he

11  wanted to go to the hotel instead and it progressed.

12  Q    Now, before this trial, did you plead guilty to the

13  possession of child pornography?

14  A    Absolutely.

15  Q    Did you, in fact, possess child pornography?

16  A    I did.  When Jack was showing us stuff on his iPad, he

17  passed out.  I looked in the iPad and I saw the source of

18  where he got the stuff from.  I went and I looked at that

19  source.  I dumped it.  I don't want to say it out here on

20  record, but I dumped, I did a mass dump of that source and

21  then I looked at the file names, the size.  I hash-tagged them

22  as well just like the FBI and ICE does where you instead of

23  actually looking for a file name, you produce a numerical

24  representation of the file.  So, let's say file A of certain

25  file would be XYZ001567-whatever, it's a 32-digit number, and

VB        OCR        CRR

1    then, using that, I devise a little algorithm that went to the

2    back end of Google using reverse uploaded image search and I

3    was able to uncover probably what's the biggest repository of

4    child porn online right in plain sight, not through

5    peer-to-peer, not through share.  You go pay and you download

6    it and end up getting into that network and I dumped it in

7    full as well.  Or most of it, I don't know if I had time

8    because that whole operation was a very short, during a very

9    short period of time.  I think I downloaded most of it, but I

10   didn't get to downloading all of it by that time.

11   Q    When you say you dumped it, what do you mean?

12   A    Well, okay.  Let's say you are looking for a picture of

13   Scarlett Johansson.  You go browse websites, you see a picture

14   of Scarlett Johansson, and you hit -- click save as, and save

15   it.  That's browsing, saving.

16         Dumping a site, especially this site, everything was

17   in zipped encrypted ZIP files meaning, to explain to it,

18   instead of individual videos, individual images, bunch of

19   videos, thousand images of videos is inside one container

20   that's encrypted.  You got to download the whole container at

21   once to your computer, decrypt it and then you can see what's

22   inside of it.

23         So, dumping meaning, that I got a program that looks

24   at the full site, it had, I think, five or six categories or

25   four or five categories, under every category there was 20, 30

1   sets.  The site had a limit of ten gigabytes per day download,

2   so I pretty much set a little, it's called a robot or spider

3   to go and start downloading the first one, second one -- the

4   first set, second set, third set, until it went through the

5   whole website.

6   Q     And you did this through a Google search initially?

7   A     Well, I found the site through an algorithm that took

8   advantage of the back end of Google, reverse image search.

9           Google had published a technology, I think, right

10  around the same time, little bit before where let's say you

11  have a photo of yourself or a photo of a friend.  You upload

12  the photo to Google and hit browse.  Google will find either

13  the same image or images that look like it or images that were

14  taken in the same place or have the same technology or

15  resolution, color schemes and it led me to a thumbnail that

16  was hidden, not even displayed on that site and that thumbnail

17  actually, you know, once I pulled the actual site, it looked

18  like a form.  I believe we introduced it in evidence, it says

19  Lolita art form and set one, set two, set three and so on.

20  And then, I ended up dumping the whole site.

21          Jack at some point in time came to us and said that

22  his iPad and computer and other things were stolen from the

23  car and we had downloaded a few files and Kristen actually

24  ended up looking, just searching couple of keywords and so on,

25  and picking something like mom, daughter, whatever that he was

Baslan - direct - Savitt                               547

1    into and we picked four or five files and we showed him when

2    we were there.

3              And then, the discussions after that, I offered him

4    more than once and you could hear in the script that why don't

5    you just bring your iPad and I'll let you be able to view

6    remotely without having it on your iPad and you can go in a

7    room and watch those videos.

8    Q    Why did you dump the child pornography in your computer?

9    A    I dumped the whole site as it is and I was going to use

10   it to find other sources and maybe put them down.  It's not my

11   first time where I went to the FBI and I did offer them

12   information about illegal activities online.  I did it maybe

13   like ten years ago and I was shut down at the time because

14   they said illegal files rating wasn't in fashion.  They look

15   for people who make green cards and so on.

16             So this time, since I was able to find a site that

17   was right under everybody's nose and had, as Agent Phung

18   testified was the biggest collection of illegal files that

19   she's ever seen in her eight years, and I figured dump it and

20   use it to actually find others.

21             Because once you have a file, it's very easy to

22   hack, not hack but tap in, into the back end of Google and

23   find other sources.

24             During the research of this actual site I ran into

25   something called closed community, for lack of a better word,

Baslan - direct - Savitt                    548

1  and it's a specialized software that pops online when you go

2  to a special place and special time, and I ran into it once

3  and I couldn't find it after, where it allows people to trade

4  or have access to each other's kids.  And I think I mentioned

5  in the script, I said, I look at this thing, it's very

6  sophisticated technology and I didn't understand it at the

7  time.

8           A few days after that, I actually kind of figured

9  out what they were doing, but then I lost the link and I was

10  so busy with the projects and work and the whole thing with

11  Jack that I figured, you know, after the whole thing with Jack

12  is done, I'll actually go and start pursuing that and then

13  maybe post it somewhere online and expose them so I can force

14  the hand of authorities to do something about that.

15

16           (Continued on following page.)

17

18

19

20

21

22

23

24

25

1   BY MR. SAVITT:

2   Q    Now, we heard that, and you just described that the child

3   pornography, in the zip files, that were downloaded en masse,

4   or dumped.

5   A    Dumped.

6   Q    Was a huge amount?

7   A    Absolutely.

8   Q    Which one of-- what do you see?  What did you look at?

9   A    I barely saw anything.  I mean, if you were to put-- they

10  said that-- the F.B.I. counted the files and, correct me if I

11  am wrong, there were 75,000, 74,000 pictures, and about 2,000

12  movies.  And in their testimony, they said that some of the

13  movies were 45 minutes long.  Or I think--

14          THE COURT:  I think the question is, what did you

15  look at?

16          THE WITNESS:  I barely looked at anything because of

17  the length of it.  We searched, Kristen searched keywords.

18          THE COURT:  Next question.

19  Q    When you say, you barely looked at anything, what did you

20  look at it?

21  A    I looked at it first time actually watching -- in fact

22  that day on the tape, I said to him, there are files A, B, C,

23  and those are the description of them.  However I have not

24  seen them yet.  You can see it in -- and then let's watch.

25  Q    You heard the description of some of the videos during

Baslan - Direct - Savitt                    550

1   the course of Agent Phung's testimony.  Did you watch all

2   those videos?

3   A    No.

4   Q    Now, can you explain to us what the sequence of events

5   were that we listened to on the tapes.  What was the plan?

6   How did it develop?

7   A    All right.  The best way I can remember the plan,

8   summarize it as follows, it started with Jack telling us about

9   his fantasies and child pornography.  Then it evolved to us

10  trying to record him talking about it and talking about--

11  watching it, and, you know, discussing especially with his

12  kids.  If you go around, say the guy is just watching pictures

13  online, he is not going to do anything about it.  It has to be

14  something that, you know, family related or so on.

15          Jack had had severe psychological problems and like

16  I said, he grew on me in a way -- I can't tell you how many

17  times at two a clock, I would look him up-- from his wife's

18  house, I would go take him to the hospital, bring him and so

19  on.

20          So, we thought that he needed help, especially

21  psychologist.  Not to just go to prison, for a limited amount

22  of time and so.  He tries to be a good dad when he can.

23          So, we decided to go have that over him with the

24  Rabbi, and we actually did speak to a Rabbi and a Rabbi said,

25  give me the proof and then we will move on from there.

1          Then, as we started getting with that plan, Jack

2    started talking about being scared of Kristen.  All about

3    Kristen, Kristen is going to set him up, he is scared of

4    Kristen.

5          So, we took that advantage of that and we said,

6    okay, let's kind of pretend it is Kristen and see we are going

7    to set up Kristen.  But as you know Kristen was, you know,

8    knew about it.

9          Then it evolved to the baby-sitting gig, then it

10   evolved to going to the hotel somewhere.  I had told him, well

11   I'm not going to go to a hotel unless you bring the kids and

12   we can do the set up pictures.  In the script you hear me

13   saying to him, Chris will stay outside, while Kristen takes

14   one of the kids to the bathroom and you know, pretends that--

15   takes a few minutes and walks out.

16         In the mean time I would wire him up, you know, with

17   him coming in the house, dropping off the kids and me and him

18   will talk.  That is as good as proof as I need.  Then last

19   minute he changed it and all of a sudden going to the hotel in

20   New Jersey that he picked.

21         Then, he said to me, Leah is coming.  I mean I

22   remember hearing on the tape, not that I thought about it

23   once, twice, three times, four times, I was very hesitant.  He

24   started asking me constantly, are you upset, are you not

25   excited.  You should be excited.  Why aren't you excited.  I'm

1  like, oh, yeah, I'm so excited about it.  Usually when I get

2  nervous, I get very inappropriate, humor pops out.  Usually,

3  you can hear when we talk about hammer rigs and encryption, I

4  just talk passionately and I go on and on about it, details

5  and so on.  But when I get nervous, I just get insane humor.

6          Then, he gets in-- he talks more than once about the

7  drugs and stuff.  We were like humoring him.  I first said

8  Dramamine, he said Benadryl.  Now it's Benadryl.  He talks

9  about pills of Benadryl or Valium or this.  Which I even had

10 the pills, I had Ambien, I used to take sleeping pills all the

11 time.  I never brought any of it here.

12         Then it came to the last minute, where he told us

13 I'm not stopping by, because my wife gave me an ultimatum.

14 I'm in fact going to go and just, I just got to pick up the

15 stuff and go to hotel.

16         At this point in time, especially being on coke, the

17 paranoia hits, you start freaking out.  I set up this

18 situation, it's getting out of control.

19         Kristen comes up with the idea, why don't I go to

20 the store bring a bottle of something and then I can switch it

21 with some, something with the same consistency.  We had a

22 strawberry liquorice thing which she used to drink, health

23 juice.  Then, I said okay.  Great idea.

24         Except, she goes to the store and starts obsessing

25 over what bottle will look un-tampered with.  And then starts

1   sending me pictures with that.  Should I do the NyQuil or do

2   this, what do I do.

3           I snap her on the phone and said get back here, he

4   is almost there.  Lo and behold he gets to the house before

5   her.

6           Then she walks into the house, holding that.  She--

7   I'm at that point I'm out of control.  I'm just, my heart

8   probably was racing.  I'm trying to figure out, how I'm going

9   to delay this.  Even tell Jack, look if this doesn't work, it

10  is okay.  It is okay.  I don't have a problem with it, we will

11  do it later.

12          Kristen tells me, gives me a hint, hey can I give

13  him some herbal stuff to?  Can I go in the kitchen.  She was

14  giving me a hint, so I can give her an opening so she can go

15  to the kitchen and swap out the contents of the bottle.

16  Stupidly I snap at her, because I didn't get what she is

17  trying to say.  No, don't worry about it, leave.

18          Then my next strategy was trying to tell Jack, well,

19  delay the whole thing.  Wait until you are there.  Wait to

20  keep the kids in the car, let people see them in the parking

21  lot, maybe they will wonder.  Have her take a shower first.

22  So you know-- and I told him, don't take drugs, don't lose

23  control.  I kept telling him.  You know at some point in time

24  I was afraid he is going to actually start, you know, start

25  the whole process without us.  When we arrived at the hotel, I

1  actually remember seeing the agent, for some reason, even we

2  had eye contact.  She was on the phone downstairs.

3          We went upstairs and my thought was, is that Kristen

4  would-- he told us there were two rooms.  He was in one room

5  and the kids in another room.  Kristen says, hey I got to go

6  to the bathroom or change or something.  Which we didn't bring

7  any change clothing, paraphernalia, or party clothing or even

8  drugs or anything with us.  Even we didn't bring the child

9  porn file that he wanted us to bring to the hotel.

10          She goes to the next room, and-- my idea is, she

11  would go to the next room, take a picture of what was going

12  on, like two kids sleeping, one kid groggy and one kid sleep

13  or whatever.  Then she would walk out of the other room, and

14  as soon as she walks out, I will come find Jack and then he

15  will have five, six minutes to empty out the hotel room.

16  Deliver the kids to their -- back home or whatever.  Or he is

17  going to go to jail.

18          And but-- we didn't even get inside the room when we

19  got arrested.

20  Q    Was there any reason for you from your perspective to

21  have any sort of a safety over Kristen?

22  A    No.

23  Q    Were you concerned about Kristen going to the police?

24  A    No.  Kristen was in on it from day one.  The whole idea,

25  when I told her, he is paranoid about you.  She's saying, oh,

Baslan - Direct - Savitt                              555

1   yeah, that's great, so we can use that against him.  Our whole

2   theory was, whatever he wants, let's just use it against him.

3            In the whole chess game that we were trying to play.

4   I mean we have had meetings with Kristen, you have seen, had I

5   been trying to set up Kristen, and she would just hear it

6   first time on the tapes, and she's facing the same charges I'm

7   facing she would not be -- she would be here testifying

8   against me.

9            MS. DEMAS:  Objection, Your Honor as to what another

10  witness would say that is hearsay.

11           THE COURT:  Yes, disregard it ladies and gentlemen.

12           Go ahead Mr. Savitt.

13  Q    Did you ever have inappropriate sexual contact with

14  prepubescent children or babies ever?

15  A    No.

16  Q    Is that something that you ever desire to do?

17  A    No.

18  Q    Did you have sexual relationship with women?

19  A    Yes.

20  Q    Did you have a lot of sexual relationships with women?

21  A    Absolutely.

22  Q    And, during the course of some of these episodes, were

23  you high?

24  A    Mainly not.  Mainly-- couple times we smoked a joint.

25  Being high is not conducive to having a--

Baslan - Direct - Savitt                556

1   Q    All right.

2        Prior to downloading these zip files en masse of

3   dumping, did you ever possess child pornography?

4   A    No.

5   Q    Are you interested in looking at child pornography?

6   A    Well, technically processing Jack's file with that girl

7   would-- is child pornography.  But not in the context of I

8   possessed it to, you know, for self pleasure, whatever.

9        Just to-- I don't want to lie or be inaccurate on

10  the stand.  I mean, I understood when I got Jack's file with

11  that girl, that there would be considered illegal files.  But

12  they were zipped and buttoned up and put away and, to use

13  against him to go commit himself.  Which he did, twice.

14       So it seemed like it worked out pretty good.  Until

15  he escaped and we could not get him back in.

16  Q    Now, you were arrested on what day?

17  A    March 19th, I believe.

18  Q    Of?

19  A    2013.

20  Q    Was that the last time that you saw Jack?

21  A    Yes.

22  Q    At the time that you were arrested, did it appear to you

23  that Jack was being arrested?

24  A    Yeah.  He actually was-- I mean, I'm saying it is a show

25  now I know he wasn't arrested.  But he was put down by two

Baslan - Direct - Savitt                                557

1    guys.  He was screaming un-cuff me, you M F'er, and he is
2    screaming and cursing at them.  Let me go, let me go.  It was
3    a whole show.  Where me and Kristen, we just got handcuffed
4    and walked in.  We were separated.
5          I was-- what happened is, as-- Special Agent Spivack
6    testified, that there was two rooms.  The shared door on the
7    one side of the corridor and one room opposite to one of the
8    rooms.  I was moved to that room that the agents came out of
9    to arrest us and, I was cuffed and -- back cuffed and sitting,
10   I believe on some kind of love seat or little lazy boy or
11   whatever it is on the corner of the room, in the back wall of
12   the room.
13   Q    Were you in a room separate from Kristen or Jack?
14   A    Correct, I was across the corridor from them.
15   Q    Were you questioned?
16   A    Yes.
17   Q    Did you provide answers?
18   A    To what I-- you know, as much as I can.
19         I mean it was a stressful situation.  The one thing
20   that sticks clear in my mind, I kept saying to them, you
21   arrested us too soon, you should have waited.  You know.  And
22   then when he confronted me, we know about the plan, we know
23   this and that.  I said, you should have waited, it is not what
24   it looks like.
25   Q    Did you admit to possessing child pornography?

Baslan - Direct - Savitt                    558

1   A     Yes.

2   Q     Did you give any passwords or any digital information to

3   allow the agents to access --

4   A     Yes.

5   Q     The child pornography?

6   A     Yes.  But let me take the question one piece at a time.

7         I told them how I downloaded, where did I download

8   it from.  I told them it was in the Apricorn drive.  Agent

9   Spivack as you can hear me on the tapes, told me you thought

10  the Apricorn was not secure, which is true.  But I left the

11  files that I downloaded on it.  I was playing with the

12  encryption capabilities of that device.  He says to me, well

13  we know that you were not going to use that device.  That you

14  didn't trust it.  I said, yeah, but that is where the porn

15  was.

16        I had originally downloaded to the computer, under

17  three encrypted containers and I copied those containers onto

18  the Apricorn drive.

19        And then I told them, I say numerical password only.

20  Keep that only numerical password.  However, I don't remember

21  it, I just set it.  I can give it to you if I had access to my

22  computer.  I'd given him a couple of different passwords, one

23  to Kristen's laptop that she carried on her and I remember --

24  I don't know if it was Agent Steven Flatley, Steve Flatley, he

25  actually open up the laptop and did a quick search for

RB        OCR

1   encryption, videos or files and then he shut it down.  Agent

2   asked me, any pornographic material on that laptop.  I said,

3   no, it is not my laptop.  I own it, Kristen uses it.

4           Then, I give him a password to a computer which they

5   misunderstood.  I gave them a password to a laptop, when they

6   went to the house, they tried the main computer and it didn't

7   work.  I did say, I will point you in the right direction.

8           In fact, we had a meeting with them months later,

9   where I went over exactly where the files are, what the names

10  of the files are, what were they encrypted.  They were very

11  worried there were some encrypted files on my hard drive that

12  they couldn't open.

13          I said, that I gave the password which somehow it

14  got lost off the laptop.  And I told them I'm willing to open

15  it for you.  Those are duplicates on what is on the Apricorn

16  drive.

17          Basically download it first in the computer, and

18  then copy onto the Apricorn drive.

19  Q    At the time that you were being questioned immediately

20  after you were arrested, did you have any concerns for

21  Kristen?

22  A    Absolutely.

23  Q    Did you have any concerns with respect to your parents?

24  A    The first thing-- you have gotten to know me through the

25  last year and a half.  I take stress too my job very well.  I

Baslan - Direct - Savitt                              560

1   mean I direct multimillion dollar events.  I --

2          THE COURT:  Answer the question, please.

3          Repeat the question if you would.

4   Q    Were you concerned about your parents?

5   A    Very.  The concern started when I started thinking about

6   my parents and Kristen, and they asked me, where you from?

7   Where is your dad from?  They had mistakenly said where my dad

8   is from.  I said, no, my dad is from here and here.

9          Then they got -- I started getting very concerned

10  about my dad, the fact that if there is a phone call, at

11  8 hours ahead or 9 hours at the time, it would be a far in the

12  morning.  Hey your son is arrested for a child pornography

13  case.  It will be the end of him.

14  Q    Is he ill?

15  A    Yeah-- well, the problem is, we have-- I remember him

16  when he first retired, he was a healthy guy, 190 pounds,

17  180 pounds.  He was a little shorter than me.  Last time I saw

18  him, he was 150, 160 extremely skinny.  He's still active, but

19  you know, he is well on in age.  He worked all his life.  His

20  family-- you know, the background, his family are Holocaust

21  survivors, he worked from six years old.  He was a renowned

22  physician.  Pediatrician nonetheless.  There is no worse thing

23  to do, to a dad than do that.

24         MR. SAVITT:  I don't have any further questions on

25  direct examination.  Thank you.

- Proceedings -                         561

1          THE COURT:  We will take a short break folks, please

2     do not discuss the case.

3          (Jurors left courtroom.)

4          THE COURT:  12 minutes.

5          (Recess taken.)

6          THE COURT:  Please be seated.

7          Ms. Demas, do you have an application of some sort?

8          MS. DEMAS:  Yes, Your Honor, at this point, the

9     government moves to be able to cross examine and admit the

10    defendant's proffered statement on the grounds he has now

11    opened the door to it.  He has testified inconsistently with

12    his proffered statement in many respects.  But the most

13    notable of which is that he made absolutely no mention of the

14    documentary that he claimed he was producing when he gave a

15    proffered statement to the government on October 21, 2013.

16         In addition, I would note that the defendant

17    testified about the fact that he did meet with the government

18    to try to explain what was going on later, and the only meting

19    with the government that ever occurred, besides the

20    defendant's post arrest statement was that proffer on

21    October 21, 2013.

22         THE COURT:  Well, he did.  I was somewhat surprised

23    to hear that.  He did open that door to the discussions with

24    the government which was in fact the proffer.

25         Mr. Savitt, what say you, sir?

1           MR. SAVITT:  Well, he did open the door to the

2    proffer, that's true.  He did open the door to the proffer.  I

3    can't argue with what happened.

4           THE COURT:  Bring in the jury.

5           COURTROOM DEPUTY:  Certainly.

6           THE COURT:  Please be seated everyone.

7           Ms. Demas, your witness.

8    CROSS EXAMINATION BY MS. DEMAS:

9    Q    Good morning Mr. Baslan.

10   A    Good morning.

11   Q    Now, I, like you have a tendency to speak sort of quickly

12   sometimes.  So, if I am speaking too quickly or if you don't

13   understand my question, please tell me.  I will make an effort

14   to rephrase it.  Okay?

15   A    I appreciate it.

16   Q    Mr. Baslan, you have a very good memory, correct?

17   A    I think so.

18   Q    And, in fact, your memory is so good that you can

19   remember passwords with 50 characters in it, can you not?

20   A    I don't actually remember the passwords.  I drop pattern

21   on the keyboard to be able to remember the passwords.  Meaning

22   a zig zag of patterns that allows.  I cannot type as the

23   agents now, I cannot type the password from memory or speak it

24   out loud.  I need a keyboard in front of me.  Once you see the

25   pattern, it is actually easy to remember.

Baslan - Cross - Demas                                        563

1   Q    You have devices that you use to enable you to remember

2   things that a lot of people probably can't, is that fair to

3   say?

4   A    In the realm of the password itself, yes, that is what I

5   do.

6   Q    And sitting here today, the events that took place from

7   January to March 2013, they are very clear in your mind,

8   correct?

9   A    Some are, some stick out, some don't, yeah.

10  Q    I'm going to ask you some questions about the night of

11  your arrest.

12  A    Ah-hum.

13  Q    Were you arrested by F.B.I. agents on March 19th, 2013?

14  A    Correct.

15  Q    Were you arrested around 9:20 p.m.?

16  A    I don't remember the actual time, but I would not dispute

17  with you.   Sounds about right.

18  Q    Well, do you remember that you were read your Miranda

19  rights around 9:27 p.m.?

20  A    Yes.

21  Q    And would it be fair to say that your actual arrest took

22  place only minutes before the time that you were read your

23  Miranda rights?

24  A    Correct.

25  Q    So around 9:20 p.m., fair to say?

Baslan - Cross - Demas                    564

1   A    Correct.

2   Q    And were you arrested in a hotel room at the Hyatt Hotel

3   in Jersey City, New Jersey?

4   A    Absolutely.

5   Q    You were then put in handcuffs, correct?

6   A    Correct, I was back cuffed.

7   Q    And Kristen Henry was arrested at the same time as you

8   were, correct?

9   A    Yes.

10  Q    And she was also put in handcuffs; is that right?

11  A    Correct.

12  Q    And Jack was also in the room that you were arrested in,

13  correct?

14  A    Correct.

15  Q    And the agent -- they put him in handcuffs also, right?

16  A    Correct.

17  Q    As you testified on direct it looked to you as though he

18  was being arrested as well, right?

19  A    Correct.

20  Q    And then you were handcuffed and the agents took you to a

21  room across the hall; is that right?

22  A    Correct.

23  Q    In that room, the agents asked you a number of questions,

24  correct?

25  A    Yes, ma'am.

Baslan - Cross - Demas                                    565

1  Q    But before they asked you those questions, they read you

2  your Miranda rights, yes?

3  A    Yes, ma'am.

4  Q    You waived your right to remain silent, correct, you

5  spoke to the agents?

6  A    Yes.

7  Q    And, was Agent Spivack one of the people who questioned

8  you?

9  A    I believe there were two agents.  Spivack was one of them

10 and a blond agent, Bill, if I -- serves me correctly.

11 Q    A blond agent named Bill?

12 A    Yeah, or Bill Connley or something.

13 Q    Somebody Connley?

14 A    Yeah.

15 Q    And, during-- now, you spoke to the agents, to Agent

16 Spivack and an agent whose name you can't remember, but I

17 think might have a last name, might be Connley for about an

18 hour, correct?

19 A    That's sounds right.

20 Q    And, during that hour, Agent Spivack asked you many

21 questions, yes?

22 A    Correct.

23 Q    You answered his questions, did you not?

24 A    I answered the ones that I would-- the way it worked, he

25 asked me a few questions and then I-- then we got into an

1  impasse where I was-- answering, meaning that I can't answer

2  that question that you just asked me.  Back and forth.

3  Q    So, I would like to go through some of the questions that

4  Agent Spivack asked you and your responses to those questions,

5  okay.

6         On the night of your arrest, did you tell the agents

7  that you had known Jack for two to three years?

8  A    Correct.

9  Q    And, that was true, right, you had known Jack for two to

10 three years?

11 A    Sure.

12 Q    And, did you also tell the agents that you had lived with

13 Kristen Henry for two years?

14 A    Correct.  I don't remember saying the exact amount of

15 time, but I said we were living together awhile.

16 Q    It was true, you had lived with Kristen Henry for at

17 least two years -- and I'm sorry, Mr. Baslan so the Court

18 Reporter to take it down, you have to wait until I'm done

19 before you answer.

20 A    Sorry about that.  I said, yes.

21 Q    Did you tell the agents, that you were a Russian citizen?

22 A    Yes.

23 Q    That was true also, right?

24 A    Correct.

25 Q    Did you tell the agents that you had a green card and you

Baslan - Cross - Demas                    567

1   were in the United States legally?

2   A    Correct.

3   Q    That was also true, right?

4   A    Correct.

5   Q    You do have a green card, correct?

6   A    Yes.

7   Q    And, you obtained that green card by marrying a

8   naturalized United States citizen, yes?

9   A    Correct.

10  Q    That naturalized United States citizen is Ms. Kowal, who

11  you talked about on direct, right?

12  A    Correct.

13  Q    That is the ex-wife who you are still friends with,

14  correct?

15  A    Correct.

16  Q    Now, Ms. Kowal, was not the first woman in the United

17  States who you married, was she?

18  A    No.

19  Q    You married another woman before Ms. Kowal named Tina

20  Suppa, correct?

21  A    Right.

22  Q    And another woman after Tina Suppa whose name was

23  Catherine Thurber, I believe; is that correct?

24  A    Correct.

25  Q    And, you are no longer married to Maryana Kowal, are you?

Baslan - Cross - Demas                                          568

1    A    No.

2    Q    On the night of your arrest, did you tell the agents that

3    you were a videographer?

4    A    I said to them I work in media events and videography,

5    yes.

6    Q    Was it true, did you work on videography?

7    A    Yes.

8    Q    And, on the night of the arrest, did you also tell the

9    agents that for work, you did consulting for websites?

10   A    Correct.

11   Q    That is true also, right?  As you told the jury, you did

12   a lot of different consulting jobs for various websites,

13   right?

14   A    True.

15   Q    Now, on the night you were arrested, the agents asked you

16   a number of questions about child pornography, correct?

17   A    Correct.

18   Q    You told the agents that you had viewed child

19   pornography, did you not?

20   A    Correct.

21   Q    You told the agents that you had viewed child pornography

22   more than once, correct?

23   A    Yes, ma'am.

24   Q    And you also told the agents as you testified on direct,

25   that you had downloaded child pornography, yes?

Baslan - Cross - Demas                                    569

1   A    Yes, ma'am.

2   Q    And you told the agents that you had masturbated to child

3   pornography, did you not?

4   A    I did not actually.  Agent Spivack had said, and I know

5   you masturbated, and then I just said, no.  Then he said,

6   well, you know you did.  It got into one of those

7   conversations.

8   Q    I see.

9        And the agents also asked you a number of questions

10  about why you were at the hotel that evening, correct?

11  A    Correct.

12  Q    You answered those-- excuse me, sorry.

13       You answered those questions, did you not?

14  A    Correct.

15  Q    Now, on the night of your arrest, you did not tell the

16  agents that you were conducting this investigation of Jack,

17  that you just explained to the jury, did you?

18  A    No.

19  Q    And, on the night of your arrest, you did not tell the

20  agents that you were setting Jack up, did you?

21  A    No.

22  Q    On the night of your arrest, did you ever tell the agents

23  that you were making a documentary?

24  A    We never got that far.  As soon as they said, this is not

25  what it looks like, you should have waited to the arrest, the

1  rest of the conversation went sour and turned to a screaming

2  match.

3  Q    My question was on the night of your arrest?

4  A    No.

5  Q    Let me finish the question okay.

6         Did you ever tell the agents that you were making a

7  documentary?

8  A    No.

9  Q    Now, you did meet with the government on October 21,

10  2013, correct?

11  A    Correct.

12  Q    And, your attorney Mr. Savitt was he at that meeting?

13  A    Correct.

14  Q    And, was Special Agent Spivack at that meeting?

15  A    Correct.

16  Q    Was Mr. Smith, the prosecutor also at that meeting?

17  A    Correct.

18  Q    And, before you said anything at that meeting with the

19  government, you were informed that it was a separate federal

20  crime to lie to agents, correct?

21  A    Correct.

22  Q    And, at that meeting, on October 21, 2013, you told the

23  agents that you and Kristen Henry were producing a documentary

24  about Jack and child pornography, correct?

25  A    I said to them exactly, we were producing a documentary

1   about sexuality, which ended up encompassing Jack once Jack

2   popped in with that case.

3   Q    So you were producing a documentary, yes?

4   A    Yes.

5   Q    I'm sorry.  I didn't hear --

6   A    What I said actually, we were working on a documentary, I

7   didn't say producing.  Producing means we started filming,

8   which we hadn't.  I said, working on a documentary about

9   sexuality that encompassed Jack once Jack popped into the

10  picture.

11  Q    I see.

12        So, you were working on a documentary?

13  A    Right.

14  Q    And you told the agents that October 21, 2013, no dispute

15  about that, right?

16  A    No dispute about that.

17  Q    And the first time you told anybody from the government

18  about this documentary was not until October 21, 2013,

19  correct?

20  A    Which is the first time I talked to them after the

21  arrest, correct.

22  Q    And that was seven months after your arrest, yes?

23  A    That was the first time I spoke with them, yes.

24            (Transcript continues on next page.)

25

Baslan - cross - Demas                        572

BY MS. DEMAS:

Q    And during the months between the March 19, 2013, when
you were arrested and October 21, 2013, did you tell anybody
else about this documentary?

A    Oh, absolutely.

Q    Who did you tell?

A    First I remember it was my first counsel, Heidi Cesare
she was in first meeting two weeks after we got arrested, in a
codefendant meeting and then I told my first attorney.  At the
time of the meeting I think, I don't remember if we had the
preliminary discussions with my attorney, Mr. Savitt at the
time or not yet.

Q    And during the time period that you were actually making
the documentary did you talk to people about it, besides
Ms. Henry?

A    Okay.

         Let's just clarify the term.  When you say working
on the documentary, it's not producing or filming.  You are
collecting information.  The idea of the documentary was a
year and year and a half before Jack.  It was after the 50
Shade of Gray came out we were wondering about American abuse.
I collected a lot of material about the documentary, articles,
books.  It was going to be a comparison, a comparative
narrative between 50 Shades of Gray which was a American
creation, which is still I think years later still on the top

Baslan - cross - Demas                                573

1   of best seller list and a movie called Romance which is a

2   French movie.  We were going to kind of portray why the movies

3   depict the same exact subjects but they took different turns

4   and a balance between guilt and social values versions, you

5   know, social tendencies and so on.

6          Then when Jack came, we were calling it Darker

7   Shades of Gray.  When Jack came into the picture, jokingly we

8   thought, if we go through the same with Jack and we finish the

9   investigation and we uncover something, we can call it the

10  Darker Shades of Gray or something like that.  It was not a

11  primary focus.  Even in the meeting I said there was an

12  investigation about Jack.  But the documentary was also

13  parallel.  It was like two birds with one stone.

14  Q    This is a two-pronged inquiry on the one hand, you re

15  investigating Jack because, as you testified on direct, he

16  told that he had sexual interest in children and had actually

17  molested them in the past?

18  A    Correct.

19  Q    And the on the second prong you were going to memorialize

20  this vision on film as part of your documentary, correct?

21  A    Right.

22         But not in any sense where I would say Jack so and

23  so went and he did this.  It was more we worked on -- it came

24  into our lives at the end of this documentary that we had

25  worked on something like this and this is what we uncovered.

1  We uncovered the source of child pornography that was right

2  under everybody's nose and why nobody had dealt with it.  That

3  is kind of going to be the climax of the documentary that

4  millions of the dollars are used on setting up people and

5  agents posing as underage children on line to try to induce

6  people who are the biggest source of the child pornography is

7  on there for a lot of people to deal with without being

8  caught.

9  Q    You wanted to alert the authorities as to this huge cache

10 of child pornography that was just sitting there under

11 everyone's nose, right?

12 A    Absolutely.

13 Q    You were being like a good citizen, correct?

14 A    Yes.

15 Q    A whistle blower if you will?  Are you familiar with that

16 term?

17 A    Yes.  I think I understand what it means.  Yes.

18 Q    In order to show the FBI that there was this massive

19 cache of seventy-six thousand images and videos of child

20 pornography you had to download it, right?

21 A    No.

22 Q    You did not have to download it?

23 A    No.

24        I said on exam I downloaded it.  Every time I

25 downloaded the source I was able to hash tag the file which is

1   the same form that the FBI and ICE uses those hash tags to

2   track other files.  All I had to do was an anonymous e-mail.

3   The website was there.  The anonymous e-mail was encrypted

4   with the password of the website.

5   Q    You were aware obviously at the time that you downloaded

6   this massive cache of the child pornography it was illegal to

7   do so?

8   A    I fully understood it was illegal.  I was going to take

9   that risk was part of the greater good.  I was willing to take

10  that risk.  I figured as soon as I am done with it I could

11  delete it and get away with it.

12  Q    Just everybody is clear.  A documentary, that's a film,

13  correct?  It does involve film?

14  A    Yes.  Mainly it's interviews with people.  There's a

15  narrative.  Same as even like at a trial you bring witnesses.

16  You bring out stories.  You talk with them and check their

17  story and interview other people that are involved in the

18  story.  You build it up.  It becomes like the documentaries

19  I've done about Holocaust and so on.

20  Q    You are, sir, as you testified on direct, you have sort

21  of an artistic bent, right?

22  A    I try to have an artistic bent to balance out of the

23  boring IT part of my life.

24  Q    You are good at our hobby.  You got second place in

25  photography at the museum in Sweden, right?

Baslan - cross - Demas                                  576

1  A    I try.  Anybody tries this as a hobby you try to make it

2  better.

3  Q    Naturally when making this documentary, I am sure you put

4  the same amount of effort that you did with your photography,

5  correct?

6  A    Yes.

7            But the documentary wasn't anything -- it was on a

8  back, back burner.  At the time of this whole thing happening,

9  I was involved with the Kleitman Holocaust Museum, which I had

10  about eight DVDs to produce.  That month while we were talking

11  about Jack I had to deal with the military for 45 issues that

12  got cancelled.  We had to get another gig.  I had another

13  place where I was going to travel around the world with

14  another company to produce event.

15            So, yes, the documentary thing was definitely at a

16  halt.  I thought that at some point in time when I take a

17  break, I can produce it.  Whip it together and -- do you want

18  me to wait until you --

19  Q    I'm  listening.

20  A    Okay.

21            And I wanted to finish, when I get a break I can

22  whip out this documentary and maybe it becomes something good

23  and maybe it will be my break to get out of the monotonous

24  media job and get into doing documentaries.

25  Q    You testified on direct that you started investigating

1  Jack in December 2012 or January 2013, correct?

2  A    Correct.

3  Q    By that point in time you believed that he had molested

4  children before, correct?

5  A    Well, the first time that we've met I'm not sure.  He was

6  high.  I'm answering your question.  I like to usually

7  sometimes give people the benefit of the doubt.  He does talk

8  a lot under drugs.  When you are drugs that's what you do, is

9  especially between coke, mushrooms and oxycodone.  I have no

10  idea what that cocktail could do.  He could embellish and talk

11  in fantasies.  I think in one of the exhibits it asked him if

12  this is a fantasy thing.  It's a different psychological -- I

13  thought of it as a different psychological issue and he needs

14  specialized help if it was something that he has done or not.

15  I was not sure.  When a person sits in front of you and they

16  are high and he's talking about this and enjoying it for me as

17  soon as he started talking about.  Me and Kristen got involved

18  and it got weird.  We were listening.  The conversation wasn't

19  you know, one two, three, lovely weather and the next thing I

20  molested children and child pornography and can I show you

21  something.  Why don't I show you this picture and the fetish I

22  have.  Every step he will look at us gauging our reaction if

23  all of a sudden the situation was going to blow up on him or

24  we were into this and it slowly progressed into the point, I

25  have this and that and he brought up the point with his

Baslan - cross - Demas                          578

1    girlfriend.

2    Q    Let at the stop you for one second.  My question was very

3    simple one.  My question was:  At what point in time did you

4    actually believe that Jack had molested children?

5    A    Probably by the meeting after we had that night.

6    Q    So what date is that?  What month and what year?

7    A    Within the next few days after.  He came to me and he had

8    a conversation about are you guys weirded out by this.  I said

9    no.  Keep going.  He wasn't high and he kind of confirmed the

10   stories or reiterated the stories that he told us.

11   Q    By February 2013 you believed that Jack was a child

12   molester?  Yes?

13   A    Yes.

14   Q    And by February 2013 you truly believed that he had

15   actually molested children before, correct?

16   A    Correct.  But it wasn't the fact is he doing it again and

17   it seemed to me that he's done it and he was more of an

18   opportunistic guy.

19          THE COURT:  Excuse me.  Excuse me.  We have to have

20   questions and answers here.  Respond to the question.

21   A    Can you repeat the question?

22          THE COURT:  Limit your response to the question,

23   please.

24   Q    My question, sir, was:  By February 2013 you believed

25   that Jack had actually molested children?

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Baslan - cross - Demas                          579

1    A    In the past, correct.

2    Q    Your answer?

3    A    Yes.

4    Q    Okay?

5         That concerned you, correct?

6    A    Very much.

7    Q    Because you did not want him to molest more children, did

8    you?

9    A    Correct.

10   Q    And now by February 2013 you had known Jack for many

11   years?  Yes?

12   A    Yes.

13   Q    And you knew that Jack had -- how many kids did Jack

14   have?

15   A    I believe seven or eight.

16   Q    He had access to those kids, did he not?

17   A    I don't think he had access to the kids.  His ex-wife

18   kept the kids.  He had the two new kids with his current wife.

19   Q    He had access to the two new kids with his current,

20   right, did he not?

21   A    Yes.

22   Q    Both infants?

23   A    Hmm.

24   Q    You were concerned about their safety?

25   A    Correct.

Baslan - cross - Demas                    580

Q    And you knew Jack's second wife, right?

A    Correct.

Q    You had met her, correct?

A    A few times.

Q    And by February 2013 at the point at which you actually
believed that Jack had molested children of course you told
Annette, right?

A    No.  Annette --

Q    It is a yes or no question.

A    No.  I did not her.

Q    Thank you.  I'll move on?

        You told the police, right?

A    No.

Q    You told a rabbi, correct?

A    Yes.

Q    Which rabbi did you tell.  What is his name?

A    Do we have to say it on the record, your Honor?

        THE COURT:  Yes, I, please.

A    Leibowitz.

Q    Rabbi Leibowitz?

A    Yes.

Q    How do you spell his last name?

A    L E I bowitz.  I'm not sure.

Q    How did you know Rabbi Leibowitz?

A    He was one of the rabbis who helped in the community.  I

Baslan - cross - Demas                                581

1    do a lot of not-for-profit events in the community and I had
2    popped into him more than once.
3    Q    Did you have Rabbi Leibowitz' contact information in your
4    iPhone?
5    A    No.  I had the contacts with one of his assistants.
6    Q    It is a yes or no question.
7    A    No, I didn't?
8    Q    Did you meet Rabbi Leibowitz in person or did you speak
9    to him on the phone?
10   A    In person.
11   Q    Is Rabbi Leibowitz associated with a particular temple or
12   shul?
13   A    I believe it's Bufbaf, but I am the not certain.
14   Q    What is Bufbaf?
15   A    It's a sect, a division of Satmar, which is a community
16   located in Brooklyn, Boro Park.
17   Q    Boro Park you believe?
18   A    Yes.
19   Q    Have you been to the temple of shul where Rabbi Leibowitz
20   works?
21   A    I met him at events, Jewish events, where everybody ends
22   up attending.  Although I lived in the community, I don't
23   attend the shul myself so much.
24   Q    You did live in Boro Park in Midwood, correct, during the
25   time that you lived in Brooklyn?

1   A    Boro Park and Midwood?

2   Q    Crown Heights, is that around Boro Park and Midwood?

3   A    No.  I believe it's like a 20 minute drive or something.

4   A different area.

5   Q    You are familiar with the area of Crown Heights?

6   A    Yes.

7   Q    Having lived in Brooklyn for many plain, many years?

8   A    Yes.

9   Q    Is there a large Jewish population in Crown Heights?

10  A    Absolutely.

11  Q    What exactly did you tell Rabbi Leibowitz?

12  A    I said that I think that there's a community member who

13  is engaging in -- may be engaging in activities with children

14  and would I be allowed to go to the police for it and he said

15  no.  And then I kind of ran the risk.  All my money and

16  productions in life comes from the community and if you go to

17  the police without authorization you get shunned and then you

18  get halted.  But he said if it's true, then we'll deal with

19  it.

20  Q    Did the rabbi give you direction as to what you should do

21  to prove the truth of these allegations that Jack was a child

22  molester?

23  A    He said give me the proof.

24  Q    You intended to give the rabbi concrete proof of Jack in

25  the act of the molesting a child?  That was going to be your

1   proof?

2   A    No.  The proof was going to be either Jack talking about

3   it or masturbating as I testified on direct.

4   Q    Jack masturbating in child pornography would have been

5   enough for the rabbi?

6   A    If I caught him like I said on the iPad masturbating his

7   own kids, yes.

8   Q    Part of your investigation necessarily was going to

9   involved you recording Jack?

10  A    Yes.

11  Q    You had to have proof, correct?

12  A    Correct.

13  Q    And as of February 2013 of course you must have recorded

14  conversations that you had with Jack about his interest in

15  children, right?

16  A    I attempted to record the one conversation.  I attempted

17  to also call him a few times and record with the doohickey

18  setup I had.  However, he always used to call me back.  That

19  became harder.  I figured I would set him up with a camera in

20  the room where he's masturbating and we'll record him then.

21  Q    You cannot record Jack when you were having conversations

22  with him about his sexual interest in children?

23  A    One of the conversations --

24  Q    It's a yes or no question.

25  A    I did record him once.

Baslan - cross - Demas                          584

1    Q    Do you have that recording?

2    A    Yes.

3    Q    Did you bring it to court?

4    A    It should be on my computer.

5    Q    It's on your computer.  Is it available on your computer

6    or is it in an encrypted file?

7    A    It might be in an encrypted file.  You will hear me

8    clicking on the computer the first conversation saying hold

9    on, hold on and then a click and that's the recorded

10   conversation.

11   Q    How long is the recorded conversation that is on your

12   computer in an encrypted file?

13   A    Five minutes.

14   Q    Where is it?

15   A    It's a cross recording with the script.  Either the first

16   or third conversation in the script.

17   Q    I see.  You recorded one of the conversations that the

18   jury heard in court, that's what you are saying?

19   A    Hmm.

20   Q    Which computer of yours is that on?

21   A    I believe it's the tower.

22   Q    The Mac tower.  Do you know if it's in the three terabyte

23   drive or the nine terabyte drive?

24   A    I wouldn't think so.  I don't know.  It is a year and a

25   half later.

Baslan - cross - Demas                      585

1   Q    You don't remember?

2   A    Prior to the arrest we changed encryption.  So I don't

3   know.

4   Q    You have not produced that cross recording at any point

5   in time to the government, have you?

6            MR. SAVITT:  Objection, your Honor.

7            THE COURT:  Sustained.

8   Q    That was the only recording you made, sir?

9   A    Yes.

10  Q    Because on other occasions Jack was what, too paranoid?

11  A    Not too paranoid.  It came always as a surprise.  As you

12  can hear from the scripts, I'm working with everybody

13  discussing -- Kristen and I -- we are working on web design,

14  looking at gray box.  We were working on a lot of things and

15  he pops up and I was not prepared.  Every time he popped in,

16  it was not I'm going to come.  Multiple times he promises he

17  was going to come that night and he didn't and then he'll pop

18  out of the blue and I will be there in 20 minutes and he

19  don't.

20           Most of the conversations you can hear conversations

21  with me talking with people on phone and working with Kristen,

22  I don't like this color, match this and so on.

23           THE COURT:  Next question, please.

24  Q    Mr. Baslan, you did have an iPhone with you during the

25  time that you were investigating Jack, correct?

Baslan - cross - Demas                          586

1   A    Correct.

2   Q    It's the same iPhone 5 that you were arrested with, was

3   it not?

4   A    Correct.

5   Q    And that iPhone 5 has a voice memo function on it?

6   A    Yes.

7   Q    You've also used a voice memo function in the past to

8   record conversations with people, correct?

9   A    Correct.

10  Q    You recorded yourself paying rent to your landlord in the

11  past, right?

12  A    Absolutely.

13  Q    The reason you did that, sir, because you paid your rent

14  in cash or at least you did and by recording that you're

15  paying your rent then there would be no question that you

16  actually paid the correct amount?

17  A    Absolute.

18  Q    You did not on numerous occasions?

19  A    All the time.

20  Q    You did it in August 2012?

21  A    I did it pretty much every transaction I have had with

22  the person and a contract I would handshake with the person

23  and then record it.

24  Q    You saved all those voice recordings on your iPhone, did

25  you not?

Baslan - cross - Demas                          587

1    A    Yes.  They are saved and stay on the iPhone.

2    Q    You did not record Jack using the voice memo function of

3    the iPhone?

4    A    I did record Jack using the iPhone memo in person one

5    time.  The voice memo does not work while you are on the

6    phone.

7    Q    You tried to record him but it did not work?

8    A    No.  No.  If you are in phone conversation the voice memo

9    does not work, as far as I know.

10   Q    My question is:  Did you use the voice memo function to

11   record Jack has part of this investigation that you were

12   conducting of him?

13   A    Correct.

14   Q    You did?

15   A    Correct.

16   Q    What was on that recording?

17   A    It was one of the conversations I believe in between two

18   meetings.  In between two recordings.  It's the one between

19   the end of February beginning of March I think.  It was like a

20   twelve day gap.

21   Q    Yes.

22   A    We had recorded a quick meeting.  Nothing too juicy.  He

23   talked about the babe sitting plan.

24   Q    That would be made on the iPhone that the government

25   seized from you?

1    A    Which is part of the files that I religiously for years

2    kept every receipt that I have.  When we got the iPhone

3    magically everything past December 14 disappeared and we asked

4    about it repeatedly and the only thick I got was Agent Spivak

5    reading me, this is recording one, two, three.  We never got

6    them.  I raised this issue with my first lawyer since day one.

7    Q    Let me make sure I'm clear.  You recorded a conversation

8    with Jack using the voice memo functions of your iPhone,

9    correct?

10   A    Correct.

11   Q    That conversation was on the iPhone that you were

12   arrested with?  Yes?

13   A    Correct.

14   Q    Magically when Agent Spivak went to record those

15   conversations it was gone?

16   A    I said when we -- when you gave us the lantern report.

17   The lantern said it didn't pick up the voice memo apps.  The

18   voice memo recording.  We sent a letter to the court as you

19   know and then we were told by you that post December 14 there

20   was not a single recordings, although you said that I record

21   religiously every transaction and business that I have done

22   for years but magically post December 14 there was not a

23   single recordings of rent or anything.  I apparently stopped

24   paying rent.  I wanted to raise an issue that later the phone

25   was tampered with.

Baslan - cross - Demas                                    589

1  Q     It's your belief that the phone was tampered with?

2  A     Absolutely.  I raised it with every counsel that I had

3  the pleasure of working with.

4  Q     The FBI tampered with your phone?

5  A     Correct.

6  Q     Specifically Agent Spivak?

7  A     I am not saying Agent Spivak.  He had the password to my

8  phone and used the phone the next day to look up a I believe

9  couple of pieces of information like zip code and address.

10 Only when we got to pretrial when he was in the presence of

11 Mr. Smith and I had heard him talking on the phone and we

12 would call Agent Spivak while he was with Mr. Smith and said,

13 oh, we need the two phone numbers for a bail thing then they

14 made me sign the waiver to get the two names.  Prior to that

15 he had access in front of me with my own password that I

16 provided multiple times.  I didn't have to sign a waiver or

17 anything.

18       THE COURT:  Okay.  Next question.

19 Q     Now, Mr. Baslan, surely you took notes about the

20 investigation you were conducting on Jack, correct?

21 A     Not necessarily.

22 Q     No notes.  No notes in your computer either about this

23 documentary that you were making about Jack?

24 A     The documentary, there's multiple folder of movies

25 downloaded leaded from different countries, from books, PDF

1   files.   There's an excerpt from a volume of books called

2   History of Civilization --

3               THE COURT:   I thought the question h ad to do with

4   materials concerning Jack.

5               MS. DEMAS:   It did, sir.

6               THE COURT:   Would you like to hear the question

7   again?

8               THE WITNESS:   Okay.

9   Q    No recordings on your computer having to do with your

10  investigation of Jack?

11  A    And I answered no.

12  Q    No.   Okay.

13  A    Then you asked my about the documentary --

14  Q    I asked if there were recordings about Jack for the

15  documentary you were producing on your computer?

16  A    They would be the same recordings for the investigations

17  that I don't have access to.

18  Q    Now, besides Rabbi Leibowitz you must have told other

19  people about this investigation of Jack, right?

20  A    I told two people actually, one person was in Sweden and

21  I had toll her that I am working on something but it's really

22  getting to me.   I don't want talk about it on the phone.   When

23  you ask people to talk about it and I had told a personal

24  friend of mine that I am also working on something and it's

25  giving me a lot of stress.   I was so stressed out to a point

1   where I ended up --

2   Q    Sir, my question was:  You surely told people about the

3   investigation?

4   A    Not the details of the investigation.  Only that I am

5   doing something that was pretty disturbing at the time.

6   Q    So you told one friend Sweden that you were doing

7   something that was getting to you, right, it was causing you a

8   lot of distress but you didn't want to talk about it on the

9   phone, correct?

10  A    Correct.

11  Q    And then you told someone else, a close personal friend,

12  that you were having a lot distress?

13  A    Correct.

14  Q    I want to make sure I understand exactly what you told

15  them.

16  A    Yes.

17  Q    The close personal friend was who, Maryana?

18  A    Toby.

19  Q    Toby Kessler.  Okay.  Of course you told Kristen Henry

20  all of the details of what you were doing because you were

21  doing it together?

22  A    Absolutely.

23  Q    Now, so as of February 2013 you truly believed that Jack

24  did molest kids?

25  A    Right.

Baslan - cross - Demas                    592

1   Q    He was a monster, right?  He needed to be stopped?

2   A    Correct.

3   Q    So you called the police, right?

4   A    I already answered no.

5   Q    You did not call the police.  You have had contact with

6   the police before, have you not?

7   A    I'm not sure I understand your question.

8   Q    Well, have you had contact with the police before?  It's

9   a simple question.

10  A    Contact in what sense?

11  Q    Do you understand the word contact?

12  A    Contact, I'm assuming arrest.

13  Q    No, sir.  Have you ever had to use the services of the

14  police?

15  A    Sure.

16  Q    And, in fact, you had a business card for a Detective

17  Dominick DiPietro, II on your computer, correct?

18  A    Correct.  I'm assuming it's true.

19  Q    From the 70 precinct?

20  A    I don't remember.  But, yes, I have the card, but sure.

21  Q    You did make a habit of saving all sorts of mundane

22  things to your computer that most people don't?

23  A    I scan like business cards and so on to digitalize them.

24  Q    You did not call Detective Dominick DiPietro at the time

25  when you found out that Jack was molesting kids, did you?

Baslan - cross - Demas                                    593

1    A    No.

2    Q    Did you call the anonymous state hot line that you can

3    use to report child abuse without giving your name?

4    A    I called no authority whatsoever.

5    Q    You didn't call the FBI either?

6    A    No.

7    Q    Although as you testified on direct apparently you did at

8    some point in time work with the FBI?

9    A    I did not work with the FBI.  I offered them help doing

10   illegal stuff and they turned it down as they said that's not

11   what they were interested in at the time.

12   Q    You had contact with the FBI before?  By contact I mean

13   you had spoken to someone from that agency?

14   A    About ten or twelve years ago in Buffalo.

15   Q    Now, you didn't tell the mother of the children who you

16   believed Jack was molesting?

17   A    The first one, no.

18   Q    You did not tell -- you also believed that Jack had

19   molested his niece, correct?

20   A    He claimed to have touched her inappropriately, yes.

21   Q    And you believed him, didn't you?

22   A    Hmm.

23   Q    You wanted to stop him?

24   A    Yes.

25   Q    And during some of the time that you actually believed

1  that Jack was molesting his children you would text with him,

2  right?

3  A    I don't think I've ever said that he was currently

4  molesting his children.  I said before when you cut me off at

5  the time I didn't think he was doing anything.  He took a

6  break and wanted to do something else.  He was afraid or

7  something.

8  Q    You thought that Jack had molested children in the past,

9  but he had taken a break?

10 A    Yes.  I said I didn't believe at the time he was

11 molesting.  If I thought that he was going to molest that kid

12 I definitely would end up calling the police.  I thought he

13 was fantasizing.  He was very scared.

14 Q    You relied on the information that Jack gave you, right,

15 to decide whether or not you believed that he was an actual

16 child molester, correct?

17 A    Correct.

18 Q    So on the night of your arrest -- I just want to make

19 sure I get the time line right -- at about 5:47 p.m. Kristen

20 Henry went to the drugstore and bought the Benadryl?

21 A    Yes.

22 Q    You brought that Benadryl back to your apartment in Boro

23 Park, correct?

24 A    Correct.

25 Q    And then Jack was at the apartment with you and Kristen

1  Henry and she gave him the Benadryl, right?

2  A    Correct.

3  Q    She was going to switch it for some sort of like

4  innocuous medicine but she didn't have time and so she gave

5  him the real Benadryl, right?

6  A    Right.

7  Q    Jack left, correct?

8  A    Correct.

9  Q    And you believed that Jack was then going to go pick up

10 the three children and go to the Hyatt hotel, correct?

11 A    Correct.

12 Q    And then at 7:30 that evening you got the call from Jack,

13 did you not?

14 A    Correct.

15 Q    And in that call Jack gave you the code phrase?

16 A    Code word.

17 Q    He talked about, oh, sorry, I can't get coffee, which

18 meant the plan was on, right?

19 A    Correct.

20 Q    And that's when Jack was on his way to the hotel,

21 correct?

22 A    Correct.

23 Q    And then you got another call from Jack that night at

24 about 8:00 p.m. telling you that he was actually in the hotel

25 room with the kids that he had given Leah the Benadryl and

Baslan - cross - Demas                                596

1   that she was very groggy, correct?

2   A    Correct.

3   Q    And he even told you what room he was in, right?

4   A    Yes.  At one of the conversations he did, yes.

5   Q    He told you it had only taken him a half hour to get to

6   that hotel, right?

7   A    Correct.  However --

8   Q    That was my only question, sir.

9   A    Yes.

10  Q    You truly believed at that point in time, since Jack had

11  gone to the hotel and had administered the Benadryl that he

12  was definitely a child molester, right?

13  A    Correct.

14  Q    Because he was in that hotel room with his niece and his

15  two sons, right?

16  A    Correct.

17  Q    And you always believed that he had molested Leah before,

18  correct?

19  A    Correct.

20  Q    You must have gone straight to that hotel as fast you

21  could then?  Yes or no.

22  A    No.

23  Q    You took some time to get prepared, sir?

24  A    We got dressed.  We got out and we left.  We didn't go on

25  any detours.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Baslan - cross - Demas                                    597

1   Q    And during the time that you were getting ready, getting

2   your stuff together, Jack in your mind was at this hotel with

3   his drugged niece Leah, right?

4   A    She wasn't asleep -- yes.

5   Q    As you testified on direct you were very concerned that

6   he might do it without you guys, right?

7   A    Yes.

8   Q    So at that point in time you called Jack's wife, right?

9   A    No.

10  Q    You called hotel security, right?

11  A    No.  I did not call anybody.

12  Q    You didn't call the police?  You didn't call Rabbi

13  Leibowitz and say I have the proof, come to the hotel?

14  A    No.

15  Q    You didn't call Steven, Leah's father, either, did you?

16  A    No.

17  Q    Now, correct me in I'm wrong but the sort of

18  investigation documentary that you were doing, this

19  two-pronged approach, at least part of the documentary was

20  going to take place in that hotel room, correct?

21  A    We weren't really sure if that's going to be part of the

22  documentary, more than mentioning that that had happened.

23  Q    I see.  So as you are leaving your apartment in Brooklyn

24  to go to the hotel, where you believed there's a drugged child

25  and her uncle and the father of two of the other children.

1   You're not sure exactly what you are going to do in the room

2   besides what, confront him, telling him you're a bad guy,

3   stop?

4   A    As I didn't testify on direct I said to Kristen as soon

5   as we walked into the room Kristen would go to the other room,

6   saying that I am going to bathroom or something.  Snap a shot

7   of the room and walk out of the door and at that point in time

8   Jack would be in a locked position of having to leave and

9   bring the kids back to their home.

10  Q    I believe you testified on direct that the reason you did

11  not want to go to any sort of civil or police authorities was

12  because in the community that you belonged to that is frowned

13  upon, am I right?

14  A    Correct.

15  Q    And that is what is call miseria?

16  A    Correct.

17  Q    What does miseria mean?

18  A    Well, the way I understands it -- I don't want to turn

19  this into a Talmudic discussion -- is that you are not allowed

20  to go bear false witness or talk to or surrender them to

21  authority without having the countenance of the rabbinical

22  court.  The rabbinical law come beforehand, before state law.

23  I am not a scholarly person and I'm lightly religious.  If you

24  were to go testify and do anything you would get shunned by

25  the community.  All business connections or life connections

Baslan - cross - Demas                                    599

1   get shunned and stopped.  Ninety percent of my work is from

2   the orthodox community.

3   Q    In that community it's absolutely forbidden to go to the

4   authorities about child sexual abuse, correct?

5   A    It's forbidden to go take anything before the permission

6   of the rabbis.  I don't think there's posters saying don't go

7   report child abuse.  The community dealings with it very

8   seriously usually and ends up trying to commit the person.  If

9   they can resolve it and commit the person, I think that they

10  would go to the police then and just have him arrested.

11  Q    Are you aware of an organization called the Beth Din?

12  A    No.

13  Q    Are you familiar with rabbinical courts?

14  A    I myself have never gone to rabbinical courts or had the

15  use for them.  I'm familiar with what they are.

16  Q    Are you aware that a rabbinical court in Crown Heights,

17  which is also in Brooklyn, issued an edict if you will that --

18        MR. SAVITT:  Objection to this, your Honor.

19        THE COURT:  I will permit it.  The question is is he

20  aware of it.

21  Q    One is forbidden to remain silent in the case of child

22  sexual abuse and one must go to the authorities?  Are you

23  aware of that?

24  A    Yes.  That's the rabbinical court or the borough court or

25  where I belong to.  It's the same community and it's not --

Baslan - cross - Demas                          600

1              THE COURT:  The question is:  Are you aware of it?

2    You answered yes, you are aware of it.  Next question.

3              THE WITNESS:  I answered actually, your Honor, no,

4    I'm not aware of it.

5              THE COURT:  I beg your pardon.  He's not aware of

6    it.

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Baslan -   cross - Demas                                601

1   (CONTINUING)

2   Q    Sir, you've written E-mails during the time that you've

3   been awaiting trial; correct?

4   A    Yes.

5   Q    And you've written E-mails to a number of friends of

6   yours; correct?

7   A    Correct.

8   Q    One of your friends is Rachel Keller; correct?

9   A    Correct.

10   Q    Another friend of yours is Toby Tessler; yes?

11   A    Correct.

12   Q    And another friend is a man named Benny Hayon; correct?

13   A    Correct.

14   Q    Okay.  And you're also friends with someone named Shira

15   Keller; correct?

16   A    Correct.

17   Q    Okay.  You were arrested on March 19th, but you spent

18   part of that time in a place where you were not able to access

19   E-mail freely; correct?

20   A    Yes, it is true, for the first part of my arrest,

21   correct.

22   Q    So, it was early April 2013 when you were first able to

23   reach out to people and E-mail them, correct?

24   A    Correct.

25   Q    And the MDC E-mail system, it's kind of slow; right, it's

Baslan - cross - Demas                                    602

1   clunky?

2   A    It's delayed an hour and 15 minutes for E-mail.

3   Q    And it's also monitored; right?

4   A    Yes.

5   Q    And you're warned when you sign in that it's monitored;

6   correct?

7   A    Correct.

8   Q    And so, when you first e-mailed your friend Rachel Keller

9   on April 5th, 2013, do you recall writing to her, the system

10  is monitored and not that what we would say anything bad there

11  is nothing to say but let's keep any personal info whatsoever

12  off the convo.

13          Do you recall that?

14          MR. SAVITT:  Your Honor, I object to reading from a

15  document not in evidence.

16          MS. DEMAS:  Your Honor, it's the defendant's own

17  statement.

18          THE COURT:  I'll permit it.

19          Go ahead.

20  A    I mean, if it said so and it says in my E-mail, remember

21  it, I try to warn everybody, attorneys tell me, that should

22  you to -- anybody know about your defense, you should not be

23  telling --

24  Q    Sir, my question was do you recall that?

25          Your answer is yes?

Baslan - cross - Demas                                    603

1    A    Yes.

2    Q    Okay.  Do you recall on April 6th, 2013, writing to your

3    friend Toby Tessler, Toby, Toby, hi, I miss you so much,

4    smiley face.  The system is slow and monitored and it takes a

5    few hours for messages to come through and just so you know,

6    it is monitored.

7         Did you write that?

8    A    Yes.

9    Q    And then on April 16th, 2013, did you write to your

10   friend Benny Hayon, hi, Jacob told Shira that you wanted to

11   talk to me so I added you, how are you, also please be

12   careful, all messages here are monitored and I want nothing

13   about the case or any personal detail discussed.

14        Do you recall that?

15   A    Correct.

16   Q    Do you recall writing to Shira Keller or April 17th,

17   2013, can you let Benny know that I sent him an E-mail for

18   approval, can you let him know that this system is monitored

19   so be careful if need be or if he has helpful info, I will

20   call him.

21        Do you recall that?

22   A    Correct.

23        MS. DEMAS:  I have no further questions.

24        THE COURT:  Is there anything else?

25        MR. SAVITT:  Just a few, Your Honor.

VB        OCR        CRR

Baslan - redirect - Savitt                                    604

1    REDIRECT EXAMINATION

2    BY MR. SAVITT:

3    Q    Mr. Baslan you were just asked some questions about

4    E-mails that you sent?

5    A    Correct.

6    Q    All right.  These are E-mails from a particular

7    institution?

8    A    Yes.

9    Q    What institution is that?

10   A    MDC, where I'm currently incarcerated.

11   Q    In the year-and-a-half since the time of your arrest

12   would it be fair to say that you sent thousands of E-mails to

13   people?

14   A    Probably a lot more than that.

15   Q    And when you warn people that the system is monitored, is

16   that because there's a sign right near the phones saying be

17   aware the system is monitored?

18   A    Correct.  Correct.

19   Q    Now, you reached out to a number of friends since your

20   arrest; am I correct?

21   A    Correct.

22   Q    You also had communications with your attorneys?

23   A    Correct.

24   Q    Including myself?

25   A    Correct.

VB        OCR        CRR

Baslan - redirect - Savitt                          605

1    Q    And those communications are also monitored; correct?

2    A    Correct.

3    Q    And would it be fair to say that your understanding is

4    that you don't want the Government to understand all of what's

5    going on in your life because you're under prosecution; right?

6    A    Correct.

7    Q    And that everything that is sent out on this system,

8    TRULINKS or CORRLINK, could be read by the Government; right?

9    A    Correct.

10   Q    And in fact, you received a CD full of E-mails, hundreds

11   of E-mails that you sent out while you were detained for the

12   last year-and-a-half; correct?

13   A    In fact, they were so large I couldn't even open them on

14   the computer in MDC, yes.  There's thousands and thousands and

15   thousands of E-mails.

16   Q    Would it be fair to say that before this trial started

17   the Government produced certain discovery and certain tapes?

18   A    Correct.

19   Q    And the Government produced certain statements of

20   witnesses who would testify?

21   A    Correct.

22   Q    And when were those produced?

23   A    The tapes.

24   Q    Before this trial?

25   A    Yes.

Proceedings                                                    606

1  Q    The statements of the witnesses, when were they produced?

2  A    Two weeks before trial.

3           MS. DEMAS:  Objection, Your Honor.

4           THE COURT:  What is the basis of your objection?

5           MS. DEMAS:  It's a legal issue not properly before

6  the jury.

7           THE COURT:  Not yet.

8           Overruled.

9  Q    When was that you received then?

10 A    Two weeks before trial, I believe.  Actually, it's less

11 than two weeks because it came in on Shabbat and you can't

12 work, so I got it by the weekend, two days maybe before trial.

13 Q    Just a couple weeks ago.

14          MR. SAVITT:  I don't have any further questions.

15          THE COURT:  Is there anything further?

16          MS. DEMAS:  No, Your Honor.

17          THE COURT:  The witness may step down.

18          Next witness.

19          (Defendant steps down.)

20          MR. SAVITT:  The Defense calls Maryana Kowal.

21          I just want to see if she's outside, may I have a

22 moment?

23          (Pause in the proceedings.)

24          MR. SAVITT:  Your Honor, the witness is in the

25 courthouse, the problem is she doesn't have a communication

Proceedings                                                    607

1    device so she might be on the third floor.  I have no way of

2    contacting her unless I ask Ms. Podgorskaya to go get her and

3    come back up.

4              THE COURT:  You have ten minutes to find her.

5              Step outside.  Don't discuss the case, folks.

6              THE COURTROOM DEPUTY:  All rise.

7              (Jury exits.)

8              (In open court; outside the presence of the jury.)

9              THE COURT:  All right, get busy.

10             MR. SAVITT:  Yes, Your Honor.

11             (Recess taken.)

12             (Witness enters and takes stand.)

13             (In open court.)

14             (Judge RAYMOND J. DEARIE enters the courtroom.)

15             THE COURTROOM DEPUTY:  All rise.

16             (Jury enters.)

17             THE COURT:  All right, please be seated.  We have

18   found our witness.

19             Would you introduce the witness, Mr. Savitt.

20             MR. SAVITT:  Yes, the Defense calls Maryana Kowal.

21             THE COURTROOM DEPUTY:  Please, raise your right

22   hand.

23

24             (Continued on following page.)

25

1   M A R Y A N A    K O W A L,

2            called by the Defense, having been

3            first duly sworn, was examined and testified

4            as follows:

5            THE COURTROOM DEPUTY:  Thank you, please have a

6   seat.

7            State and spell your name for the record.

8            THE WITNESS:  Maryana Kowal -- M-A-R-Y-A-N-A,

9   K-O-W-A-L.

10  DIRECT EXAMINATION

11  BY MR. SAVITT:

12  Q    Ms. Kowal, good afternoon.

13  A    Hello.

14  Q    I am going to ask you to speak up loud.

15  A    Okay.

16  Q    So that we can all hear you.

17  A    Okay.

18  Q    Can you tell us where you're from originally?

19  A    Originally I was born in Ukraine.

20  Q    When did you come to the United States?

21  A    In '99.

22  Q    Did you come alone or with your parents?

23  A    With my mother.  With my stepfather.

24  Q    And with your stepfather?

25  A    Yes.

Kowal - direct - Savitt                               609

1   Q     How old were you approximately when you came to the U.S.?

2   A     Fifteen.

3   Q     Did you attend school in the United States?

4   A     Yes.

5   Q     Where were you living at the time?

6   A     In Norehtonawana.

7   Q     Can you spell that so that the reporter can write it

8   down?

9   A     N-O-R-E-H-T-O-N-A-W-A-N-A.

10  Q     Where is that?

11  A     It's in Buffalo.

12  Q     Is it a suburb or a portion of Buffalo?

13  A     It's a suburb, it's 20 minutes away from Buffalo,

14  downtown Buffalo.

15  Q     For how long a period of time did you live there?

16  A     Almost around nine, ten years.

17  Q     Let me ask you, did you go to school in Buffalo?

18  A     Yes.  And university, too.

19  Q     Did there come a point in time where you met Bebars

20  Baslan?

21  A     Yes.

22  Q     Do you see him in the courtroom today?

23  A     Yes.

24  Q     Can you identify him?

25  A     Yes.

Kowal - direct - Savitt                                        610

1   Q   Could you tell us what color suit and tie he's wearing?

2   A   Black and red tie.

3   Q   That's the polka-doted red tie not the striped red tie?

4   A   The tie is red.

5   Q   Okay.  How do you know Bebars Baslan?

6   A   I met him, I married him.  I dated him and I married him.

7   He was my husband.

8   Q   Okay.

9

10              (Continued on following page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kowal - Direct - Savitt                                    611

1    BY MR. SAVITT:

2    Q    For how long a period of time did you date Mr. Baslan?

3    A    Can you repeat that question.

4    Q    Yes, how long, how long of a-- let me withdraw that.

5         When did you meet him, what year was it?

6    A    It was around 2001.

7    Q    What were the circumstances of your meeting him, how did

8    you meet?

9    A    We met through friends.  First we just used to know each

10   other and then we started dating.

11   Q    When did you start dating?

12   A    It was around 2000-- late 2001, I think.

13   Q    How old were you at the time?

14   A    17.

15   Q    And, can you tell us the circumstances of your first date?

16   A    Well, first date he--

17            MR. SMITH:  Objection.

18            THE COURT:  No, the circumstances of her first date.

19            MR. SAVITT:  I will withdraw that.

20   Q    The first date, did Mr. Baslan ask your parents

21   permission to take you out?

22   A    Yes.  He didn't want to because-- he wanted-- he didn't

23   want to take me out because, he wanted to know my mom, and

24   have permission to take from my mom.  So he had to come and

25   introduce himself before he takes me out.

Kowal - Direct - Savitt                        612

1   Q     And, did he do so?

2   A     Yes.

3   Q     Did he come over to your house where you were living?

4   A     Yes.

5          MR. SMITH:  I object to the entire line of

6   questioning, it is improper character testimony.

7          THE COURT:  I do not know where we are going with it

8   so this point, I can't rule on your objection.  If it is going

9   to be that sort of testimony, there is certainly room for

10  background, to establish, so we understand the basis of the

11  witness' opinion.

12         Overruled.  Go ahead.

13  Q     And, did there come a point in time when the two of you

14  decided to get engaged?

15  A     Yes.  We were engaged for one year.

16  Q     When did you get engaged, how long after you started

17  dating him, approximately?

18  A     A year.

19  Q     And by that time how old were you?

20  A     I was 17-- pushing 18.

21  Q     Did there come a point in time when the two of you were

22  married?

23  A     Yes.

24  Q     What year was that?

25  A     2003.

1   Q    Did you move into Mr. Baslan's home at some point after

2   you started dating?

3   A    I moved to his house when we were engaged and I stayed

4   with him.

5   Q    Did you meet some of his friends?

6   A    Yes.

7   Q    Did he have a circle of friends, a large circle of friends?

8   A    Yes, he did.

9   Q    Can you tell us what he did for a living?

10  A    He was helping testing-- he was helping his friends

11  testing computer programming.  He was like a freelancer.  He

12  used to work for also, a company, providing computer stuff,

13  building computers.

14  Q    Did there come a point in time when you started helping

15  him in the information technology field, or the computer field?

16  A    Yes.  He got hired by DirectTV and then later on, he took

17  me as his assistant to test programs that he write for the

18  company.  And I used to work with him every day, and go to

19  school.

20  Q    Did he also do photography?

21  A    On the side, yes.

22  Q    Was there a studio that he shared with others?

23  A    Yes, later.

24  Q    Now, did you go out socially with Mr. Baslan as well as

25  with his friends?

Kowal - Direct - Savitt                            614

1   A    Of course.

2   Q    Did you discuss Mr. Baslan's character or reputation with

3   his friends?

4   A    Of course.  They all used to love him.  He has very good

5   friends.

6   Q    Did you discuss his reputation for being honest and

7   reliable?

8   A    Yes.

9   Q    Can you tell us?

10  A    We even went to the vice president of the company, to his

11  house, he invited us for a dinner.

12  Q    But, specifically, in terms of his reputation for being

13  truthful.  Can you tell us, did you discuss that with friends?

14  A    Yes.  Whatever he promised me or promised to anybody, he

15  used to always deliver.

16  Q    Now, there came a point in time when the two of you

17  parted ways, and you got divorced?

18  A    Yes.

19  Q    When was that?

20  A    It was later on, he used to-- I guess spend a little more

21  time, too much time with the friends because they needed him

22  more often and I didn't like that.

23  Q    When you say that, they needed him more often, can you

24  elaborate?

25  A    Sometimes they used to call in the middle of the night

Kowal - Direct - Savitt                                615

1   and he had to go because either they were drunk or they needed

2   some help.  That's--

3   Q    Do you know who these friends were?

4   A    Girls.

5   Q    Any men?

6   A    Some.

7   Q    Now, when did you get divorced?

8   A    In 2008.

9   Q    So you were married for how long?

10  A    Almost six years.

11  Q    And during that period of time, up until I suppose the

12  period before your divorce, did you have a good relationship

13  with him?

14  A    Yes.

15  Q    Did you have any children with him?

16  A    No.

17  Q    Can you tell the jury, and I know this is not, you know,

18  this is somewhat private, but you are on the stand.  Can you

19  tell us why you got divorced?

20  A    Well, honestly it was just because of me.  I was a little

21  bit too demanding of him and I got -- I wanted him more to

22  myself. And I-- it is because he used to help me a lot with

23  everything, with school, with homework, with pushing me to

24  school, to college, and I got used to that so much, that I

25  wanted him only for myself.

Kowal - Direct - Savitt                            616

1          And, at the same time he was working and it was just
2     all me, me, me, about me, and I didn't realize that he also
3     had to work and provide for me because at the time I didn't
4     work, I had to do my school.
5          So, it was I think, I burdened him a little bit too
6     much because I used to drive him crazy, and sometimes it
7     just-- it was overwhelming for him, and now I realize that.
8     Q    You went to school, did you pay for your school?
9     A    He did.  He paid for everything.
10    Q    What do you do for a living?
11    A    Fashion design.
12    Q    Where did you get your degree in fashion design?
13    A    In Buffalo State University.
14    Q    At that time, were you married to Mr. Baslan?
15    A    Yes.
16    Q    Is he the one who pushed you to go to school?
17    A    Yes.  He actually -- I had some difficulty getting into
18    ECC college first.  So he went, he talk to the dean and he
19    made it for me to go to be able to go and take classes.  And,
20    I was so happy.  I think he made my life right now.
21    Q    Now, you are currently married, right?
22    A    Yes.
23    Q    And, you live in the New York metropolitan area?
24    A    Yes.
25    Q    When did you move to the New York metropolitan area from

Kowal - Direct - Savitt                    617

Buffalo?

A    Four years ago.

Q    Do you know if Mr. Baslan did as well?

A    I don't know, he moved later on.  I know that for sure.

Q    At some point did you regain contact with him?

A    Yes.

Q    Here in New York?

A    Yes.

Q    And were you friendly with him?

A    Yes.  Every time I needed something from him, I used to call him.  He was like my, encyclopedia of help.

          And even too, sometime, I needed to be at the job or drop off or needed help.  He never said, no, to me.

Q    Did you date him here in New York?

A    I used to see him occasionally.

Q    Did you have contact with him after his arrest?

A    Yes.

Q    Did you have contact with him by E-mail?

A    Yes.

Q    Did you have contact with him by visiting at the-- him at the MDC?

A    Yes.

Q    The Metropolitan Detention Center?

A    Yes.

Q    How long have you been married currently to your current

1   husband?

2   A    A couple of months.

3   Q    Did you continue visiting Mr. Baslan?

4   A    Yes.

5   Q    Did you visit him as a friend?

6   A    Yes.

7   Q    Do you feel beholden to him in any way?  In other words,

8   do you credit him for helping you?

9   A    Can you rephrase that?

10  Q    Yes.

11        Do you feel that you owe him something because he

12  helped you?

13  A    No.  I just feel because he is just amazing person.

14  Q    And in your opinion, is he an honest person?

15  A    Yes.

16  Q    Is he reliable?

17  A    Yes.

18  Q    Before testifying here today, when was the last time that

19  you had any contact with him?

20  A    As a visit?

21  Q    As a visit.

22  A    Three weeks ago, I think.

23  Q    While in New York, did you also meet any of his friends?

24  A    No.

25  Q    And, would it be fair to say that when you called on Mr.

Kowal - Direct - Savitt                               619

1   Baslan, for him to do you a favor, he responded right away?

2   A     Yes.

3   Q     You know the nature of the charges against Mr. Baslan?

4   A     Yes.

5   Q     Do you know what they are about?

6   A     Yes.

7   Q     Are you subpoenaed to testify here as a witness or did

8   you come voluntarily?

9   A     I come voluntarily.

10  Q     Why is that, why did you come to testify?

11  A     Because I believe that he is not guilty.

12         MR. SAVITT:  I don't have any further questions.

13         THE COURT:  Any questions of the witness?

14         MR. SMITH:  Yes, Your Honor, just a couple.

15  CROSS EXAMINATION BY MR. SMITH:

16  Q     Good afternoon.  My name is Tyler Smith, I have a few

17  questions for you.  Okay.

18         When were you married to the defendant?

19  A     2003.

20  Q     For what time period?

21  A     Six years.

22  Q     During that entire time did you live together?

23  A     Yes.  I lived with him even when I was engaged to him.

24  Q     When did you start living with him?

25  A     In 2002.

Kowal - Direct - Savitt                               620

1   Q    When you testified as to the character that you knew

2   among his friends, you were talking about the time period that

3   you were married, right?

4   A    Married, engaged, dating, yes.

5   Q    That was the time period you knew his group of friends,

6   right?

7   A    Yes.

8   Q    And, even when you got divorced, you still cared for him,

9   right?

10  A    Yes.

11  Q    You still care for him now, right?

12  A    I do.

13  Q    You don't want to see anything bad happen to him, right?

14  A    Of course.

15          MR. SMITH:  No further questions.

16          MR. SAVITT:  Nothing further.

17          THE COURT:  You may step down.

18          (Witness excused.)

19          THE COURT:  Next witness?

20          MR. SAVITT:  The defense rests.

21          THE COURT:  Ladies and gentlemen, the defense has

22  completed the presentation of evidence.

23          Anything further from the government?

24          MR. SMITH:  Yes, Your Honor.  The government calls

25  Special Agent Spivack again.

1   SPECIAL AGENT AARON SPIVACK, having been previously duly

2   sworn, resumed the stand and testified further as follows:

3            THE COURT:  Mr. Spivack, have a seat.  You have been

4   previously sworn.  You will remain under oath.

5            Do you understand that?

6            THE WITNESS:  Yes, sir, I do.

7            THE COURT:  Mr. Smith.

8   DIRECT EXAMINATION BY MR. SMITH:

9   Q    Special Agent Spivack, when you last testified, we

10  discussed what happened on the night of the defendant's

11  arrest, do you recall that?

12  A    Yes, sir, I do.

13  Q    You testified that you had set the scene, correct me if I

14  get anything wrong.  You put Benadryl in the orange juice in

15  the room, do you recall testifying to?

16  A    Yes.

17  Q    Then you testified you arrested the defendant.  After you

18  arrested the defendant, where did you take him?

19  A    Immediately after he was arrested, the defendant was

20  taken into the room directly across from the room where he was

21  arrested in, which was the initial staging area for the agents

22  and officers.

23  Q    Who else was with you in that room?

24  A    It was Special Agent Brian Connley.

25  Q    Where was Jack taken?

1  A     Jack, he was initially arrested in the bathroom, taken

2  out in the hall.  I don't recall what room he was taken to or

3  where he was led to.  Led away from the room with the arrest.

4  Q     What about Kristen Henry?

5  A     Ms. Henry remained in the room where she was arrested.

6  Q     What did you do after you took the defendant to another

7  room?

8  A     Immediately after sitting him down, after things kind of

9  calmed down, I advised him of his Miranda warnings.

10 Q     What happened when you advised him of his Miranda rights?

11 A     After going through the Miranda rights in detail, the

12 defendant acknowledged that he was willing to speak with me,

13 without a lawyer present.  And he did not invoke any of his

14 rights.

15 Q     Can you explain what happened in the interview after he

16 had waived his Miranda rights?

17 A     Yes, sir.

18       The way Agent Connley and myself kind of set the

19 stage for the defendant, we insinuated that Jack had also been

20 arrested.

21       Very important part of the initial part of the

22 interview, the defendant thinks everybody is arrested.  He is

23 more likely to talk.  If he thinks there is a cooperator

24 involved, he is likely to shut down and not cooperate to us or

25 talk to us.

Spivack - Direct - Smith                    623

1   Q    Did you ask questions about why he was there at that point?

2   A    Yes, I did.

3   Q    What did he say?

4   A    Initially the defendant-- gave the defendant open ended

5   questions, as to why we were there.  Why I had three children,

6   though I didn't, why we had three children in the back room.

7   The defendant initially stated to me, that he was there to

8   have a sex party, swinger party, I believe is the word he used

9   with Jack, Ms. Henry, and they were going to smoke marijuana.

10  Q    Did he indicate at that point he was investigating Jack's

11  sex abuse of minors?

12  A    No, sir, he did not.

13  Q    Now, at that point, had you listened to the recordings

14  that we heard last week of the defendant and Jack?

15  A    Yes, sir, I listened to them all.

16  Q    After he told you that he was there to have a swing

17  party, did you ask him more questions?

18  A    I did.

19  Q    What did you ask him?

20  A    Again, I asked specifically about the kids in the other

21  room, insinuating that one appeared passed out, threw out the

22  term, Benadryl, things of that are sort.  The defendant then

23  stated -- he used the word hypothetically a lot.  It was

24  something to the effect of hypothetically, someone could

25  change their mind.  That someone could come to the hotel to do

1  something, but then get cold feet and change their mind.

2  Q    Did you ask him specifically about Jack during the course

3  of this portion of the interview?

4  A    Yes, sir, I asked a couple of times about Jack.

5  Q    What did he say?

6  A    He didn't say anything about Jack.  I gave him the

7  opportunity to throw Jack under the bus so to speak, or to

8  implicate Jack as part of this plan, and the defendant did not

9  take that opportunity both times or couple of times that I

10 offered it.

11 Q    Did the technique -- you said you started with open ended

12 questions.  Did the technique you were using during the

13 interview change at some point?

14 A    Yes, it did.

15 Q    How did it change?

16 A    Yes, sir.

17        After initially just kind of going with open ended

18 questions, what are we doing here, why do I have three kinds

19 in another room, things of that sort.  I then confronted the

20 defendant with more specific questions about facts that I

21 knew.  I didn't let on to how I knew these facts, but kind of

22 made it sound like, the F.B.I. looking at this as an

23 investigation knew he was coming to the hotel to engage in

24 sexually explicit conduct with three very young children.

25        (Transcript continues on next page.)

1    BY MR. SMITH:

2    Q    What did he say?

3    A    He initially stated, again, this hypothetical thing.

4    That was the big thing.  He is talking about that he could

5    hypothetically have an idea and then change his mind at the

6    last minute.

7    Q    When you would ask him those questions did he say

8    anything about the investigation of Jack?

9    A    No, he did not.

10   Q    Did he say anything about a documentary?

11   A    No, he did not.

12   Q    Did you ask him about child pornography?

13   A    I did.

14   Q    What did he indicate about that?

15   A    At some point during the evolution of this interview

16   which had lasted I think a little over an hour, we discussed

17   child pornography and that we knew child pornography had been

18   downloaded to his residence in Brooklyn.

19        At that point the defendant conceded that, yes,

20   there had been child pornography that he downloaded.  He

21   conceded that he had downloaded it that day, that he

22   masturbated to child pornography.

23        And then at that point he tried to kind of make a

24   deal with me by stating that he would show me where the child

25   pornography was located if I let him go to Russia.  And that

Spivak - direct - Smith                          626

1    became kind of next theme of the defendant was that I'll show

2    you with the child pornography is if you let me go to Russia

3    and we'll never have to hear from him again.

4    Q    During the course of your interview did he indicate at

5    some points that if you had waited you would have seen he

6    didn't do anything?

7    A    Yes, he did.

8    Q    Did he indicate that around the same time he indicated he

9    would have had cold feet?

10   A    Yes, he did.

11   Q    Did you ask him questions about baby-sitting service?

12   A    I did, yes, sir.

13   Q    What did you ask?

14   A    Do you have the 302?  I asked in general terms about

15   baby-sitting business.

16   Q    I'm going hand the witness what is marked as 3500 AS 11?

17            (Pause.)

18   A    Let me see here.  The defendant advised -- we actually

19   had this in quotes.  I apologize.  He said that the talk about

20   the baby-sitting business was bullshit.  And that he never

21   intend to create a baby-sitting service.

22   Q    Did he indicate who had planned that night?

23   A    He indicated it was coplanned by he and Jack.

24   Q    Now, at some point during your interview did you seek to

25   memorialize the things he was saying in a written statement?

1    A    Yes.

2    Q    How did you do that?

3    A    What we did, what we do every time, at the end of an

4    interview, particularly one in which it goes kind of a variety

5    of directions, we memorialize the substantive part of the

6    interview, the part relating to why he's under arrest.  We

7    memorialize that in a document that the agents, myself in this

8    case, handwrite.

9    Q    Before I go further on that, point, had you at this point

10   asked him any questions specifically about Leah?

11   A    I had.

12   Q    What questions did you ask?

13   A    We had a discussion about Leah.  I indicated to the

14   defendant that I knew, based on recordings -- at this point

15   when talking about Leah I had insinuated to the defendant that

16   we were up on his phones, again without trying to implicate

17   Jack.  I made it sound like we were up on a wire where we were

18   listening to phone calls.  That's how I knew of the

19   conversations between he and Jack.

20          So I confronted the defendant with information about

21   Leah, that I knew that the defendant indicated he is going to

22   go down on Leah.  At which point the defendant acknowledged

23   that he had stated that.

24   Q    Now, you indicated that you handwrote a statement.  Why

25   is it your practice to write a statement yourself rather than

1   having the person you're interviewing do it?

2   A    It's our practice based on our experience that, again,

3   the purpose of writing it down is so that there's an

4   understanding between us and the individual we're arresting

5   that we understand the facts.  If we give them a pen and paper

6   to write on their own, more often than not it goes into

7   completely tangent circumstances.  We don't actually have

8   anything memorializing why they are under arrest.

9   Q    After you handwrote that statement, what if anything did

10  you do?

11  A    I initially would have provided it to Agent Conolly, my

12  partner, to review, make sure that I had all the facts right,

13  that I didn't misinterpret anything, that things that he had

14  written down and things that we had overheard were consistent

15  with what I had written up.

16  Q    And after you had written the statement and you had Agent

17  Conolly look at it, what did you do after that?

18  A    I then provided it to the defendant, Mr. Baslan.  I told

19  him that I wanted him to read it out loud so that I was

20  confident that he was reading it and internalizing it.

21  Q    Did he read it aloud?

22  A    He did.

23  Q    Did you tell him whether he could make changes to it?

24  A    Yes, sir.  I told the defendant that though I had written

25  it it was his statement.  He's free to make any changes, any

Spivak - direct - Smith                          629

1   corrections, any additions.  If he didn't like something I

2   wrote, he could cross it off.  I just ask that he initial the

3   changes that he made.

4   Q    Did he make changes to the statement you had written?

5   A    Yes, sir, he did.

6   Q    And after he made changes what, if anything, did you do?

7   A    After changes were made the defendant wanted to write an

8   addition.  So he did on the following page.  He wrote a

9   sentence.  Then the defendant, myself and Agent Conolly each

10  signed the bottom of the statement.

11  Q    Is that statement one page or two pages?

12  A    It's actually two pages.

13  Q    I would like to show you what's been marked as

14  Government's Exhibit 55.  Do you recognize that document?

15  A    Yes.

16  Q    What is it?

17  A    This is the original statement signed and written that

18  night.

19  Q    And if you flip to the second page, is that your

20  signature?

21  A    One of the three signatures is mine.

22         MR. SMITH:  The government offers Government's

23  Exhibit 55.

24         THE COURT:  Any objection?

25         MR. SAVITT:  No, your Honor.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

Spivak - direct - Smith                    630

1              THE COURT:  Received.

2              (So marked.)

3              MR. SMITH:  If you could turn on the document

4    camera, please.

5              THE CLERK:  Mr. Smith, it's going to take a moment

6    to warm up.

7              MR. SMITH:  All right.

8    Q    Agent Spivak, first I want to go through and look at the

9    changes that you said were made by the defendant.  I'm looking

10   at the first line there.  Can you tell my what that mark that

11   appears to say BB over it is?

12   A    Yes.  I misspelled the defendant's last name, Baslan.  He

13   then crossed out my misspelling and corrected it and initialed

14   above it.

15   Q    What about this line out through the middle there?

16   A    That's actually an error on my part and to the right of

17   that line is my initials indicating I crossed that out.

18   Q    What about this next spot that I pointed to?

19   A    Those are my initials over it.  That is an error that I

20   made.  I put that the defendant was -- watched child

21   pornography on many occasions.  The defendant crossed it to

22   reflect few occasions.

23   Q    What about down here?

24   A    Yes, sir.  The defendants also made changes to that

25   particular line.  I can read it if you would like.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1    Q    One second.  I'll have you read the whole thing.  You

2    said there was an addition.  I'm putting up the second page.

3    What was that?

4    A    The defendant wrote the following:  I want to talk to

5    someone about my options.  I am fully willing to cooperate.

6    And he signed it.

7    Q    Did he write that addition essentially immediately after

8    reading and changing this?

9    A    Yes, sir.

10   Q    The first page of the document?

11   A    That's correct.

12   Q    Let me put up the first page again.  Can you read the

13   statement as it was changed, the final version.

14   A    Yes, sir.  I, Bebars Baslan, was arrested at the Hyatt

15   Hotel in Jersey City, New Jersey.  I have been told I have

16   been placed under arrest and I have been advised of my rights,

17   which I have waived -- excuse me -- which I have waived.  I

18   agree to talk dot FBI voluntarily and have not been made any

19   threats or promises.

20            I came to the Hyatt with the intent to engage and

21   have Kristen engage Jack's two month old boy, his one and a

22   half year old boy, and his eight year old neice in sexually

23   explicit conduct.  However I had cold feet and was not going

24   to go through with it.  I suggested Benadryl so the kids would

25   be sleeping.

Spivak - direct - Smith                          632

1          I planned on going down on Leah, the eight year old,
2     but had cold feet.  We were also going to take photos and
3     videos.  I have a sexual interest in children and have watched
4     child porn on a few occasions and have masturbated to the
5     child porn.
6          I have links on my computer to the child porn which
7     I will provide to the FBI.  My child porn is on an encrypted
8     hard drive at home.  I also have used a 256bit encryption, but
9     can't provide the password at this time.  I have provided the
10    FBI with passwords to my computers and my phone.  I have never
11    harmed a child nor have I sexually abused a child in the past.
12    Q    I'll go to the second page.
13    A    I want to talk to someone about my options.  I am fully
14    willing to cooperate.  Bebars Baslan.
15    Q    What's the signature immediately after that?
16    A    The signature immediately after that is mine, Agent
17    Spivak, FBI, New York office and below that is Special Agent
18    Brian Conolly's signature and it says Brian Conolly SA or
19    special agent.
20    Q    Did you actually witness the defendant signing this
21    immediately after he read it and made that change?
22    A    Yes, sir, I did.
23    Q    Special Agent Spivak, we may have talked about this at
24    the beginning.  How long was the interview?
25    A    It was approximately an hour, give or take.

633

1    Q    And at any time during that hour of interview did the

2    defendant indicate that he had been investigating Jack?

3    A    No, sir.  He never mentioned that.

4    Q    Did he indicate at any point that he was doing a

5    documentary?

6    A    No, sir, he did not.

7              MR. SMITH:  No further questions.

8              THE COURT:  Mr. Savitt, any questions?

9              MR. SAVITT:  Yes, sir.

10             THE COURT:  How long do you expect to be,

11   Mr. Savitt?

12             MR. SAVITT:  More than two minutes, your Honor.

13             THE COURT:  I didn't ask you that.

14             MR. SAVITT:  About fifteen, I would imagine.

15             THE COURT:  Why don't we take our break, if you

16   don't mind.

17             MR. SAVITT:  Not at all.

18             THE COURT:  We'll take our luncheon break.  It's a

19   choppy morning.  You'll understand why.  We'll resume at

20   2:00 o'clock.

21             (Jury excused.)

22             THE COURT:  All right.  While we have a moment, do

23   you have another witness on rebuttal?

24             MR. SMITH:  Yes, your Honor.

25             THE COURT:  Who would that be?

634

1          MR. SMITH:  Special Agent John Robertson.

2          THE COURT:  That's it?

3          MR. SMITH:  That's it.

4          THE COURT:  That's another fifteen or 20 minutes?

5          MR. SMITH:  Approximately.

6          THE COURT:  How long is your opening station?

7          MR. SMITH:  Approximately an hour.

8          THE COURT:  Mr. Savitt, yours?

9          MR. SAVITT:  About the same, an hour.

10         THE COURT:  Okay.  We'll see where we are.  We need

11   to spend a few moments going over the charge, although I don't

12   think there's much left in controversy.  We'll pick that up

13   later this afternoon.  Okay.  2:00 o'clock.

14         (Lunch recess.)

15

16

17

18

19

20

21

22

23

24

25

Spivack - cross - Savitt                      635

1                        AFTERNOON SESSION

2              (In open court.)

3              (Judge RAYMOND J. DEARIE enters the courtroom.)

4              THE COURTROOM DEPUTY:  All rise.

5              (Jury enters.)

6              (The following occurs in the presence of the jury.)

7              THE COURT:  Please be seated, everyone.

8              Mr. Savitt.

9              MR. SAVITT:  Thank you, Your Honor.

10   CROSS EXAMINATION

11   BY MR. SAVITT:

12   Q    Good afternoon, Agent Spivack.

13   A    Good afternoon, sir.

14   Q    Now, let's focus back on the evening of March 19th of

15   2013.

16              As you testified a few times, you were part of an

17   arrest team that night; correct?

18   A    That's correct.

19   Q    A number of fellow agent were with you?

20   A    Yes, sir.

21   Q    About how many?

22   A    Eight to ten perhaps, agents and officer.

23   Q    I believe you told us earlier in the trial that you were

24   able to see my client, Mr. Baslan, and Ms. Kristen approach

25   the room where Jack was supposed to be?

Spivack - cross - Savitt                            636

1   A    That's correct.

2   Q    And you saw this through the peephole?

3   A    Yes, I did.

4   Q    And then the arrest was effectuated; am I right?

5   A    Yeah, before they even crossed the threshold.

6   Q    And at that time Mr. Baslan is arrested?

7   A    Yes.

8   Q    He's pushed down onto a bed because it's a small room,

9   there are lots of people?

10  A    Yes.

11  Q    He's at some point cuffed behind his back?

12  A    That's correct.

13  Q    Ms. Henry's arrested and taken to an adjoining room?

14  A    I believe Ms. Henry was kept in the current room as far

15  as I recall.

16  Q    All right.  And Jack was also arrested?

17  A    Yes, that's correct.

18  Q    Was he cuffed?

19  A    I believe he was, yes, sir.

20  Q    And the whole purpose of that is not to give away his

21  role as a cooperator?

22  A    Yes, sir.

23  Q    So it would make it look as if he, too, is in trouble; am

24  I right?

25  A    Yes.

Spivack - cross - Savitt                637

1   Q     And he was taken out of that room, right, somewhere?

2   A     Yes, sir, he was.

3   Q     And at some point taken out of the hotel?

4   A     Yes.  He was let go and then he left on his own volition.

5   Q     Okay.  And of course, you didn't tell Mr. Baslan that

6   we'll let Jack go and he's out.

7   A     No.

8   Q     Because that wouldn't have protected his identity at that

9   time or protected him as a cooperating witness?

10  A     Yes, sir, that's correct.

11  Q     Okay.  Now, you told us on direct examination again also

12  the first time that you testified that you then conducted an

13  interview of my client, maybe not the first time but on direct

14  examination you told us it was about an hour; right?

15  A     As far as I recall, give or take a few minutes.

16  Q     Had you planned to question my client before arresting

17  him?

18  A     Yes, sir.

19  Q     Okay.  And the reason that you question suspects who are

20  arrested is in order to see if they can be cooperative?

21  A     Cooperative, not like the cooperator sense but yeah, we

22  interview them to see if they will provide us with

23  information.

24  Q     Okay.  And before you do that, do you give them their

25  Miranda warnings, you have a right to remain silent, you have

1   a right to an attorney, et cetera, et cetera?

2   A    Correct.

3   Q    Okay.  What we see on Law and Order from time to time

4   before we fade out to commercial?

5   A    Correct.

6   Q    And then, you do tell, of course, the person arrested

7   that he or she has a right to remain silent and not talk to

8   you altogether; am I correct?

9   A    That is correct.

10  Q    So, in this particular case that's what you did with

11  Mr. Baslan, you told him you don't have to talk to us?

12  A    Correct.  I mean, I read him the Miranda warnings as they

13  are in the sheet.

14  Q    But he chose to talk to you, right?

15  A    That's correct.

16  Q    And you asked him questions, he provided answers?

17  A    Yes, sir.

18  Q    Over the course of approximately an hour, in that hotel

19  room; right?

20  A    That's correct.

21  Q    And that would have been between 9:30 and 10:30 in the

22  evening of March 19th, a year-and-a-half ago; right?

23  A    Give or take, yes, sir.

24  Q    You were, I take it, not the only agent in the room.

25  There was another agent, at least?

Spivack - cross - Savitt                                    639

1   A    Yes.

2   Q    And from time to time agents went in and out?

3   A    That's correct.

4   Q    Now, your conversation with Mr. Baslan, was it friendly?

5   A    Portions of it were.

6   Q    Okay.  And other portions less friendly?

7   A    That's correct.

8   Q    Voices were raised?

9   A    Yes, sir.

10  Q    You raised your voice?

11  A    I did.

12  Q    Screamed at him from time to time?

13  A    Screamed at, no.  Raised my voice, yes.

14  Q    And you basically told him that hey, you've got to tell

15  us the truth, right, or you're going to get into trouble?

16  A    No in that sense, no, sir.

17  Q    At some point -- well, let me ask you this.  You didn't

18  record this conversation; did you?

19  A    No, sir.

20  Q    All right.  Is that standard operating procedure not to

21  record conversations?

22  A    It was until about a week ago.

23  Q    All right.  A week ago the Attorney General said you've

24  got to start doing that; right?

25  A    That's correct.

VB        OCR        CRR

Spivack - cross - Savitt                          640

1    Q    But this happened a year-and-a-half ago; right?

2    A    Yes, sir.

3    Q    And at that time, nobody said you've got to do it so you

4    didn't do it?

5    A    It was not our policy at the time.

6    Q    All right.  And there's nothing wrong with that either;

7    is there?

8    A    No, not at all.

9    Q    Okay.  But at some point you decided, following your

10   policy at that time, that it would be a good idea to have

11   something in writing; am I right?

12   A    That's correct.

13   Q    And so, you decided to handwrite a statement

14   incorporating at least some of the information that was

15   discussed with my client prior to that point in the room; am I

16   right?

17   A    That's correct.

18   Q    Now, you handwrote this statement because I assume you

19   didn't have a laptop handy or it would have taken longer than

20   it should?

21   A    True, yes, sir.

22   Q    Okay.  And the words chosen, you chose the words?

23   A    I chose the words, some of the words were derived from

24   what he told me during the interview.

25   Q    Did you have any other notes with respect to what went on

Spivack - cross - Savitt                          641

1    during the interview?

2    A    My partner Agent Connelly had notes that I referred to.

3    Q    Okay.  But you're the one who wrote out the statement

4    that has been received in evidence as Government's Exhibit 55;

5    am I right?

6    A    That's correct.

7    Q    And it's a two-page document; am I right?

8    A    Yes, sir.

9    Q    And on the second page we see the handwritten words -- I

10   don't know if you have it in front of you.

11   A    I do not.  I have, it is transcribed in my 302, but I do

12   not have the original in front of me.

13   Q    I'm going show you the page two, the original

14   Exhibit page two.

15   A    Okay.

16   Q    And it says I want to talk to someone about my options, I

17   am fully willing to -- it looks like -- cooperate.  And then

18   my client signed that; right?

19   A    Yes, sir.

20   Q    Those are his, that's his handwriting; correct?

21   A    That is correct.

22   Q    That is what he chose to write?

23   A    That is what he chose to write.  Yes, sir.

24   Q    Did he explain to you how he was willing to cooperate?

25   A    Yes, sir, he did.

1   Q    And did he tell that you he wanted to give you

2   information about child pornography websites, things like

3   that?

4   A    My recollection is that he wanted to specifically show me

5   where the child pornography was on his computer and then talk

6   about just in general why we were there.  The answers to the

7   questions I was asking weren't going to be addressed until I,

8   like I mentioned earlier, let him go to Russia.

9   Q    Did you find it odd that he said look, I just want to go

10  to Russia, I want out of here?

11  A    No, I didn't, sir.

12  Q    You believed him, he did want to go to Russia instead of

13  stay with the FBI that night?

14  A    That certainly would be true, sir.

15  Q    During this entire conversation that you had with him,

16  before you handwrote this statement, I take it you didn't tell

17  him that Jack is cooperating against you?

18  A    No, sir, I never mentioned that to him that night.

19  Q    You did mention something about overhearing my client

20  saying certain things on a tape; am I right?

21  A    That's correct.

22  Q    You didn't tell him that Jack was taping that; did you?

23  A    No, sir, I did not.

24  Q    And there are times, of course, where law enforcement --

25  there are wire-taps where you can obtain a court order and you

Spivack - cross - Savitt                              643

1   can actually record conversations of two people, neither of

2   which is cooperating?

3   A    That's correct.

4   Q    In this case the one person wh0 was cooperating, though,

5   is Jack?

6   A    That is correct.

7   Q    And because he consented to being part of this

8   conversation, you didn't need a court order.  You did not.

9   A    That's correct.

10  Q    Okay.  But you didn't tell any of that to my client at

11  the time; right?

12  A    No, sir, I did not.

13  Q    So, for all he would have known, Jack was not

14  cooperating.  He was another defendant?

15  A    That's an assumption, yes, sir.

16  Q    Okay.  Now, the words that you chose to put into

17  Government's Exhibit 55, to the best of your ability to kind

18  of put a synopsis on what you discussed with Mr. Baslan, that

19  was incorporated in Government's Exhibit 55; am I right?

20  A    The synopsis of specifically why we're there, why the FBI

21  is there, why he's in handcuffs.

22  Q    But of course, there was a lot more discussed than what

23  we read in this particular document.

24  A    Absolutely, yes, sir.

25  Q    Not everything was incorporated in the document; am I

Spivack - cross - Savitt                    644

1   correct?

2   A    That is correct.

3   Q    And there are certain things that you chose to

4   incorporate because you felt that those were important; am I

5   right?

6   A    That's correct.

7   Q    And there are other things that you chose not to

8   incorporate because perhaps you felt they were not important?

9   A    That's correct.

10  Q    And of course, you made that judgment; right?

11  A    I, along with the defendant.

12  Q    Well, when you say I, along with the defendant, you're

13  the with one who authored the document and then you asked him

14  to see whether there are any corrections there; correct?

15  A    Or additions.

16  Q    Or additions.

17  A    He had the opportunity to write whatever he wanted.

18  Q    Did he ask you about specific terms in the document?

19  A    Not that I recall, sir.

20  Q    All right.  Did you explain any of the terms in the

21  document to him?

22  A    I don't recall.  Maybe.  I don't know what terms maybe

23  you're referring to.

24  Q    Any of the terms.  Any of the terms that were put into

25  the document?

Spivack - cross - Savitt                   645

1   A    No, not that I recall.

2   Q    Okay.  And if it was something important, I take it that

3   you would have recalled that; right?

4   A    Absolutely.

5   Q    Because that's your obligation not only as the case agent

6   but also as a Federal investigator; am I correct?

7   A    That's correct.

8   Q    You're not going leave important stuff out?

9   A    Not intentionally, sir.

10  Q    Okay.  So, is it fair to say that it wasn't your

11  intention to put in every single thing that you spoke to

12  Mr. Baslan about orally into the written statement

13  Government's Exhibit 55?

14  A    That is correct.

15  Q    Would it be fair to say that -- well, let me ask you

16  this.  Do you believe that what is written or what you wrote

17  as amended in certain portions by Mr. Baslan, what you wrote

18  in 55, do you believe that that was truthful?

19  A    I'm sorry, sir, do I believe that the statement was

20  truthful?

21  Q    Correct.

22  A    In part, yes, sir, I do.

23  Q    Did you believe that the entire statement was truthful?

24  A    I have to read it again, but I certainly believed that

25  discussions about him and his involvement in sexual

Spivack - cross - Savitt                    646

1   exploitation of children were believable.

2   Q    Well, when you say sexual exploitation of children, did

3   you discuss with him what sexual exploitation of children

4   would mean?

5   A    I don't, I don't know, maybe, sir.  I don't know if I

6   used those words specifically.

7   Q    Well, you're using the words now.  Is this something that

8   you find in Government's Exhibit 55?

9   A    If you could put it up, sir, I don't know.  Maybe.

10  Q    Well, actually, the word sexually explicit conduct, I

11  will put it up so it will make it easier for us to remember

12  what it says.

13           And if we look at sort of the midsection --

14  A    Oh.

15  Q    Right above this crossed-out line.

16  A    I see it, yes, sir.

17  Q    Did you discuss what that term meant with Mr. Baslan?

18  A    Not that I recall.

19  Q    Okay.  Did you discuss with him what he meant by I was

20  going have cold feet?

21  A    Yes, sir.  I believe so.  I don't recall specifically,

22  but I recall having discussions about cold feet.

23  Q    All right.  And that would have been before the statement

24  was written by you; correct?

25  A    Yes, that's correct.

Spivack - cross - Savitt                    647

1  Q    After the statement was written by you, you asked my

2  client to review it and to make any corrections that he deemed

3  important; am I right?

4  A    That's correct.

5  Q    He made some crossouts, as we see here in the middle of

6  the document, perhaps also at the top of the document in the

7  spelling of his name Baslan; am I right?

8  A    That's correct.

9  Q    And also, there seemed to be a bunch of crossouts and

10 additions towards the bottom of the document; am I correct?

11 A    That is also correct.

12 Q    Did you discuss any of this with him at all?  Or did you

13 just take the corrections, take the document back and that was

14 the end of that?

15 A    No, he told me what he was writing in.  As he crossed it

16 out, he advised me what he was correcting.

17 Q    All right.  Did you go into an extended conversation

18 about that?

19 A    No, sir.  I mean, as far as I recall, he made his

20 corrections, I let him make his corrections.  I wasn't going

21 to combat him on it.

22 Q    Now, Mr. Baslan was arrested and he has been in detention

23 ever since the day of his arrest for the last year-and-a-half;

24 correct?

25 A    Yes, sir.

Spivack - cross - Savitt                    648

1    Q    And he's had lawyers.  I'm not his first lawyer; am I?

2    A    No.

3    Q    And there are certain procedures before a defendant

4    accused of a crime will speak with the Government.  I mean

5    this has to go through the lawyers; right?

6    A    That's correct.

7    Q    And you were present in the October 2013 proffer session?

8    A    I was.

9    Q    All right.  Would you know, based on your involvement in

10   the case as the case agent, who asked for the proffer session?

11   A    At this point, sir, I don't remember who asked for it.  I

12   don't recall.  I know there was a lot of discussion back and

13   forth, but I don't recall who asked for it.

14   Q    All right.  So, before this proffer session actually

15   occurred, there was a lot of discussion back and forth; right?

16   A    That is correct.

17   Q    Over a series of weeks; am I right?

18   A    Yes, sir.  And honestly the discussions that happened

19   between the lawyers is usually outside of my purview.  I just

20   know when the proffer was set up I was asked or told about it

21   and obviously attended.

22   Q    And a proffer, a proffer is a meeting with somebody in

23   order for that person to kind of tell his side of the story?

24   A    In essence, yes.

25   Q    All right.  And there's something called the proffer

Spivack - cross - Savitt                    649

1   agreement, which basically says well, we can't use anything

2   that you say against you unless you go to trial and you

3   testify.  I mean, there are certain exceptions; right?

4   A    There are certain exceptions, yes, sir.

5   Q    Proffer is really a fancy word for offer, just offer us

6   what you're saying and we make an assessment of whether or not

7   it's believable; am I correct?

8   A    I suppose that's one way of looking at it, sure.

9   Q    Is there any other way of looking at it?

10  A    I see a proffer as it's an interview.  It's another

11  interview.  It's an attempt to identify if the individual is

12  telling the truth.  As you mentioned, the proffer agreement,

13  there is an agreement that somewhat dictates we won't use

14  certain things against you unless, and there are a variety of

15  factors that precipitate to that, but I see it more of just as

16  an interview.  Secondary interview.  A custodial interview.

17  Q    And this was actually a custodial interview where

18  Mr. Baslan is brought in to this courthouse somewhere else,

19  thankfully not in a courtroom, some lower level of the

20  courthouse in order to be interviewed; correct?

21  A    That's correct.

22  Q    And I was present, you were present, Agent Robertson was

23  present, prosecutors were present, questions were asked,

24  questions were answered; am I right?

25  A    That's correct.

Spivack - cross - Savitt                    650

1   Q    And at the end of that interview, I guess -- well.

2        MR. SAVITT:  Let me withdraw that.

3   Q    The judgment as to whether or not the person who is being

4   interviewed or is being interviewed is telling the truth,

5   that's a judgment that is collectively made by the

6   prosecutors, the agents; am I right?

7   A    Sure, yes, sir.

8   Q    All right.  Would it be fair to say that the bulk of the

9   interview concerned Mr. Baslan's ability to detect storage

10  files of child pornography?

11  A    I wouldn't say the majority of the interview, but

12  certainly we discussed his ability to detect child pornography

13  or files, and he discussed a lot about child pornography and

14  how he could help the FBI, and things of that sort.

15  Q    Okay.  And there are certain discussions about the case

16  as well?

17  A    I believe so, yes, sir.

18  Q    And there were certain discussions about Mr. Baslan's

19  interest in making a documentary?

20  A    He did discuss a documentary.

21  Q    He discussed Jack's background a little bit; right?

22  A    Yes, sir.

23  Q    He answered all the questions that were posed to him?

24  A    He did -- no, sir, he did not.  I take that back.  He did

25  not.

Proceedings                                        651

1   Q    All right.  There was a question posed to him that he did

2   not answer?

3   A    Yes, sir.

4   Q    All right.  What question was that?

5   A    I don't recall exactly, I'm trying to put myself back

6   there, it was quite a while ago and there's been a lot.  But I

7   remember the defendant making a deal.

8            He said there was like a three-pronged thing that he

9   had and he was willing to give us the first prong, but he

10  wouldn't talk about the others if, until we offered him some

11  kind of deal or something.  I don't remember the specifics,

12  but it was very much I'll give you the child porn, but if you

13  want everything else, we need to make a deal, and that's what

14  I recall of that.

15  Q    Well, in recalling that, do you recall that he did again

16  say that he possessed child pornography; am I right?

17  A    That's correct.

18           MR. SAVITT:  Thank you very much, no further

19  questions.

20           THE COURT:  Anything further, Mr. Smith?

21           MR. SMITH:  No further questions.

22           THE COURT:  Thank you.

23           THE WITNESS:  Thank you, sir.

24           (Witness steps down.)

25           THE COURT:  Next witness.

Proceedings                                          652

1          MR. SMITH:  The Government rests.

2          THE COURT:  The Government has completed the

3    presentation of evidence.  The evidentiary phase of the trial,

4    ladies and gentlemen, is now complete, so we will talk a very

5    early break and then return for the summations of Counsel.

6    So, bear with us just a few minutes, we will be ready to go

7    shortly.

8          Do not discuss the case.

9          THE COURTROOM DEPUTY:  All rise.

10         (Jury exits.)

11         (In open court; outside the presence of the jury.)

12         THE COURT:  All right, have a seat, everyone.

13         Mr. Savitt, do you renew your motion?

14         MR. SAVITT :  Yes, Your Honor, I do.

15         THE COURT:  Denied.

16         Before we begin, there are a couple of outstanding

17   issues.  You've been given several versions of the draft

18   charge and I just want to alert Counsel to some final

19   adjustments -- not final, but possibly final given the

20   requests I've received from each of you.

21         Now that Mr. Baslan has testified, an instruction

22   that does not seem to invite controversy regarding his

23   statements as suggested by Mr. Savitt is appropriate and will

24   be added.

25         The Government prefers the lengthier version

                    VB        OCR        CRR

Proceedings                                              653

1    definition of visual depiction.  Mr. Savitt had suggested

2    deleting all but the last sentence.  I am, frankly, somewhat

3    indifferent about it.

4              MR. SMITH:  Your Honor, we're willing to do away

5    with our objection and we're fine with the shorter language.

6              THE COURT:  All right, I think that makes more

7    sense, given the case.

8              The Government has asked that I replace the attempt

9    instruction to avoid any possible misunderstanding.  Frankly,

10   I don't think there could be, that we have two counts to

11   charge an attempt.  I'm going to do that.

12             I think Mr. Savitt's suggested instruction on

13   character evidence is appropriate.  Frankly, I don't read

14   Pujana-mena to be quite as broad as you suggest it is.

15   Obviously, it holds that the specific charge in that case,

16   which is not before me, is not required; but to eliminate the

17   instruction entirely would be, in my view, inviting trouble

18   and certainly, I don't read the Circuit's opinion on

19   Pujana-mena to counsel that.  Indeed, right after the holding,

20   the Court makes it clear what they are not ruling on.

21

22             (Continued on following page.)

23

24

25

VB        OCR        CRR

- Proceedings -                                    654

1        THE COURT:  Let's see, bear with me a second.

2        I had thought that with respect to the count

3   involving violation of New York State or New Jersey law, we

4   could simplify it.  I have not gotten any reaction from any of

5   you.

6        Obviously the facts alleged would violate the State

7   law and I would suggest we instruct them just to that effect.

8   But if you want me to go into the specific provisions, of New

9   York and New Jersey law, I will do that.  It is just by way of

10  suggestion.

11       Any thoughts about that?

12       MR. SMITH:  Your Honor, if the defense doesn't

13  object, we are okay with it.  If they do object to the

14  instruction, we ask for an instruction as to--

15       THE COURT:  Of course.

16       MR. SAVITT:  I'm not sure what it is that I'm

17  supposed to be objecting to.

18       All I know is one thing, Your Honor, I know that it

19  is quite a bit for the jury to, you know, to bite off and

20  digest because of the nuances of the different State statutes.

21  I understand that.  I just don't want to be in a position

22  where the jury might get the idea that we are conceding any of

23  the elements.

24       THE COURT:  Enough said.  Given that, I will leave

25  it the way it is.

- Proceedings -                655

1          MR. SAVITT:  Okay.

2          THE COURT:  There is-- I will add an instruction on

3    the interviews of witnesses, and no duty to call all

4    witnesses.

5          As of this moment, there will be no instruction on

6    punishment, but that could change given any arguments that are

7    made that sensitizes me and potentially the jury to that sort

8    of issue.

9          I think that is probably it.  Unless I have omitted

10   anything, if I have, what is it?

11         MS. DEMAS:  Your Honor, I just wanted to make sure

12   there was a correction that the government made on what is now

13   page 14.  It is the second element of the substantive offense

14   of sexual exploitation of a minor.  I had put-- I had

15   erroneously put instead of producing in there.  I made that

16   change.  I wanted to make sure that is incorporated.

17         THE COURT:  Yes, it is.

18         Anything else, Mike?

19         LAW CLERK:  I think that is it.

20         THE COURT:  Are you ready to proceed, Mr. Smith?

21         MR. SMITH:  Give me five minutes, I have to set up a

22   computer.

23         THE COURT:  Five minutes.  You got it.

24         Mr. Savitt, anything else on the Charge?

25         MR. SAVITT:  No, Your Honor, thank you.

- Proceedings -                                      656

1           (Recess taken.)

2           THE COURT:  Can I see counsel up here.

3           I may ask Mike to read the Charge tomorrow morning.

4    Does anybody have a problem with that?

5           MS. DEMAS:  No, Your Honor.

6           MR. SAVITT:  No.

7           MR. SMITH:  No.

8           THE COURT:  I will be here of course.

9           Thank you.

10          (Jurors enter courtroom.)

11          THE COURT:  Please be seated.

12          Ladies and gentlemen, we are beginning the next

13   phase of the trial, the summations of counsel.  It is an

14   important phase of the trial, but I want you to remember what

15   I told you at the beginning of the trial, namely, what the

16   lawyers say is not evidence.  All right.

17          They are going to make arguments to you about what

18   the evidence is, what evidence you should credit and so forth.

19   That will be readily apparent to you once we get under way.

20   But what they say is not evidence.

21          The evidence is in our record.  Every word of which

22   is taken down by our Court Reporter and will be available to

23   you should you need it during the course of your

24   deliberations.

25          Bear in mind as well, that we all know from our

RB        OCR

- Proceedings -                                    657

1   human experience that our recollections even on the most

2   simple things, can differ, even after a short period of time.

3   So, if you hear something from a lawyer that doesn't quite

4   jive with our own recollection of the evidence, bear in mind,

5   it is your recollection of the evidence that counts.

6          Okay.  And needless to say, if necessary, as I said

7   a moment ago, we can find ways to refresh your recollection.

8   I don't mean to suggest to you that the lawyers are going to

9   try to pull a fast one or misinterpret or anything of the

10  sort.  It is just that on the human level, we all recall

11  things differently so bear that also in mind.

12         Now that the evidentiary phase of the trial is

13  completed, you are not likely going to hear the word

14  "objection".  All right.  That doesn't mean the lawyers who

15  are listening and not arguing, are agreeing with what is being

16  said.  That will be quite obvious to you from the very outset.

17  Okay.

18         Finally, when the summations are completed,

19  actually, more like tomorrow morning, you will be instructed

20  on the law that governs this case.

21         I do not generally permit the lawyers to get into

22  the legal discussion.  That is my department.  All right.  But

23  I do permit the lawyers to make passing reference to some of

24  the basic concepts that we employ about which you will hear

25  further specific instructions from me during my Charge to the

1    jury.  So bear that also in mind.

2           It is an important phase, listen carefully, it won't

3    take us all that long.  We will hopefully have you out of here

4    on time.

5           With that, we will turn first to the government, Mr.

6    Smith for his opening summation.

7           MR. SMITH:  Your Honor.

8           For over a month, in several in person meetings on

9    over a dozen phone calls, the defendant Bebars Baslan,

10   discussed a plan to sexually abuse children.

11          The plan involved his girlfriend Kristen Henry

12   giving oral sex to an infant.  The plan involved an informant

13   for the government bringing his children, bringing his niece

14   to a hotel room, where the defendant would go with his

15   girlfriend, with camera equipment, to take sexually explicit

16   photographs of Kristen Henry with the children, of the

17   defendant -- with the children.  The plan involved the

18   defendant himself sexually abusing a 7-year old.  The plan

19   involved drugging her.  So that she would be sure, to be

20   passed out, so he could do these things.

21          None of those things are in dispute.  There is no

22   dispute that that was the plan.  There can't be any dispute

23   about it, because it is in the recordings.  It is Government

24   Exhibits 1 through five.

25          The defendant also doesn't dispute that he did

1   things in connection with that plan.  On March 19th, 2013, his

2   girlfriend went to a Walgreens, and she got a bottle of

3   Benadryl.  You have seen it.  He gave this bottle to Jack, an

4   informant working for the government, and he gave him

5   instructions on how to use it to drug his 7-year old niece.

6        He arranged code phrases with Jack so he would know

7   if the plan was on for that night.  And later that evening,

8   Jack called him and told him one of the code phrases.  He

9   called him later, 7:59 p.m. on March 19th, he told him, the

10  stuff you gave me is working.  My niece is very groggy, the

11  defendant said, oh, should I come over then.  That is what he

12  did.  An hour later he came over.

13       He came over with the camera that he said he would

14  bring with his girlfriend who is supposed to come.  And the

15  defendant also cannot dispute that sitting in his home, when

16  he left on-- as part of that plan, was a hard drive containing

17  76,000 images and videos of child pornography.

18       The defendant can't dispute any of that.  He doesn't

19  dispute any of that.  He admitted all that on the stand.

20       I would like to go through what the charges are in

21  this case.  The Court is going to instruct you on the law and

22  you should listen to what he says.  But I want to address some

23  of these charges so you see how the evidence fits into them.

24       The defendant is charged with travel with intent to

25  commit sexual acts with a child under twelve.  He is charged

1  with the attempted sexual exploitation of a child, conspiracy

2  to sexually exploit a child, and attempted coercion and

3  enticement of a minor to engage in illegal sexual conduct.

4        Let me talk briefly about the first charge.  Travel

5  with the intent to commit an aggravated sexual assault on a

6  minor.  To prove that charge, the government has to prove that

7  the defendant crossed the state line, with the intent to

8  engage in sexual conduct with a child under 12.

9        You just heard me talk about this plan, while there

10 is no dispute, the defendant crossed the state line, from

11 Brooklyn to Jersey City, from New York to New Jersey, on the

12 night of March 19th.  There is no dispute that the people he

13 thought were there, Daniel, Jack's son, 3 months old, Eli,

14 Jack's son, one and a half years old and Leah, Jack's niece,

15 Steven's daughter, 7 years old.

16        Now, what was the plan that they talked about?

17 Well, to prove that he intended to commit a sexual act with a

18 minor, we have to prove he intended to have some sexual

19 conduct, that includes things like, someone putting their

20 month on a child's vagina or the intentional touching of a

21 child not through clothing, for the purposes of sexual

22 gratification, what was the plan what did he say?  I want to

23 go down on her.  We heard testimony from Special Agent

24 Spivack, what that meant.

25        That meant he wanted to give oral sex to Leah, a

1    7-year old.  He said it twice.

2          He is also charged for aiding and abetting someone

3    else who is committing the same crime, Kristen Henry.  Because

4    the plan was for her to sexually abuse these children also.

5          You will remember, he wanted to make a video of her

6    blowing one of Jack's sons.  You will remember Special Agent

7    Spivack's testimony, that that meant oral sex also.

8          She is just going to pretend to diaper change him,

9    and take a couple of pictures, sucking him off.  That meant

10   oral sex also.  That is it for that charge.

11         The next charge is the attempted sexual exploitation

12   of a child.  That just means that the defendant took a

13   substantial step.  He tried to commit the crime of producing

14   child pornography.  That crime requires someone to use a minor

15   who is under the age of 18, to produce sexually explicit

16   photographs, and because this is a federal crime, they have to

17   do so, using some item that is moved in interstate commerce,

18   something crossed State lines or they have to know that that

19   image is going to move in interstate commerce across State

20   lines.

21         Well, we have just gone through who was supposed to

22   be in that room.  Minors, certainly under 18.  Three months

23   old, one and a half years old, seven years old.

24         And what can the defendant say about it?  These are

25   all his quotes.  These are his words.  I want to make a little

1  video.  Take a couple of pictures.  Build a library of

2  pictures and a video.  A good amount of pictures of Leah.

3  Just jerk off material, is what the defendant said.

4         And if there is any question about what he wants in

5  those pictures, well that is clear too.  He has this

6  discussion with Jack.  What kind of pictures are you talking

7  about?  Underwear on or off?  Off.  Of course.

8         What was he going to use to take those pictures?  He

9  was going to use a camera, that was made in Thailand, a camera

10  made in China and he was going to take those pictures back

11  home with him from New Jersey to Brooklyn.

12         What about conspiracy?  A conspiracy is just an

13  agreement to commit a crime.  Two or more people agreeing that

14  they are going to do some illegal act together.  What is the

15  evidence of that?  Well, a lot of the evidence is right there

16  in that picture.  Kristen Henry, the other coconspirator,

17  talking about committing these crimes.  That is an image from

18  the March 7th meeting where they discuss exactly what she will

19  do to Jack's sons, while the defendant takes pictures of her.

20         They talked about the sexually explicit plans, she

21  talks about how it is going to feel wrong, it is going to feel

22  bad.  She refers to it as our little scheme.

23         She doesn't just talk.  She goes out and she buys

24  the Benadryl.  She texted the defendant from the store to make

25  sure she is getting the right stuff.  She calls him to make

1   sure she is doing the right thing.

2          Then on March 19th, she shows up, which is the last

3   act that Kristen Henry took as part of this conspiracy.

4          Now, last charge, attempted coercion and enticement

5   of a minor.  That is a charge about using a telephone to try

6   to get a minor to have, engage in some illegal sexual act.

7   That is pretty much all there is to it.  The sexual conduct

8   would be illegal under some State law.  It won't surprise you

9   to find out that any sexual contact with a child under twelve

10  is illegal.

11         And the use of a telephone to try to persuade

12  someone, doesn't have to be the child themselves.  It is

13  sufficient if you are attempting to persuade some adult

14  intermediary, a parent, a relative who has control over them.

15         What is the evidence of this?  Government Exhibit 1.

16  It is just a CD of recorded telephone calls talking about this

17  plan.  So that is the charges.

18         So, what is in dispute?  What is the thing that we

19  are actually in dispute in this case?  There is only one thing

20  in dispute.  It is the only thing that the defendant can

21  dispute, what was in his head at the time that he was saying

22  all those things and doing all those things.

23         He says that he didn't intend to do any of it.  You

24  know what, we don't have any mind readers, we can't hook him

25  up to a machine to figure out exactly what he thought at the

- Government's Summation -                    664

1   moment he was arrested.  But you all know from your own lives,

2   that you can tell, what someone intends, from their words,

3   from their action, also from their history.  So let's take a

4   second and let's look at what his words and actions were.

5            Let's talk about the camera first.  The defendant's

6   camera.  You will remember, I just showed you the quotes of

7   him talking about taking pictures.  You will remember the

8   recordings where he says over and over again, what he is going

9   to do.  Taking pictures.  What pictures he is going to take?

10  Exactly what poses.  He talks about how he is going to bring

11  his DSLR, HD, fully charged, fully loaded.

12           What does he do?  On March 19th, he shows up with

13  his DSLR.  Is it fully charged, fully loaded?  He shows up

14  with his lens cloth, in case it gets dirty.  He shows up with

15  extra memory in case he takes so many pictures.  He shows up

16  with an extra battery just to make sure.  He does exactly what

17  he said he would do.

18           Let's talk about the safety picture.  You may

19  remember from the beginning of the recordings, there is a

20  discussion of securing Kristen Henry, taking a picture of her

21  with one of Jack's children so that everyone would be sure she

22  would not go to the police.  You may remember that the

23  defendant brings this up over and over again.

24           And when he talks about it, he talks about it

25  saying, I want this.  Not we need this or you Jack need this.

- Government's Summation -                    665

1    He says, what I want is this picture to secure her.  I want to

2    have some safety on her.  She has access to the next thing, I

3    want to have this.  I want to make sure that I secure it.

4           And the defendant is the one who tells Jack what he

5    is going to do, to secure her.  He talks specifically about

6    the fact that he wants to take this photograph with a

7    different camera, and he is going do that, so he can extract

8    off of that camera's card, that photo and hide it in a certain

9    location on her computer, so that he can tell people where it

10   is, but it is secret and he is going to use what is called

11   food file shredding to destroy the card and that is really

12   just a program to destroy the information on it so it doesn't

13   trace back to him.

14          And, what does he show up with?  He presses Jack,

15   even on the very day of the arrest, that he wants Jack to come

16   to him first to get this picture.  Jack says, no, he keeps

17   pressing, what does he show up with at the hotel?

18          In Kristen Henry's purse, there is another camera.

19   A separate camera, with its own memory card and a card reader

20   that will hook up to her computer.  You heard him testify that

21   was her computer they brought.

22          In other words, he brought every single thing he

23   needed to do the exact thing that he had told Jack he intended

24   to do.  He brought the extra camera to take the picture that

25   would not look like it came from his camera.  He brought the

1    card reader so that when he was done, he could put that

2    picture on her computer and destroy the evidence from the

3    card.

4              What about the drugs?  Now, the defendant testified

5    a little about this.  How Jack was constantly bringing it up.

6    And I ask you to remember, that what you heard, that is in

7    evidence.  If you want to hear it again, just ask.  Because I

8    submit that that is not what happened on those recordings,

9    that Jack is not the one bringing up drugging children.  The

10   defendant is.

11             The defendant brings it up first, on March 7th, when

12   he talks about giving Leah, Jack's niece, Dramamine.  He then

13   later suggests Dramamine or Benadryl and then he later

14   suggests, even Valium or Ambien.  He is the one talking about

15   it, he has information about this.

16             He has looked online, and there is one guy online

17   who is drugging children and they are gone.  They are passed

18   out.  But Benadryl is also more than enough to knock out a

19   kid.

20             He is instructing Jack, it is not the other way

21   around.  And think back to the recordings that you heard from

22   March 19th on the day of the arrest.  You will remember that

23   at the beginning of that day, Jack was instructed he needs to

24   change this plan.

25             The plan had been for him to stop at the defendant's

- Government's Summation -                    667

1   house and do the safety picture.  But he needs to stop that

2   because he can't bring kids to the defendant's house.  The

3   F.B.I. is not going to let that happen.

4          And he gets on the phone with the defendant and

5   tells him, I'm going to go straight to the hotel.  And the

6   defendant says, no, no, you have to stop by here first.  If

7   you don't stop by here and pick up the Benadryl, which he

8   doesn't even call Benadryl.  He says, the pharmacy, and later

9   says, I mean the Benadryl because Jack doesn't seem to

10  understand.  Then I can't come to the hotel.

11         Because if Leah was not drugged, the defendant could

12  not come to the hotel.  And then, he sends out Kristen Henry

13  to go get the Benadryl.  Then, he instructs Jack on what to do

14  with it.

15         We have got the Benadryl and we have also got this

16  orange juice.  Here.  Put the Benadryl in the orange juice so

17  she wouldn't know it is there.

18         He also instructs Jack on how much to give.  He

19  doesn't tell him, you know, just give her a regular dose.  He

20  says, you can even go a little bit over.  Give her an extra

21  dose to make sure she is passed out.

22         Does that sound like someone who intended to get

23  that child not to be drugged?

24         Let me talk about something else, because there is

25  another type of evidence I want to discuss.  What we usually

1  call consciousness of guilty.  A simple fact, guilty people

2  act differently.  They know they are guilty, so they try to

3  conceal evidence.  They try to hide things.

4       How did the defendant act?  He didn't want to talk

5  about anything on the phone.  I'll tell you in person.  Don't

6  spell it out.  Don't text me.  Don't text me pictures.

7       Now, if the defendant wanted evidence that Jack was

8  in the hotel room with a drugged child, why on earth would he

9  tell him not to send that evidence?  He would not even have to

10 go, right?  He could just call the police, the Rabbi, with

11 just a text that Jack sent of his niece knocked out.  But he

12 specifically tells him, don't send me that.  I don't want

13 that.

14       I submit, he does that because his whole scheme that

15 he described, that whole story was false.  And listen to the

16 way he talks about things on the phone.  You will remember

17 when Jack talked about things on the phone, he was explicit

18 because he was making recordings.  He was trying to get the

19 defendant to admit things.  How does the defendant talk about

20 it.  He talks about things like, the next thing.  The next

21 thing was abusing children.

22       She has access to the next thing.  We can get to the

23 next thing.  He doesn't want to mention it by name.  Because

24 he is afraid of Jack maybe recording him.  He is not trying to

25 draw information out of Jack.  He is trying to hide the fact

1    that he is doing this.

2            What about the instructions he gives Jack?  The guy

3    that he will have you believe he thought was a dangerous child

4    molester.  When you register at the hotel, keep Leah in the

5    car so they don't see.  They might be suspicious.

6            Be careful who sees you with the Benadryl.  Benadryl

7    is pretty obvious, you better hide that.  And whatever

8    happens, make sure you dispose of the evidence that we were

9    going to drug this child.  Make sure you dispose of that

10   Benadryl.

11            (Transcript continues on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. SMITH:  (Continuing)  He even wiped his prints

2  off the box.  He didn't do that because he was investigating

3  Jack.  He did that to prevent himself from being caught

4  because that was all evidence of a crime he intended to

5  commit.

6         Let's talk about Leah for a second because we heard

7  more about Leah than just what was in the tapes.  Special

8  Agent Spivack testified that Leah was mentioned as a lure in

9  this case because the defendant had showed an interest in her

10  and we've heard about what that interest was.  You heard from

11  her father, that Jack came over in the middle of the night

12  once, hysterical, and said that the defendant had pulled the

13  picture of Leah up from Facebook and masturbated to it.

14         The defendant himself on the recordings on March 7th

15  talks about how Kristen has been begging him to baby-sit Leah,

16  to drug her and abuse her.  And none of this is a fantasy.

17  Leah is just not some girl he picked out of nowhere.  He knew

18  her.  He lived next door to her.  He gave her a video game

19  console for her birthday.  He knew things about her.  He knew

20  she had celiac disease.

21         And you remember Steven's testimony.  He had offered

22  to baby-sit Leah.  Kristen Henry had offered to tutor her.

23  And we know why he would choose somebody like Leah.  The

24  defendant said himself.  She was vulnerable because she's not

25  as smart.  Do you remember Steven's testimony?  She has

Summation - Smith                                    671

1    learning disabilities.  She was perfect to the defendant as a

2    steppingstone, the perfect first victim.  Then they'll move on

3    to something more advanced is what he said.

4            Let me talk for a second about his past victims.

5            I'm sure everybody remembers hearing from Courtney.

6    She told us that when she was 15, she told the defendant that

7    she had been abused and shortly after, he took her to a bar

8    and she woke up with him sexually abusing her.  She told us

9    about her friends Andrea and Christie who also were sexually

10   abused by the defendant.  And then she told us about how the

11   defendant had come to her years later and asked her to sign

12   things.  She didn't know why.

13           I want you to consider for what motive she had to

14   lie out of this, what she got out of this experience, and I

15   also want you to consider if her story wasn't true, why we

16   find these affidavits purporting to be by these girls that say

17   the defendant didn't sexually abuse them.  The very type of

18   thing that someone like the defendant would think would get

19   him out of it if one of them accused him of the things he had

20   done.  And you remember we looked at the properties,

21   defendant, last saved by, at around the time that Courtney

22   says he came to her.

23           And let's talk about the child pornography.  Let's

24   talk about the 76,000 images, 74,000 images and 2,000 videos.

25   You remember they were on this hard drive.  We heard testimony

Summation - Smith                                        672

1    about how the FBI had to essentially crack it open.

2         The defendant didn't just have all those videos.

3    You heard descriptions of a handful of them.  He didn't just

4    have them.  He talks in the recordings about how he's watched

5    them, how he's seen them.  You remember seeing the website

6    that he admits is where he downloaded them, Lolita Space For

7    You.  Video Collection.  You remember seeing it on the very

8    day of his arrest.  That's where he was earlier that

9    afternoon.

10        And I want to talk about one specific video which

11   actually shows that he, he was not telling the truth, I

12   submit.  He said just this morning that the first time he had

13   seen any of those videos was the day that Jack came over and

14   he showed them to him.  He and Kristen Henry refer to a video

15   as the yogurt video.  We showed you clips of that.  We showed

16   you 1 minute and 31 seconds of that video.  It's a 26-minute

17   long video.  And I want to point out a couple of things.

18        One is there's no yogurt for the first 13 minutes of

19   that video.  And when the defendant talks about that video, he

20   doesn't just call it the yogurt video.  He describes what's

21   going to happen in it before they see it:  She ends up going

22   down on her, the mom ends up going down on her.  That doesn't

23   happen until the end.

24        That wasn't the first time the defendant had seen

25   that video.  The defendant had seen that video before Jack

Summation - Smith                                673

1    ever came over and if you remember the recording, they hadn't

2    just seen it.  It was a favorite of his and Kristen Henry.

3           The final thing I want to talk about is just the way

4    he talks in these recordings.  We listened to a lot of

5    recordings, but I expect that what's going to happen when I

6    sit down is that defense counsel is going to stand up and say

7    that I took this all out of context, that if we had just put

8    it in context, you would see that the defendant was actually

9    trying to elicit things from Jack, he wasn't the one leading

10   this scheme.

11          So, I'm going to play one more recording and I just

12   want you to listen carefully.  Listen to who is leading the

13   plan.  Listen to the way he talks about it, casually, easily.

14          (Audio played.)  (Audio stopped.)

15          MR. SMITH:  I submit he wasn't pretending when he

16   was talking in this clip, he wasn't pretending how kids would

17   be willing, how they would want it, how they would attack you

18   and I submit over the course of the hours of recording, you

19   heard the defendant was not pretending when he talked about

20   sexually abusing those children, when he talked about the

21   plans for Chris and Henry to sexually abuse Daniel and Ellie,

22   infants.  When he talked about his own plan to sexually abuse

23   Leah, a seven-year old, he wasn't pretending to talk about the

24   sexually explicit photographs that he wanted to take.  He

25   wasn't pretending when he gave Jack Benadryl and instructions

1    on how to use it to drug Leah.

2           He meant what he said on those recordings and that's

3    why he showed up on March 19th.  You know it from his words.

4    You know it from his actions.  He is guilty of the crimes

5    charged.  Hold him accountable.  Find him guilty.

6           THE COURT:  Mr. Savitt.

7           MR. SAVITT:  Yes, Your Honor.  Thank you.

8           May it please the Court, members of the jury, when I

9    first spoke to all of you from this podium last week in the

10   opening statement, I promised that this was not going to be an

11   easy trial, that the subject matter of the trial is disturbing

12   and that at the end of the trial, the actors involved in this

13   are people that you're not going to like.  I'm not talking

14   about law enforcement.  I'm talking about Jack.  I'm talking

15   about my client.  I'm talking about Steven.

16          You know, it's interesting that Mr. Smith is very

17   eloquent and very capable.  I respect him and he's doing his

18   job very well, and the same thing is true for Ms. Demas.  They

19   are advocates in this case.  They are advocates in this case

20   in an attempt to persuade you to find my client guilty of

21   horrific crimes.

22          I'm an advocate in this case.  I represent my

23   client.  And as you know already and as you will be instructed

24   I'll bet tomorrow, the burden in this case is always on the

25   prosecution, it never shifts to the defense.  It never does.

1    Never.  Not even when a defendant takes the stand does the

2    burden shift to him.  Oh, yes, you have an absolute right to

3    assess his credibility, to look at his demeanor, to understand

4    what's at stake for him, but the burden doesn't shift for the

5    defense.  It's always on the prosecution.

6            So what does the prosecution come up with?  I don't

7    have a quarrel with the agents in this case.  They're doing

8    their job.  I understand that the agents believed that my

9    client is guilty.  Of course.  We wouldn't be here if they

10   didn't believe that my client was guilty.

11           My client has said I am not guilty and that's why we

12   are here today.  We are here because it is your determination

13   as the judges of fact, as the jurors in this case, to decide

14   not whether my client is innocent, not whether we've proven

15   anything to you, but whether the government has persuaded you

16   beyond a reasonable doubt that my client is guilty of these

17   crimes.

18           Now, what are we talking about?  Who came here to

19   testify about my client and was involved in any interactions

20   with my client?  Nobody.  I didn't see anybody come through

21   this door.  Never, never, never saw Jack other than in a

22   photograph.  Now, the government has every right not to call

23   Jack.  They don't have to call Jack.  They can seek to prove

24   their case beyond a reasonable doubt without calling Jack.

25           Jack's a troubled guy.  We know that from the

Summation - Savitt                                              676

1   testimony of Agent Spivack.  We know that from the testimony

2   of my client.  We know that from the testimony of his brother

3   Steven.  He's bipolar which is unfortunate.  He's manic.  He's

4   depressive.  He's a drug addict.  He tried to commit suicide.

5   He's been in mental institutions.  You can bet your boots you

6   wouldn't want to spend too much time with Jack and you can

7   pretty much figure out what kind of witness Jack would be.

8   And yet, when you listen to the tapes, you say, Oh, my God,

9   Jack certainly sounds -- I mean, if you didn't know anything

10  about the case and you listened to the tapes, you would say

11  Jack really sounds like he wants to get into this thing.

12          Forget about opening statements, closing statements,

13  government witnesses.  Just listen to the tapes.  Jack sounds

14  really believable.  And it sounds like he's conspiring with

15  Mr. Baslan because Mr. Baslan is also saying, Oh, man, let's

16  do this thing, terrible things which fortunately, fortunately

17  nobody ever could have done, nobody could ever commit.

18          So, if Jack were on trial, he would sure sound

19  guilty to me and perhaps to you but Jack's not on trial.  Jack

20  never entered the courtroom.  We don't know Jack.  My client

21  is on trial.  He sounds guilty on the tapes, absolutely he

22  does.  He took the stand.  He explained to you what his

23  involvement was about, what his intent was.  And you might say

24  to yourself, well, gee, that's really convenient.  I mean, he

25  really sounds guilty.  What else are you going to say?  I'm

1    guilty.  You've got to say something.

2         You know, I guess Mr. Smith is right to some extent.

3    He did predict very accurately that I would come up here and

4    say he would pick a few things, he picked and chose a few

5    things in those conversations.  There are a lot of

6    conversations.  I don't see anything in the prosecutor's ELMO

7    display where Mr. Baslan says:  We don't even have to touch

8    the children.  All I want to have is a safety picture with

9    Kristen.  All I want is a safety picture with Kristen.  I want

10   to make it look like it.  And that's all on the audio.

11        So, without getting into any fancy displays, in a

12   conversation or two before the actual events that transpired

13   in Jersey City, New Jersey, on March the 19th late afternoon,

14   Baslan tells Jack, Yes, all right, exactly, and then I want

15   that, the initial photo thing done.  Jack says, You need a

16   picture first before you go.  And Baslan says, Yes.  Baslan

17   says, Which minimally we can accomplish just today, I guess,

18   if we cancel everything else.  Jack says, You just want to at

19   least get that out of the way?  And then he says, Yeah, for

20   sure.

21        I mean, is there a reason why Baslan does not trust

22   Kristen Henry, his co-conspirator?  A safety picture on

23   Kristen Henry?  Why?  It makes no sense.  They're

24   co-conspirators.  They're charged in the indictment with

25   committing the same crimes, with crossing the state line from

Summation - Savitt                                              678

1   New York into New Jersey to commit sexual abuse of a child

2   with attempts, with conspiracy, with using telephones.

3   They're in on it together.  What safety, what kind of

4   nonsense, safety against whom?  That doesn't make any sense at

5   all, not at all.

6          If Mr. Baslan is actually guilty, if his intent

7   really was to abuse children, that makes no sense.  It does

8   make sense, however, that Mr. Baslan's intent was to get Jack

9   in there to take a picture.  Nothing else has to happen.

10  Nothing else has to happen.  You know, we have a lot of tapes,

11  but, you know, what we also don't have?  We have a lot of

12  gaps.

13         These things start the tapes, February 15th.  Next

14  tape, February 20-something or other.  What happened in

15  between?  Where was everybody?  Was everybody on vacation?

16  Were people abroad, you know, taking a rest?  Was there

17  absolutely no contact between Jack and Baslan in the scheme

18  where Baslan wants to abuse children?

19         Yes, there was one weekend where Baslan went to

20  Vegas for a shoot.  He came back, but that doesn't explain the

21  absence and the gaps and why there's nothing else.  I'll tell

22  you what explains it.  What explains it, we can derive from

23  Agent Spivack's testimony, when he candidly told us about

24  their system, I forgot what it's called, a UTECH or SHMUTECH

25  or some acronym, that actually is hooked up to Jack's devices

1   as long as Jack gives the FBI the devices.  When there's an

2   incoming call, it won't necessarily record.  Where there's an

3   outgoing, it will.  When there is no interaction with any

4   recorders, you don't hear anything.  What is being discussed?

5          Why is it there, in certain of the conversations,

6   there are certain allusions being made to a plan?  When was

7   the plan formulated?  We don't get that on tape, do we?  We

8   don't know when the plan was formulated based on the tapes.

9   We don't know who formulated the plan based on the tapes.  We

10  don't know anything about who formulated anything from any of

11  the government witnesses in this case and we sure won't hear

12  that from Jack because Jack never made it to the Sands.

13  Instead, the only testimony we have on this comes from

14  Mr. Baslan.  The only testimony.

15         If you listen to the tapes, and you hear

16  conversations about when Jack says, Yes, I'm going to pick up

17  the boys, I'm going to pick up Leah, and you hear the reaction

18  by Mr. Baslan, he didn't know he was being tape recorded.  The

19  only one who knows that there is a tape recording going on is

20  the absentee Jack.  And Baslan is obviously not happy about

21  the fact that Leah is supposed to be there.  And you can hear

22  it in his voice.  You want to hear something in his voice?

23  Listen to their evidence.  Listen to the tapes.

24         Leah, yes, Jack is picking up Leah.  He's taking her

25  to the hotel in New Jersey and think about this.  A hotel in

1  New Jersey?  For God's sake.  People live in Brooklyn.  Nobody

2  has to go to Jersey.  It's all a ruse, right?  It's all a ruse

3  because, guess what, going from one place in Brooklyn to

4  another ain't crossing state lines so, you know, we've got to

5  take them over to New Jersey.

6          Agent Spivack says, you know, there are two reasons.

7  We want to really show, we want to really show Mr. Baslan was

8  interested in going ahead with these crimes and for that

9  reason, we have to take him out 20 minutes away so that, you

10  know, he doesn't make a U-turn and turn back.  I mean, they'll

11  keep on saying that the tapes keep saying things beyond a

12  reasonable doubt.  Who needs to lure him out?  For what?

13          Or is it the second reason, because, you know, it's

14  crossing state lines and there's nothing wrong with that.  I'm

15  not saying it's illegal.  It's not.  The FBI has a right to do

16  that.  Crossing into New Jersey has never been a wonderful

17  experience but over here, it sets up a jurisdictional hook and

18  they're saying just look at the tapes.  Now, he's crossing

19  into New Jersey to do something with the kids and he's got a

20  camera.

21          Look at this.  Government Exhibit 12.  The Sony

22  camera.  This is actually a very nice camera and he's got this

23  with him and that shows, Mr. Smith argues, that they were

24  going to take pictures of Kristen doing terrible things to

25  kids and him going down and all sorts of things.

1       That same camera that doesn't take pictures of Jack
2   as Jack pleasures himself when all this is happening, as he
3   did on March 7th when he's fully wired in a portion of the
4   conversation that, thankfully, was not played for us so you
5   don't have to listen to this stuff but it's in evidence, he's
6   a government cooperator.  He's looking at child pornography.
7   He's going, Oh, I can't stand looking at child pornography.
8   And at the end of the conversation, you didn't hear it, but
9   it's in evidence and it's on that tape of March 7th, it is
10  Jack pleasuring himself beyond belief for quite a while, quite
11  a lot of stamina, right after looking at the child
12  pornography.  There are no audios or videos of my client doing
13  anything like that, but there is one of Jack.  Do you ever
14  wonder why Jack is not here to testify?

15      We heard from Agent Spivack what happened.  Now, it
16  may not be illegal to do such a thing, but let's face it, it
17  gives you an insight into the kind of person Jack was.  It
18  gives you an insight into what his interests are and it gives
19  you something to think about quite seriously as to what it was
20  that led to these events on March the 19th of last year.

21      Steve comes here and testifies.  Steve wasn't
22  involved in any of these events, but he comes here basically
23  as the proxy, as the proxy for the absent Jack and he says,
24  oh, there came a point in time, I don't remember when, it was
25  sometime at the beginning of last year, I don't know how cold

Summation - Savitt                                    682

1   it was because I didn't step out of the house, and my brother

2   was crying uncontrollably and although he's a drug addict and

3   although he has psychiatric problems and although he's a real

4   sick guy, and I'm paraphrasing, obviously, this time it was

5   different, different this time.  He kept on saying, I'm sorry,

6   I'm sorry, I'm sorry, I should, I'm sorry, I should have hit

7   him, I should have hit him.

8          We heard from both Agent Spivack and Steven that

9   when Jack gets angry, he hits people.  He rearranges spaces if

10  he has to when he gets angry.  But here he is saying, oh, my

11  God, oh, God, oh, God, I'm so sorry.  And he can't talk for

12  20 minutes and then he says something terrible happened.  He

13  was over at Bebars' house, he's pleasuring himself to a

14  picture of Leah, your daughter, and he's also looking at child

15  pornography.  I'm going to be having sex with Kristen but I

16  happen to see all of this.

17         Come on, ladies and gentlemen of the jury.  Yeah,

18  Leah's photo may have been on Facebook.  Who has access to

19  Leah's photo on Facebook, Uncle Jack maybe?  And when, when

20  Jack is crying and saying he's looking at child pornography

21  and he's looking at Leah and he's pleasuring himself and he's

22  going crazy, naturally you would call the police right away.

23  No.  No.  It took him two or three weeks before he made any

24  report.  Two or three weeks.  That's what Steven said.  Two,

25  three weeks.

1           What's happening during those two or three weeks?

2    That's a pretty long period of time not to report something

3    like this.  I mean, here's a dangerous predator and here is an

4    uncle who comes in and says, you know, I'm breaking down but,

5    you know, now it's different, now it's serious.  And it's your

6    daughter, brother Steve.  And what does brother Steve do?

7    Nothing.  There's no reports.  There's nothing.  You don't go

8    anywhere.  You don't talk to anybody.  Three weeks later.  I

9    believe Steven says three weeks later.

10          Let's look at their other witness.  You know, you

11   got Courtney.  You pull her in from Buffalo and I have to tell

12   you, she was quite an interesting young woman.  I mean, this

13   is the same young woman who says, Oh, my God, what a monster,

14   what a monster this man is.  You know what he did to me?  He

15   did A, B, C, X, Y, Z and I trusted him.  Oh, the dreams that a

16   young girl has, dreams.

17          On direct examination, she told us that she was an

18   aspiring model.  On cross-examination, she told us that she

19   was in the entertaining field and that whilst in Chicago, she

20   broadened her horizons and became a pole dancer in a

21   gentlemen's club.  She also told us, Well, I'm an actress, I

22   was a child actress.  And then as we probed some more, we find

23   out that she's not just a child actress, she acts in movies

24   and she's a musician and she's an artist and, yes, she went to

25   birthday parties with Mr. Baslan and friends and this is after

Summation - Savitt                                        684

1    the terrible things that he did.

2              If he goes into a room and he does something that is

3    unmentionable to Agre and to her, naturally you would tell

4    mom, you would tell someone.  No.  No complaints.  No reports.

5    Nothing.  Nothing.

6              (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CMH        OCR        RMR        CRR        FCRR

Summation - Savitt                                    685

1    (CONTINUING)

2          MR. SAVITT:  And the first we hear of it?  Is nearly

3    a decade later, right here in Federal Court.  That's the first

4    time anybody gets to hear it.  She's an actress all right.

5    But don't expect to see her on the red carpet at next year's

6    Oscars.

7          You know, they find three affidavits, form

8    affidavits, one of them says Andrea.  Another one says

9    Cortney -- no, I'm sorry, not Cortney -- yes, Cortney.  And a

10   third one, I think, is Kristen with last names blocked out in

11   order to protect the innocent, and they're unsigned.  Why

12   would Mr. Baslan do such a thing if he didn't rape, pillage,

13   ravage?  Why?

14         Well, you know when these particular affidavits were

15   prepared?  We're talking about two years, three years after

16   the events that Cortney is talking about.  And you know what?

17   They're unsigned.  They're completely unsigned.  And who

18   prepares them?  A woman by the name of, I think her name is

19   Binder or something like that.  And what do we know about

20   this?  Oh, this shows consciousness of guilt.  Why would he

21   have prepared this in the first place?  Why not have them

22   signed?

23         According to Cortney, he said, oh, I want you to

24   sign an affidavit, she didn't see the affidavit, had her

25   friend throw him out of the coffee place.  You would think

1   that a predator, a dangerous person, Mr. Baslan, would go

2   again and try to get her to sign, get her to sign.  No, that's

3   the end of it.  Nothing happens.  Until she takes the stand

4   and she does her acting, quote, unquote.

5           That's the Government's case.  They're asking you to

6   find that my client intended to commit unspeakable crimes

7   based on some idiot that they dredged out of Buffalo who

8   obviously is a complete flake, based on an interaction with a

9   person who we never saw on the stand who is suicidal,

10  bi-polar, a drug addict and whose brother comes in as a

11  stand-in.

12          And then they say hey, listen to those

13  conversations, it proves his guilt.  Not if Mr. Baslan was

14  trying to do something to stop Jack, whom we never were able

15  to look at, to listen to in person, to hear on direct, to

16  evaluate on cross-examination.  They don't have to do it.

17  They chose not to bring him in.  Jack ain't dead.  He's alive.

18  And he's probably still a very sick guy and that's why we

19  never saw him.  And yet they're saying that's enough to

20  convict beyond a reasonable doubt.  Case closed.  It's over.

21          And then when we hear cross-examination of

22  Mr. Baslan and the suggestion that Mr. Baslan sent out E-mails

23  from a correctional institution saying listen, this is being

24  monitored, consciousness of guilt.  That's what it says on the

25  sign, it's being monitored.  He knows that the Government is

1   reading this stuff.  How does the Government know to read it

2   to you?  This is because they get it all time.  It's

3   monitored.  Why should he let the Government know what he's

4   thinking?  The Government isn't his friend.  They want to put

5   him away.  They want to convict him.  Would you want somebody

6   who's not your friend to listen to anything that you're

7   saying?  But when somebody's locked up, they've got no choice

8   and people on the outside may not know that, so he tells them

9   that oh, my God, what a terrible thing.

10          And why didn't he come in to speak to the Government

11  sooner than October of 2013?  Why not?  Why?  Because he

12  person who's locked up can't just say excuse me, I want to go

13  out, I want to speak to the Government, I want to tell them

14  this and that.  There were attorneys involved.  There was a

15  succession of attorneys.  There were plans being made back and

16  forth.  It doesn't happen like that.  There are formalities to

17  go through.  There are rights to be protected.  There is

18  something called a proffer agreement which protects somebody

19  in a very limited way.  You don't just go in, call up and say

20  hey, guys, I want to talk to you.  Nobody does that.  Nobody

21  can do that.  So, the idea that he waited, he didn't wait.  It

22  takes time.  It's a process.

23          He was arrested a year-and-a-half ago, we're on

24  trial today.  Why weren't we on trial a year ago?  Because

25  it's a process.  It's not that we didn't want to go to trial a

Summation - Savitt                                                688

1    year ago.  It's because there are certain procedures that

2    don't concern us at this trial that happen before trial,

3    including the disclosure of statements of witnesses for the

4    Government.

5           Now, the Government has a right not to give us the

6    statements until shortly before trial, that's fine, there's

7    nothing wrong with that and that's what happened here.  And

8    I'm not complaining about it, but don't you think that

9    Mr. Baslan has a right when he's locked up for a crime that he

10   says he did not commit to say to his friends please, don't,

11   these are monitored calls, oh, my God, this is consciousness

12   of guilt.  Consciousness of guilt.

13          There are a lot of questions in this case.  I mean,

14   you could accept the Government's version and just convict my

15   client of everything and that's it, that's the end of it.

16   That's a possibility.  Then of course, as I'm asking you to

17   do, you can choose not to be reflexive and to think about it

18   and to look at the evidence and to really think this through

19   and to bear this mind that the burden of proving guilt is the

20   Government's beyond a reasonable doubt and that we don't have

21   a burden.

22          Yes, I've assumed certain burdens, I'm speaking to

23   you right now.  Of course, I'm speaking to you right now

24   because we have to tell you both sides of the story.  You see

25   two sides of the coin.  It's not just a one-sided coin or it's

1   not one of those trick coins with two heads and you flip it

2   and the Government always wins.  It doesn't work like that.

3          If you look at the evidence, and I'm sure you will,

4   if you listen to the tapes that you believe are important, if

5   you assess the credibility of the witnesses, if you consider

6   not only the evidence presented to you but also, the evidence

7   that was not presented to you, witnesses that they didn't have

8   to present but frankly, could have, like Jack, and you try and

9   consider all that, and ask yourselves is there a reasonable

10  doubt here that the Government has not proven its case?  Is

11  there a reasonable doubt?

12         Does it make sense that he would meet my client as

13  safety over his girlfriend co-conspirator, or tell Jack that,

14  you know, no touching has to be done at all or be reluctant

15  about the inclusion of Leah into this?  Or the fact that Jack

16  who professed to be, according to Agent Spivack more and more

17  upset about this whole thing with child pornography but who

18  manages just simply to pleasure himself endlessly and sounds

19  that can disgust anybody.  And it's in the tapes, you haven't

20  heard it, but we get the tapes ahead of trial, we listen to

21  those things, there are no secrets here, nobody's being

22  blind-sided between the parties.

23         Then you ask yourselves whether or not the

24  Government did prove its case.  Ask yourselves why it is that

25  in thousands and thousands of files and terabytes and all this

1   stuff, why don't we have one image, one image despite a

2   year-and-a-half investigation and analysis and FBI experts

3   coming from Washington and there's another encryption expert

4   and then there's another expert and experts upon experts upon

5   experts, not one image of Mr. Baslan with a child or abusing a

6   child.  I'm talking about a prepubescent child.  An eight year

7   old child.  A one-and-a-half year old child.  A three-month

8   old child.  Nothing.  Zero.  Zero.

9          And it's not for lack of trying either because if

10  they found even one image, we would have seen it.  They do a

11  real good job and they're entitled to do that, that's their

12  obligation.  So that's what they call the lack of evidence.

13  It's not there.  It's not there, Ladies and Gentlemen of the

14  Jury.

15         So, please, I know you're keeping an open mind.  I

16  know you're listening to all this.  I know that you're also

17  going to listen to Ms. Demas's delivery of a rebuttal

18  summation and in our system because the Government has the

19  burden of proof that never shifts, they get to speak first,

20  they get to speak last and boy, I'll tell you, I once heard

21  somebody say it's sort of like having an argument with your

22  spouse, but your spouse gets the last word, you know?  It's

23  tough.  It's tough.  You just sit there.

24         So I'm going to ask you, because I'm not smart

25  enough to remember everything in the case, I'm not adept

1   enough or skilled enough to anticipate everything that

2   Ms. Demas is going to tell you.  I'm sure she'll be very

3   eloquent.  Please, put yourselves in the position of asking

4   what would that lawyer have said in response to that.

5   Remember, it's not an even fight here.  You know why it's not

6   an even fight?  Because they're the ones who have to prove the

7   case.  They have to prove that somebody is guilty of crimes

8   beyond a reasonable doubt.  So, it's not an even, even playing

9   field.

10          It's also not an even playing field because there

11  are certain witnesses that frankly, are not available to us.

12  I'm talking about Jack.  They're not available to us.  Could

13  we have called Jack?  I suppose.  What; so we could see him

14  unravel on the stand?  The Government decided not to call him,

15  why should we.  They have to prove the case, not we.  It's

16  their responsibility, not ours.

17          Now, for Mr. Baslan, this was the most important

18  case in his life.  Literally, in his life.  For you as jurors

19  in this case I'm asking you, and I know that you're taking it

20  seriously, but understand the importance with which this case

21  is taken by my client who is sitting back there accused of

22  terrible crimes, locked up for a year-and-a-half and listening

23  to people come in from Buffalo and listening to Steven come in

24  and saying thing that they claimed they heard or claimed they

25  saw and it turns out that guess what?  You can't rely on them.

Summation - Savitt                                                    692

1    At all.

2              You couldn't rely on Cortney to go and get you a

3    sandwich.  You can't rely on somebody like that to find guilt

4    beyond a reasonable doubt.  You can't rely on somebody like

5    Steven who's obviously, obviously got a stake in this case

6    with his brother as well.  And also, is a person who neglected

7    to say his own involvement in certain activities that are less

8    than savory, and who comes in all of a sudden a week before

9    trial, I found out I'm a witness.  Jack's the one who's going

10   in and out of the U.S. Attorney's Office before trial.  A week

11   before trial I find out I'm a witness.  Oh boy.  Proof beyond

12   a reasonable doubt?  You decide.

13             This is not the a question of innocence, guilt.

14   This is a question of whether they were able to prove this

15   case beyond a reasonable doubt.  I submit to you that they

16   have not.

17             I thank you for your attention and the seriousness

18   with which you take this case.

19             THE COURT:  We'll take a short break, ladies and

20   gentlemen.

21             THE COURTROOM DEPUTY:  All rise.

22             (Jury exits.)

23             (In open court; outside the presence of the jury.)

24             THE COURT:  Okay, five minutes.

25             (Recess taken.)

1           THE COURT:  Mr. Smith, are you ready?

2           MR. SMITH:  I am ready, Your Honor.

3           THE COURTROOM DEPUTY:  All rise.

4           (Jury enters.)

5           THE COURT:  All right, please be seated.

6           Finally, we have a brief rebuttal from the

7    Government.

8           Mr. Smith.

9           MR. SMITH:  Thank you, Your Honor.

10   SUMMATION

11   BY MR. SMITH:

12          MR. SMITH:  Mr. Savitt said a number of things that

13   I'd like to address.  But I'm going start at the end.

14          He said you can't rely on the Government's witnesses

15   and that you should acquit because of that.  But you were all

16   here for all the evidence.  You know that what we're asking

17   you to rely on in is your own ears.  Your own eyes.  Because

18   our best witness was the defendant himself; the defendant when

19   he didn't know he was talking to law enforcement before he had

20   a year-and-a-half to come up with some story.  And Defense

21   Counsel wants to talk a lot about Jack.  Let's talk about

22   Jack.

23          Defense Counsel says Jack is really unreliable.  He

24   is so unreliable, he has mental illness, you can't believe a

25   word he says.  Why didn't the Government put him on there?

Summation - Smith                                    694

1   Why is it?  What would you do if you're Special Agent Spivack,

2   somebody comes into your office and says I know about a plot

3   to molest children, but I know I have a bad history, I've done

4   some bad things, I have some mental illnesses.  You wouldn't

5   kick him out of your office.  These are serious crimes.  You'd

6   think, what do I need to do to investigate this in a way that

7   doesn't rely on this person, right?

8           And that's exactly what Special Agent Spivack

9   testified he did.  He didn't sign him up right away.  He said

10  all right, let me set you up, make some recordings, let's see

11  if this pans out.  And it did pan out.  And so he made more

12  recordings.  Because ultimately, those recordings don't rely

13  on Jack's memory.  They don't rely on anyone's memory.  They

14  are what they are.  They're unambiguous.  They tell the story.

15          I understand Defense Counsel wanted to put Jack on

16  the stand to show him to be a guy who was in mental

17  institutions.  There's no hiding that.  Who had sex with

18  underage girls.  There's no hiding that.  The Government

19  brought that out.  Jack is who he is.  But ultimately, the

20  difference here is that Jack went to the police and he made

21  those recordings, that evidence that you've heard.

22          Let's just take a second and let's imagine that what

23  the defendant was saying was true.  Let's imagine that that's

24  what happened, that he found out that Jack had sexually abused

25  his own niece, his own kids and that he was conducting this

1    investigation.

2            What do we have to believe in that story?  Well, we

3    have to believe that the defendant was having his

4    conversations about a guy he thought was a dangerous sexual

5    predator.  He wasn't going to call the police, though, because

6    he was afraid that it would being reported in his community,

7    but he wasn't going to call the anonymous hotline either.  I

8    don't know why.  He didn't talk to the parents of these

9    children who he knew.  I mean, one of them was Steven, who

10   lived next door to him, who was a friend.

11           He talked to a rabbi.  He didn't want to mention the

12   name.  When we pressed, Rabbi Liebowitz.  What's he associated

13   with?  I don't really know, he's just a guy I saw at events.

14   No contact information.  His phone's in evidence, we could

15   look at his phone.  We could look at the phone numbers for six

16   other rabbis, none of them Rabbi Liebowitz.  He didn't call

17   any of them.  If he called one of them, we would have been

18   able to find him and talk to him.

19           Let's talk about how this investigation progressed.

20   He said he is trying to get evidence that Jack had sexually

21   abused a child so that he could bring it to a rabbi; right?

22   He didn't record any meetings.  He wasn't apparently going to

23   record anything until Jack actually brought a child.  He said

24   he was planning to record things.  Had he recorded those

25   meetings, he certainly would have captured discussion about

1    molesting children.  He could have brought that to a rabbi.

2         And what was his end?  What was the end of this

3    investigation?  He said the end was that they were going to go

4    to the hotel and you remember, he was going to switch the

5    Benadryl, but he didn't.  And after he didn't switch the

6    Benadryl, he instructed Jack to give more than the dose that's

7    required because he was so concerned about Leah.  And then,

8    when he found out that Jack was going to go and actually drug

9    her with the Benadryl he bought, the defendant didn't call

10   anybody.  He didn't call any parents.  He didn't call the

11   police.  He didn't think at that point maybe he should call

12   the Rabbi, maybe he should do something more.  No, he waited.

13        He waited for Jack to call him, to give him the code

14   word and then he headed -- no.  Wait.  He didn't head to the

15   hotel then.  He didn't do anything then.  He waited until Jack

16   called him and said Leah is very, very groggy, that stuff you

17   gave me, that worked.  And then, he didn't call the police.

18   He didn't call motel security.  He didn't call Leah's parents.

19   He didn't call Jack's wife.  He took his time, eventually got

20   dressed and moseyed on over to the hotel with all the stuff he

21   said he'd bring to take sexually explicit photographs of kids.

22        Now I want to be clear on this next point.  The

23   defendant is absolutely correct, the burden is on the

24   Government in this case.  It's all on us.  No matter what, it

25   never shifts to the Defense.  Even though he's taken the

1  stand, it is still our burden to prove every element of those

2  charges we discussed, but nothing prevents the Defense from

3  putting on evidence that is consistent with what it tells you

4  is the truth and here we heard from the defendant and he told

5  you things.

6           But you can think about what you didn't see, too.

7  You didn't hear from this Rabbi.  And you didn't hear any of

8  these recordings he says he has, which he claims were on his

9  phone whens it was seized and then Special Agent Spivack

10  destroyed.

11          I would also like to take a second, I'd like to talk

12  about Kayla.  You might remember she came up.  She was Jack's

13  daughter.  The daughter that he didn't want involved in this

14  investigation.  Kayla comes up on the recordings on March 7th

15  and during that conversation the defendant asks Jack about

16  Kayla and about how things came out with her.  And what Jack

17  says is that Kayla told him that she had been sexually abused

18  by her grandfather.  And Kayla doesn't come up for a little

19  while.

20          And then Kayla comes up again on March 18.  And the

21  defendant says I think Kayla was trying to initiate with you

22  and she wanted to have sex with you.  That's why she told you

23  about being molested by her grandfather.  And he says here's

24  how I would do it if I were trying to have sex with your

25  daughter.  A child.  I would have her talk about her

1   experiences and I wouldn't do anything for a little while.

2   And then she would open up and then, you could initiate with

3   her.  She's going to get it from somewhere, might as well be

4   you.  Defendant says that.

5          He goes even further.  He says now that she's

6   reported that she's been sexually abused, if she says that

7   you've abused her, she won't have any credibility.  Really.

8   The defendant talking to a guy he thinks is a dangerous sexual

9   predator is going to tell him your daughter wants to have sex

10  with you, here's the way you do it and if do you, and she

11  tells anyone, she doesn't have any credibility.  That's not

12  just not reporting something.  That's a road map.  He's not

13  trying to stop Jack from molesting any children.  He's

14  encouraging him to molest children.  You heard it on the tape

15  I played earlier.  He' talking about when children are

16  willing; how you can tell; how much they want it.  His story

17  doesn't make any sense.

18         And his fallback, his fallback is there are no

19  images of the defendant actually sexually abusing a child.

20  You know what?  In a perfect world that would be every case.

21  The defendant's not on trial because he actually abused these

22  children.  There were no children in that room.  The defendant

23  is on trial because he was going to abuse them.

24         But you know, while Defense Counsel is so confident

25  about what is on his computer, I just want you to keep in mind

Summation - Smith                                      699

1   the testimony you heard about the encrypted files that were

2   never broken open.  Who knows what was on those.  But

3   ultimately, we don't have to know what was on those because

4   the evidence is about what he was going to do on March 19th

5   and that evidence is clear.  The defendant was telling the

6   truth on recording after recording when he talked about

7   sexually abusing children and that's why he didn't take any

8   action to stop Jack in this plan that he claims.

9            That's why he took the actions he said he would

10  take.  He got Jack the Benadryl.  He gave him instructions on

11  how to use it and when it was time for him to go to where he

12  thought he would find those two infants and that drugged

13  child, he took a little while to get his stuff together, his

14  cameras, his computer to make sure that he was ready to do all

15  the things he said he'd do.  You don't need anyone else's

16  testimony for that.  You can hear the defendant himself say

17  it.

18

19            (Continued on following page.)

20

21

22

23

24

25

- Proceedings -                    700

1          MR. SMITH:  He is guilty of these crimes, and the

2     evidence is all there.  If you want to hear more of it, just

3     ask.  And if you listen to it again, you will hear, you will

4     hear it in the defendant's words, and you heard about his

5     actions.  He was going to do the things he said.

6          Find him guilty.

7          Thank you.

8          THE COURT:  All right.  Ladies and gentlemen, it has

9     been a long day, even though it is a relatively short day.  We

10    are going to break.  The Court instructions will be given to

11    you at 9:30 tomorrow morning and the case will be in your

12    hands later tomorrow morning.

13          It is critical that you continue to abide by my

14    instructions, not to discuss the case with anyone.  Get some

15    rest.  Have a pleasant evening, and we will see you 9:30 sharp

16    tomorrow morning.

17          Good night.

18          (Jurors left the courtroom.)

19          THE COURT:  Good night everyone.

20          MR. SAVITT:  Good night, Judge.

21          (Matter adjourned for the day.)

22

23

24

25

701

<u>I N D E X</u>

<u>WITNESS</u>                                                    <u>PAGE</u>


B E B A R S   B A S L A N

    DIRECT EXAMINATION

    BY MR. SAVITT                                      526

    CROSS EXAMINATION                                  562

    REDIRECT EXAMINATION

    BY MR. SAVITT                                      604

M A R Y A N A   K O W A L

    DIRECT EXAMINATION

    BY MR. SAVITT                                      608

    CROSS EXAMINATION                                  619

**SPECIAL AGENT AARON SPIVACK**                            621

    DIRECT EXAMINATION                                 621

    CROSS EXAMINATION

    BY MR. SAVITT                                      635

    SUMMATION

    BY MR. SMITH                                       693


<u>E X H I B I T S</u>


  Exhibit 55                                             629

VB       OCR       CRR